```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED: 02/15/17 _____       │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOINT STOCK COMPANY CHANNEL
ONE RUSSIA WORLDWIDE, et al.,

        Plaintiffs,

        -against-

INFOMIR LLC, et al.,

        Defendants.

---

16-CV-1318 (GBD) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. GEORGE B. DANIELS**

**BARBARA MOSES, United States Magistrate Judge.**

       Before the Court for report and recommendation are two motions to dismiss portions of the Complaint in this action, the first filed by defendant Infomir LLC (Infomir) on June 2, 2016 (Dkt. No. 66), and the second filed by defendant Goodzone TV (Goodzone) on June 28, 2016. (Dkt. No. 82.) Each defendant moves to dismiss various claims asserted against it pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs argue that the Complaint is adequately pleaded as filed, but in the alternative seek leave to amend pursuant to Fed. R. Civ. P. 15(a)(2). For the reasons that follow, I respectfully recommend that plaintiffs' motion for leave to amend their pleading be GRANTED and that the motions to dismiss be DENIED AS MOOT.

## <u>BACKGROUND</u>

### I.    Factual Allegations

       Plaintiffs are a group of Russian broadcasters suing to redress what they characterize as the "pirating" and resale of their programming to Russian-speaking consumers in the United States, over the internet, without authorization or license fees. Plaintiffs Joint Stock Company Channel One Russia Worldwide (Channel One), Closed Joint Stock Company CTC Network (CTC), Closed Joint Stock Company TV Darial (TV Darial), Closed Joint Stock Company New Channel (New Channel), Limited Liability Company Rain TV-Channel (Rain TV), Limited Liability Company

Veriselintel (Veriselintel), Open Joint Stock Company Accept (Accept), and Limited Liability Company Comedy TV (Comedy TV) are headquartered in and organized under the laws of the Russian Federation. Compl. (Dkt. No. 1) ¶¶ 2-3; 26, 34, 36, 38, 40, 43, 46, 50. They produce and distribute Russian-language television programming and licensed content (the Programming) in the Russian Federation and worldwide, via cable and satellite. *Id*. Plaintiffs own and operate "famous television channels" (Channels) including "Channel One," "Channel One Russia Worldwide," "Dom Kino," "Muzika Pervogo," "Vremya:dalekoe i blizkoe," "Carousel International," "Telekafe," "CTC," "Che TV," "Domashny," "REN TV," "TNT-Comedy," "Rain TV-Channel," and "Nostalgia." *Id*. ¶¶ 26-31, 34, 36, 38, 40, 43, 46-47, 50-52. Each of these Channels "bears a prominent trademark or trademarks" and "contains repeated identifications about the source of the Programming." *Id*. ¶ 5. The Channels are identified by these "famous marks." *Id*. ¶ 82.

"Subject to limited exceptions," plaintiffs' Programming is produced and "primarily first broadcast in the Russian Federation." Compl. ¶¶ 2, 78; *cf. id*. ¶ 73 ("[t]he Programming and Channels are both broadcast into the United States from the Russian Federation in the first instance"). The Programming is distributed "via cable and satellite" and is encrypted "such that only authorized recipients may access it." *Id*. ¶¶ 3-4. In addition to distributing their Programming via cable and satellite, each plaintiff has entered into exclusive licensing agreements with third parties to distribute the Channels and Programming via internet protocol television (IPTV) in the United States. *Id*. ¶¶ 32, 35, 37, 39, 41, 44, 48, 53, 84.[1] Only the relevant license holders are

---

[1] IPTV is "distribution of television programming over a network running the IP protocol." Ray Horak, *Webster's New World Telecom Dictionary* 252 (1st ed. 2008). A consumer using IPTV software "is permitted to access a unique Internet Protocol ('IP') address from which the consumer can access a livestream of the program." Compl. ¶ 21.

authorized "to broadcast, re-broadcast or otherwise transmit Plaintiffs' protected, copyrighted programming in the United States via IPTV or otherwise." *Id.* ¶ 86.

Defendant Infomir is a New York limited liability company based in Brooklyn, New York. Compl. ¶ 55; *Id.* Ex. 1. Infomir owns and operates the website www.infomirusa.com. *Id.* ¶ 55. No further information is provided concerning that website. Infomir also sells receivers "with which it is possible to view plaintiffs' channels without authorization." *Id.* ¶¶ 55-56. Defendant Goodzone is a "for-profit entity" with its principal place of business in Brooklyn. *Id.* ¶ 62. Goodzone owns and operates the website www.gudzon.tv. *Id.*[2] Neither Infomir nor Goodzone is licensed or otherwise authorized to broadcast plaintiffs' Channels or Programming. *Id.* ¶¶ 33, 35, 37, 39, 42, 45, 49, 54, 91. The Complaint also names as defendants "Panorama TV" (Panorama), Matvil Corporation d/b/a Ethnic Television Network, Mikhail Gayster, Actava TV Inc., Master Call Communications, Inc., Master Call Corporation, Rouslan Tsoutiev, and 50 John Doe defendants. *Id.* at 1-2. None of these defendants has moved to dismiss pursuant to Rule 12(b)(6).[3]

The Complaint refers collectively to all defendants, including Infomir and Goodzone, as "Defendants," Compl. at 1-2, and many of its core allegations are addressed generally to the conduct of "Defendants" without further specification. For example, plaintiffs allege generally that defendants "hack, capture, or otherwise acquire without permission the encrypted signals of the Plaintiffs' Channels and transmit those signals to [their] servers which in turn stream the

---

[2] The Complaint alleges that Goodzone owns and operates "www.gudzone.tv," hosted by GoDaddy.com, Compl. ¶ 62, but attaches a screenshot showing that GoDaddy.com hosts a website called "www.gudzon.tv." *See id.* Ex. 6 (Dkt. No. 1-6).

[3] Defendant Panorama, appearing under the name Panorama Alliance, LP (*see* Dkt. No. 95), has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. (Dkt. No. 105.) That motion remains pending.

wrongfully acquired signals over IPTV to [their] paying customers." *Id.* ¶ 87.[4] In order to access the streaming signals, defendants' customers "(a) access the Defendants' websites, (b) download software . . . and/or receive equipment necessary for viewing the pirated content . . . [and] (c) subscribe to Defendants' service," that is, agree to the relevant terms and conditions and pay a fee. *Id*. ¶ 90. "Defendants' infringement is accomplished through the use of interactive websites" which are "registered, hosted and operated in the United States," *id*. ¶ 7, and which defendants operate for the purpose of "marketing the Channels and Programming to U.S. consumers within this judicial district for a monthly fee." *Id*. ¶ 14. Defendants "mislead consumers by making it appear on their Websites that they have the right to rebroadcast Plaintiffs Programing [sic] and Channels by, among other things, displaying the Channels [sic] famous marks." *Id.* ¶ 15.

Although all defendants allegedly resell plaintiffs' "wrongfully acquired signals" to their own paying customers without a license, they do not necessarily use the same method. According to plaintiffs, a consumer who has made a payment through one of defendants' websites "is typically invited to download an [IPTV] player *or* to purchase hardware . . . similar to a cable box." Compl. ¶¶ 16-17 (emphasis added). The IPTV player is a form of downloadable computer software that "permits consumers to watch the Channels and Programming on various consumer electronics including televisions, computers and hand-held devices" by accessing "a unique [IP] address from which the consumer can access a livestream of the Programming." *Id*. ¶¶ 19, 21. The hardware, which looks like a cable box, is a receiver. *Id*. ¶¶ 17, 90. Both the IPTV player and the receiver permit consumers "to bypass the Broadcasters' encryption to view the Programming." *Id.* ¶ 17.

---

[4] "Streaming" is "[t]he process of providing a steady flow of audio or video data so that an internet user is able to access it as it is transmitted." *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498, 2503 (2014) (quoting *A Dictionary of Computing* 494 (6th ed. 2008)).

Plaintiffs do not describe the method used by either of the moving defendants to acquire plaintiffs' signals. However, they attach a screenshot of "Infomir's homepage offering receiver boxes." Compl. ¶ 90. The page appears to be located at www.infomir.us/index.html. *See id.* Ex. 14. It shows various models of devices labeled "IPTV Set-Top-Boxes," with prices listed. *Id.* The Complaint does not explain what relationship, if any, exists between "www.infomir.us" and "www.infomirusa.com," which is the website identified in the body of the Complaint as belonging to defendant Infomir. *See id.* ¶ 7. No other information is provided concerning the set-top boxes. The website does not appear to make any reference to plaintiffs' Channels or Programming and does not reproduce any of plaintiffs' logos. Also attached to the Complaint is a screenshot of a page headed "gudzon.tv," which appears to display television channel listings (in Russian), including the logos of several of plaintiffs' Channels. *See id.* Ex. 15.

## II.     Procedural Background

Plaintiffs filed this action on February 19, 2016, asserting claims for: (1) unauthorized publication or use of communications in violation of the Federal Communications Act of 1934 (Communications Act), 47 U.S.C. § 605(a); (2) circumvention in violation of the Digital Millenium Copyright Act (DMCA), 17 U.S.C. § 1201; (3) trademark infringement in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (4) false advertising in violation of § 43(a) of the Lanham Act, *id.*; (5) tarnishment in violation of § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (6) copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.*; (7) secondary copyright infringement; (8) deceptive business acts and practices in violation of N.Y. Gen. Bus. L. § 349; (9) unfair competition in violation of New York common law; and (10) a declaratory judgment. Compl. ¶¶ 92-156. On March 8, 2016, the Hon. George B. Daniels, United States District Judge, referred the case to me for general pretrial management. (Dkt. No. 35.)

On May 31, and again on June 2, 2016, Infomir filed its motion to dismiss Counts One through Nine of the Complaint as to it.[5] Infomir notes that the only allegations specific to it in the Complaint are that it operates a website and manufactures and sells set-top IPTV boxes "capable" of receiving plaintiffs' Channels. Infomir Mem. of Law (Dkt. No. 67), at 1. Since plaintiffs have not alleged facts showing that the set-top boxes are "illegal," or are "intended for or limited to nefarious purposes," or that Infomir is responsible for the conduct of any other defendant, no claim for relief – in Infomir's view – has been stated against it. *Id*. at 1-2. On June 1, 2016, Judge Daniels expanded my referral to include dispositive motions. (Dkt. No. 64.)

On June 24, 2016, plaintiffs voluntarily dismissed Counts Eight and Nine, which asserted claims under New York law, as to Infomir. (Dkt. No. 77.) Also on June 24, plaintiffs filed their opposition to Infomir's motion and a cross-motion for leave to amend their Complaint (Dkt. Nos. 78, 81), supported by a declaration from their attorney Raymond Dowd (Dkt. No. 79) and an affidavit from their investigator Christopher Vidulich. (Dkt. No. 80.) The declaration and affidavit, both of which include numerous attachments, make new factual assertions relating to Infomir, its set-top boxes, the information and software provided on its website, and the source of the unauthorized IPTV transmissions of plaintiffs' Channels which are viewable using its hardware. However, plaintiffs did not submit a proposed Amended Complaint. On July 1, 2016, Infomir filed its reply memorandum (Dkt. No. 85), arguing that the Court should not consider the new evidence and documents submitted in connection with plaintiffs' opposition to Infomir's motion to dismiss, and that plaintiffs' request for leave to file an amended complaint should be denied as futile.

---

[5] Because of a technical error in the format of its initial electronic submission, Infomir re-filed the same motion on June 2, 2016. (Dkt. Nos. 63, 66.)

On June 27, 2016, Goodzone filed its own motion to dismiss Count One and Counts Three through Nine as to it. (Dkt. No. 82.) In its motion papers, Goodzone "adopts and incorporates" most of Infomir's arguments. Goodzone Mem. of Law (Dkt. No. 83) at 2-5. On July 11, 2016, plaintiffs voluntarily dismissed Counts Eight and Nine as to Goodzone, filed their opposition to Goodzone's motion to dismiss, and cross-moved for leave to amend the Complaint and for partial default judgment against Goodzone as to Counts Two and Ten. (Dkt. Nos. 87, 88, 89.) Plaintiffs' motion papers did not include any new factual allegations or evidentiary material concerning Goodzone. Goodzone did not file a reply, but on August 8, 2016, it submitted an opposition memorandum in response to the motion for default judgment. (Dkt. No. 99.) On August 15, 2016, plaintiffs withdrew that motion. (Dkt. No. 100.)

On January 17, 2017, I heard oral argument on the motions addressed in this Report and Recommendation. During the hearing, plaintiffs' counsel clarified that, to the extent their opposition papers include and rely upon new evidence, that evidence is intended to be considered only in connection with their cross-motions for leave to amend the pleadings. *See* Tr. of Jan. 17, 2017 Hrg. (Dkt. No. 167), at 10:1-6. Since I have considered plaintiffs' new evidence only for that purpose – and since, as discussed below, I have concluded that the motions for leave to amend should be granted, making the motions to dismiss moot – there is no need for me to consider whether to treat the motions to dismiss as motions for summary judgment.[6]

---

[6] When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "the district court is normally required to look only to the allegations on the face of the complaint" and documents that are "part of the pleading[s]." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *accord Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 122-23 (S.D.N.Y. 2010) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998), and collecting cases) (a plaintiff "may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss"). If "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under

## DISCUSSION

### I.   Leave to Amend Pursuant to Fed. R. Civ. P. 15(a)(2)

Fed. R. Civ. P. 15(a)(1)(B) permits a party to amend its pleading once as a matter of course within 21 days after service of a responsive pleading or a motion under Rule 12(b). Plaintiffs just missed this 21-day window. They filed their first cross-motion for leave to amend on June 24, 2016 – 24 days after Infomir first filed its motion to dismiss and 22 days after Infomir refiled that motion.[7] The cross-motions are therefore governed by Rule 15(a)(2), which provides that a court "should freely give leave [to amend] when justice so requires."

Amendments are generally favored, "to facilitate a proper decision on the merits," *Conley v. Gibson*, 355 U.S. 41, 48 (1957); however, the decision to grant or deny leave to amend is "within the sound discretion of the trial court," *Bay Harbour Mgmt., LLC v. Carothers*, 474 F. Supp. 2d 501, 502 (S.D.N.Y. 2007) (citing *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990)), and a court may deny leave to amend for "good reason," such as "undue delay, bad faith, futility of amendment, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Michael Miller Fabrics, LLC v. Studio Imps. Ltd., Inc*.,

---

[Fed. R. Civ. P.] 56." Fed. R. Civ. P. 12(d); *accord Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006).

[7] Plaintiffs filed their second cross-motion for leave to amend on July 11, 2016, only 14 days after Goodzone filed its own motion to dismiss. According to the Advisory Committee, however, the 21-day period to amend after service of a Rule 12(b) motion is "not cumulative. If a responsive pleading is served after one of the designated motions is served, for example, there is no new 21-day period." Fed. R. Civ. P. 15 advisory committee's note to 2009 amendments; *see also Jones v. Prof. Acc't Servs*., 2016 WL 6242927, at *2 (E.D. Tenn. Oct. 6, 2016) (21-day period was triggered by first-filed answer to complaint and was not extended when remaining defendants obtained extensions of time to file their own answers). The Goodzone motion therefore did not extend or re-trigger plaintiffs' right to amend their complaint unilaterally.

2012 WL 4513546, at *2 (S.D.N.Y. Oct. 1, 2012) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).

### A. Delay, Prejudice, Bad Faith

Delay is not a significant issue here, given that plaintiffs made their cross-motion 24 days after Infomir filed its motion to dismiss the Complaint and before any defendant answered that Complaint. By the same token, permitting plaintiffs to amend would not prejudice defendants in any way. "In evaluating prejudice, courts consider whether an amendment would 'require the opponent to expend significant additional resources to conduct discovery and prepare for trial' or 'significantly delay the resolution of the dispute.'" *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 367 (S.D.N.Y. 2016) (quoting *Block*, 988 F.2d at 350), *reconsideration denied*, 2016 WL 4399325 (S.D.N.Y. Aug. 17, 2016). Undue prejudice may arise, for example, when an "amendment [comes] on the eve of trial and would result in new problems of proof." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981). Here, the parties are far from trial. No defendant has answered, no Rule 16 conference has been held, and no discovery deadlines have been established. Moreover, plaintiffs seek to amend in order to strengthen their existing claims with additional factual allegations, rather than to add new claims or parties. *See Michael Miller Fabrics*, 2012 WL 4513546, at *2 (finding no undue prejudice where plaintiff sought leave to amend to add "more specific factual allegations regarding the timing of the alleged infringements" following filing of motion to dismiss).

Nor is there any evidence of bad faith. Bad faith can be demonstrated where, for example, a plaintiff requests leave to file an amended complaint only after the court dismisses its original complaint, offers no explanation for an unreasonably long delay in making its request, and its decision not to plead the new causes of action earlier appears to have been "tactical." *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990). Here, plaintiffs moved for leave to amend promptly upon reviewing defendants' motions to dismiss. Moreover, their failure to move even more promptly – so as to avail themselves of the 21-day window under Rule 15(a)(1)(B) – appears to have been inadvertent rather than tactical.

### B.      Futility

No matter how promptly a Rule 15(a)(2) motion is made, "it is not an abuse of discretion to deny leave to amend" if the amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam); *accord Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("where . . . there is no merit in the proposed amendments, leave to amend should be denied"). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)). However, a motion for leave to amend should not be denied on futility grounds unless "it appears beyond doubt that the defect cannot be cured by the amendment." *Sullivan v. Schweikhard*, 968 F. Supp. 910, 916 (S.D.N.Y. 1997). *See also In re Winstar Commc'ns*, 2006 WL 473885, at *2 (S.D.N.Y. Feb. 27, 2006) (Daniels, J.) (faced with a motion to amend, "[t]he Court need not determine the merits of the claims, but must simply determine that the proposed claims are colorable and not frivolous").

Although the better practice for a plaintiff seeking leave to amend is to submit a proposed amended pleading with its motion papers, leave to amend may be granted where no proposed amendment is before the court, *see, e.g*., *The Youngbloods v. BMG Music*, 2008 WL 919617, at *1 (S.D.N.Y. Mar. 28, 2008) (Daniels, J.) ("it is appropriate that plaintiff be afforded an opportunity to amend, given its representation that the amended complaint will sufficiently state a plausible claim to relief beyond the speculative level"), or even, in unusual cases, where the proposed amendment is itself deficient. *See, e.g.*, *Podszus v. City of Mount Vernon, N.Y.*, 2007 WL 2230106, at *4 (S.D.N.Y. July 12, 2007) (holding that proposed amended complaint "suffers from the same defect as the original complaint," but giving plaintiff 20 days to file a pleading adequately alleging the missing facts "or to send me a letter indicating that no such allegation could be asserted"). If "any amendment would be futile," however, the motion should be denied. *Malester v. Adamo*, 2010 WL 5065865, at *5 (S.D.N.Y. Dec. 8, 2010) (Daniels, J.).

In this case, because plaintiffs have not submitted a proposed amended complaint, I cannot determine whether their next pleading will succeed in stating cognizable claims – and, if so, which claims against which defendants. However, for the reasons discussed below in connection with the motions to dismiss, I conclude that Counts Three and Four are adequately pleaded as to defendant Goodzone, and that the deficiencies in the remaining counts are at least potentially remediable on repleading. For this reason I respectfully recommend that the District Judge grant plaintiffs' cross-motions for leave to amend and give them 21 days to file an amended complaint.

I also recommend that the District Judge deny the motions to dismiss as moot, which is the "preferred course" where a case is in this posture. *Roller Bearing Co. of Am. v. Am. Software, Inc.*, 570 F. Supp. 2d 376, 384 (D. Conn. 2008) (citing *Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 956 (8th Cir. 2002)) (the "preferred course is to grant leave to amend even if doing so

renders moot the motion to dismiss"). *See also Michael Miller Fabrics*, 2012 WL 4513546, at *2 (denying as moot motions to dismiss after granting cross-motion for leave to amend); *W.B. David & Co. v. De Beers Centenary AG*, 2005 WL 3704690, at *2 (S.D.N.Y. Sept. 2, 2005) (same).

## II.     Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

Should the District Court elect to address the motions to dismiss on the merits, rather than treat them as moot, I recommend that Infomir's motion be granted, that Goodzone's motion be granted as to Counts One, Two, Five, Six, and Seven, and that, as to the dismissed claims, plaintiffs be given leave to replead within 21 days.

### A.     Legal Standards

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." If that statement fails to present "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the deficient claims may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Generally, when a court dismisses a complaint for failure to comply with Rule 8, "the dismissal should be without prejudice to replead[ing]." *Cole v. John Wiley & Sons, Inc.*, 2012 WL 3133520, at *7 (S.D.N.Y. Aug. 1, 2012) (citing *Salahuddin v. Cuomo*, 861 F.2d 40, 42-43 (2d Cir. 1988)).

When faced with a Rule 12(b)(6) motion, the trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy*, 482 F.3d at 191. However, those factual allegations "must be enough to raise a

right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The court may not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). This pleading standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 385 (S.D.N.Y. 2009) (internal quotation marks omitted).

At a minimum, the complaint must give each defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Littlejohn v. City of New York*, 795 F.3d 297, 309 (2d Cir. 2015) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 507 (2002)). "Nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *Hudak v. Berkley Grp., Inc.*, 2014 WL 354676, at *4 (D. Conn. Jan. 23, 2014). The standard cannot, however, be satisfied "[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct." *Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001) (summary order); *accord Howard v. Mun. Credit Union*, 2008 WL 782760, at *12 (S.D.N.Y. Mar. 25, 2008) ("While Rule 8 does not prohibit 'collective allegations' against multiple defendants . . . , it does require that the allegations be 'sufficient to put each [d]efendant on notice of what they allegedly did or did not do.'"); *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999), *aff'd sub nom. Dove v. O'Hare*, 210 F.3d 354 (2d Cir. 2000) (citing *Morabito v. Blum,* 528 F. Supp. 252, 262 (S.D.N.Y. 1981)) (finding that the complaint, which made "no reference to" certain defendants named in the caption, failed to state a claim against those defendants). A laundry list of potentially actionable conduct, without "specification of any particular activities by any particular defendant,"

cannot withstand a motion to dismiss. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *In re Elevator Antitrust Litig.*, 2006 WL 14700994, at *2-3 (S.D.N.Y. May 30, 2006)).

### B.   Count One – Communications Act

Defendants Infomir and Goodzone both move to dismiss Count One, which alleges "unauthorized publication or use of communications for commercial advantage" in violation of the Communications Act, 47 U.S.C. § 605(a). Compl. ¶¶ 96, 98. Infomir moves to dismiss on two grounds: first, because the relevant portions of § 605(a) apply only to "radio communications" (including satellite transmissions), not to transmissions over the internet; and second, because the Complaint alleges only "passive receipt," rather than active interception, of plaintiffs' signals by Infomir. *See* Infomir Mem. of Law at 8-9. Goodzone moves to dismiss solely on the first ground. *See* Goodzone Mem. of Law at 3. Plaintiffs argue that they have adequately stated a claim against both moving defendants under § 605(a) or, in the alternative, under 47 U.S.C. § 605(e)(4). Pl. Mem. of Law dated June 24, 2016 (Dkt. No. 81), at 9-10.

I conclude that the third sentence of § 605(a) does not require pleading or proof that the defendant intercepted a satellite transmission or other radio communication. The statute reaches the unauthorized retransmission of a signal that originated as a satellite transmission, even when it is thereafter received or transmitted over the internet. However, plaintiffs do not clearly allege that the Programming "hijacked" by the moving defendants ever traveled via satellite. I therefore conclude that Count One, as presently pleaded, fails to state a cognizable claim under § 605(a). Because the Complaint does not contain any claim under § 605(e)(4), I do not consider plaintiffs' further contention that they have alleged facts that would support such a claim.

### 1.   Statutory Framework

47 U.S.C. § 605 "generally prohibits the unauthorized use or publication of wire or radio communications." *Int'l Cablevision, Inc. v. Sykes*, 997 F.2d 998, 1007 (2d Cir. 1993) (*Sykes I*). As most recently recodified in connection with the Cable Communications Policy Act of 1984, Pub. L. 98-549, 98 Stat. 2997, § 605(a) now states, in relevant part:

> [N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.
>
> No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.
>
> No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.
>
> No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a) (line breaks between sentences added). These four sentences are generally analyzed separately, as described below.

The first sentence of § 605(a) was "intended to regulate the conduct of communications personnel . . . rather than to address the problem of unauthorized interception or reception of communications," *Dish Network L.L.C. v. World Cable Inc.*, 893 F. Supp. 2d 452, 468-69

(E.D.N.Y. 2012) (quoting *Int'l Cablevision, Inc. v. Noel*, 859 F. Supp. 69, 75 (W.D.N.Y. 1994)), and therefore is not relevant here. *Accord Int'l Cablevision, Inc. v. Sykes*, 75 F.3d 123, 131 (2d Cir. 1996) (*Sykes II*).

The second, third, and fourth sentences of § 605(a) refer only to "radio" communications (rather than to communications "by wire or radio," as in the first sentence). The term "radio communication," as used in the Communications Act, has long been understood to include satellite transmissions. *See, e.g.*, *Sykes I*, 997 F.2d at 1008 (discussing legislative history of 1984 amendments to Communications Act). Transmissions by coaxial cable, IPTV, or other means that do not involve "over the air" signals may be "wire" communications, but they are not "radio" communications. *See, e.g.*, *Sykes II*, 75 F.3d at 130-31 (distinguishing between "cable-borne" and "over the air" transmission); *Joe Hand Promotions, Inc. v. Maupin*, 2016 WL 6459631, at *5 (E.D.N.Y. Oct. 31, 2016) ("courts in the Second Circuit consider communication sent over the internet to be communication sent via wire"); *J & J Sports Prods., Inc. v. Jaschkowitz*, 2016 WL 8198768, at *4 (E.D. Ky. July 11, 2016) ("an Internet transmission qualifies as an interstate communication by wire" for purposes of § 605(a)).

The second and fourth sentences of § 605(a) "indisputably require an 'interception'" by their express terms. *Dish Network*, 893 F. Supp. 2d at 471. The term "intercept" or "interception," as used in § 605(a), "means to stop, seize, or interrupt prior to arrival; or taking or seizing before arrival at the destined place." *Premium Sports Inc. v. Connell*, 2012 WL 691891, at *2 (S.D.N.Y. Mar. 1, 2012). Liability under the second and fourth sentences, therefore, requires pleading and proof that the transmission was intercepted. *See id.* (dismissing claim under second and fourth sentences of § 605(a) because "there must be an 'interception' of a signal or a transmission"). The third sentence of § 605(a) does not include the word "interception." Instead, it prohibits

"receiv[ing] or assist[ing] in receiving" radio communications by a person "not being entitled thereto . . . for his own benefit or for the benefit of another not entitled thereto."

### 2.  Interception

While "some cases have held that, similar to the second sentence, the third sentence of 605(a) also requires an interception . . . . the vast majority of cases have persuasively held that '[s]ection 605(a) prohibits much more than just the unauthorized interception of signals.'" *Dish Network*, 893 F. Supp. 2d at 472. Thus, a person who is authorized to receive television broadcasts via satellite, but who then retransmits that signal to third parties via IPTV, without authorization and for financial gain, violates the third sentence of § 605(a). *See id.* at 473. *See also, e.g.*, *Directv, LLC v. Wright*, 2016 WL 3181170, at *4 (W.D.N.Y. June 3, 2016) ("[c]ourts have repeatedly interpreted [the third] sentence [of § 605(a)] to prohibit the 'unauthorized divulgence or use of [satellite] communications,' even if the communications have been 'received legally'") (citing *Dish Network*, 893 F. Supp. 2d at 472); *Joe Hand Promotions, Inc. v. That Place, LLC*, 2012 WL 2525653, at *3 (E.D. Wis. June 29, 2012) ("While the second and fourth sentences of § 605(a) require both an unauthorized 'interception' and a divulgence of the transmission in order to establish liability under the Act, the first and third sentences of [§] 605(a) do not similarly require an 'interception'"). Since liability under the third sentence does not require pleading or proof that the defendant intercepted the plaintiff's signal, Count One should not be dismissed on this basis.

### 3.  Satellite Transmission

The third sentence of § 605(a) does, however, require the receipt and use of a communication "by radio." Similarly, the second and fourth sentences impose liability only where the defendant has intercepted or received a previously intercepted "radio communication." Infomir argues that since its set-top boxes "are capable only of accessing the internet," its alleged conduct is "outside of the purview of 605." Infomir Mem. of Law at 9. *See also* Goodzone Mem. of Law

17

at 3 ("the statute only applies to radio communications and is not applicable to the case at bar"). The moving defendants argue, in essence, that since they are alleged to have received and/or retransmitted plaintiffs' Programming over the internet, rather than over the "air," their conduct is not within the reach of § 605(a).

The Second Circuit has taken a more nuanced view. In *Sykes II*, the defendants below sold "'pirate' cable descramblers or 'black boxes,'" used by cable TV customers to gain access to premium channels without paying for them. 75 F.3d at 126. The cable operator received those premium channels via satellite at its "system headend" and then delivered them to customers' homes, in scrambled form, via coaxial cable rather than via any form of radio communication. *Id*. The district court held that defendants could not be held liable under any portion of § 605 because that section (unlike 47 U.S.C. § 553, which specifically addresses interception of cable TV transmissions) does not "prohibit[ ] the interception and decryption of television signals transmitted via cable." *Sykes II*, 75 F.3d at 128 (quoting *Noel*, 859 F. Supp. at 73).

The Court of Appeals reversed, holding that nothing in the language or legislative history of § 605 barred its application "to the subsequent cable transmission" of a television signal previously transmitted by radio. *Sykes II*, 75 F.3d at 132. In a footnote, however, the court made it clear that the signal must have been transmitted by satellite (or some other form of radio communication) at *some* point along its journey:

> As noted at the outset of this opinion, not all programming distributed from the headend of a cable television system originates as radio communication. Thus, if it could be proved in a particular case that the interception at issue, or the distribution of a descrambler for the purpose of such interception, would not involve any radio-originated communications, [there would be no violation of § 605].

*Id*. at 131 n.5. *See also Cmty. Television Sys., Inc. v. Caruso*, 284 F.3d 430, 435 (2d Cir. 2002) ("section 605 applies in cases involving the sale of descrambling devices as long as the head end of the cable system at issue receives at least some radio transmissions").

The *Sykes II* rule is now routinely applied in § 605(a) cases throughout the Second Circuit.[8] Moreover, I can find no principled distinction between a coaxial cable and the internet (at least the wired internet) for purposes of liability under § 605(a).[9] So long as the Programming at issue was at one point transmitted by satellite, therefore, plaintiffs' § 605(a) claim should not be dismissed simply because the same Programming was traveling by internet by the time defendants received or retransmitted it.[10]

---

[8] *See, e.g.*, *J & J Sports Prods., Inc. v. Emily Bar Rest. Inc.*, 2016 WL 6495366, at *1 (E.D.N.Y. Sept. 27, 2016), *report and recommendation adopted*, 2016 WL 6495526 (E.D.N.Y. Nov. 2, 2016) (§ 605 is "applicable to thefts of cable communications, provided that the cable programming originated as a radio or satellite communication"); *J & J Sports Prods., Inc. v. La Ruleta, Inc.*, 2012 WL 3764062, at *2 (E.D.N.Y. Aug. 7, 2012), *report and recommendation adopted*, 2012 WL 3764515 (E.D.N.Y. Aug. 29, 2012) (§ 605 "applies to the theft of a radio communication whether or not the radio communication is thereafter sent out over a cable network"); *J & J Sports Prods., Inc. v. Garcia*, 2011 WL 1097538, at *2-3 (S.D.N.Y. Mar. 1, 2011), *report and recommendation adopted*, 2011 WL 1046054 (S.D.N.Y. Mar. 22, 2011) (defendant's interception of a boxing match violated § 605(a), even if defendants accessed it via "an illegal cable converter box or device," because "at least part of the . . . transmission was accomplished by satellite"); *Cablevision of Conn., L.P. v. Noferi*, 371 F. Supp. 2d 110, 114 (D. Conn. 2005) ("the unauthorized interception of Cablevision's cable services, after the signals are received from the satellite, fall within the scope of section 605(a)").

[9] *Cf.* Amy McCann Roller, *From Ship-to-Shore Telegraphs to Wi-Fi Packets: Using Section 705(a) to Protect Wireless Communications*, 68 Fed. Comm. L.J. 525, 537-38 (2016) ("Wi-Fi falls squarely within the statutory definition of 'radio communications'" as used in the Communications Act).

[10] Several courts in other circuits have allowed plaintiffs to proceed under § 605(a) without demonstrating that the signals that defendants intercepted, received, or retransmitted over the internet were ever previously transmitted by "radio," and at least one district judge within our circuit "agrees with the courts that have allowed plaintiffs to proceed under a theory of liability that contemplates interception of communications via the internet." *Maupin*, 2016 WL 6459631, at *5 (collecting cases); *see also Zuffa, L.L.C. v. Price*, 2013 WL 5310212, at *2 (N.D.N.Y. Sept. 20, 2013) (granting default judgment under § 605(a) where defendant used an "unauthorized device to intercept coded and scrambled internet transmissions"). In *Maupin*, the defendant tavern owners allegedly used a Roku Steaming Player to access a televised sporting event (the Telecast)

### 4.  Application to Complaint

Infomir is correct that the Complaint fails to allege that it – as opposed to others – "intercepted" plaintiffs' signals as that term is used in § 605(a). *Compare* Compl. ¶¶ 6, 12, 23, 86, 95 (alleging generally that "Defendants" intercepted, "hack[ed] into," "capture[d]" or "pirate[d]" plaintiffs' encrypted signals), *with id.* ¶ 56 ("Infomir is selling receivers with which it is possible to receive Plaintiffs' channels without authorization."). However, as discussed above, this is not fatal to a cause of action predicated on the third sentence of § 605(a).

Infomir is also correct that at present it stands accused of receiving and retransmitting plaintiffs' programs via internet rather than over the air. *See* Compl. ¶ 56 & Ex. 14. Plaintiffs' motion papers indicate that any amended pleading will make similar, although more detailed, allegations. *See* Pl. Mem. of Law dated June 24, 2016, at 5-8 (asserting that Infomir sells set-top boxes that stream plaintiffs' Programming via IPTV from a U.S.-based website and also offers customers "middleware," downloadable from a website in Germany, enabling them to view IPTV without any additional fees). Under *Sykes II*, however, plaintiffs need not allege that Infomir (or any other defendant) received or retransmitted satellite signals, so long as the signals they received and retransmitted "originated as a radio or satellite communication." *Emily Bar Rest. Inc.*, 2016 WL 6495366, at *1; *see also Garcia*, 2011 WL 1097538, at *2-3 ("at least part of the . . . transmission" must have been "accomplished by satellite").

---

via internet and exhibit it to their patrons. However, "[t]he Telecast originated via satellite, and was subsequently retransmitted to cable and satellite television companies." *Id.* at *1-2. I therefore do not read *Maupin*, or any contested case in the Second Circuit (the default motion in *Zuffa* was unopposed), to dispense entirely with the requirement of a "radio communication" as a predicate for liability under the second, third, and fourth sentences of § 605(a). Nor, of course, could I recommend a modification of the rule announced in *Sykes II* and applied in *Caruso* without further guidance from the Court of Appeals.

The Complaint, in its present form, fails adequately to allege that the signals retransmitted by the moving defendants were ever carried "over the air." *See* Compl. ¶ 3 (plaintiffs "distribute the Programming worldwide *via cable and satellite*") (emphasis added); *id.* ¶ 97 (defendants "are receiving, transmitting or assisting in transmitting interstate foreign broadcast communications *by wire or radio*") (emphasis added). For this reason, should the District Judge reach the motions to dismiss, I recommend that Count One be dismissed with leave to replead. On amendment, to state a cognizable claim under § 605(a), plaintiffs must plainly allege that each defendant's conduct involved "radio-originated communications." *Sykes II*, 75 F.3d at 131 n.5. If one or more plaintiffs cannot so allege, § 605(a) "may not apply." *Dish Network*, 893 F. Supp. at 473.[11]

### C.  Counts Two, Six and Seven – Copyright Act and DMCA

Count Two asserts a claim for circumvention in violation of the Digital Millennium Copyright Act, while Counts Six and Seven assert claims for direct and secondary copyright infringement, respectively. Infomir moves to dismiss all three claims. Goodzone moves to dismiss only the Copyright Act claims. Because analysis of the DMCA claim requires the Court to answer the preliminary question of whether plaintiffs' broadcasts are protected by Title 17 of the United States Code, I first analyze the Copyright Act claims and thereafter proceed to the DMCA claim.

### 1.  Direct Copyright Infringement

Count Six asserts a claim for copyright infringement pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the Berne Convention for the Protection of Literary and Artistic Works,

---

[11] This test may appear anachronistic in today's world; however, the statute plaintiffs seek to invoke was enacted in 1934, in the age of radio, and last recodified in 1984, before the World Wide Web existed. *See Matter of Warrant to Search a Certain E–Mail Account Controlled & Maintained by Microsoft Corp.*, 829 F.3d 197, 206 (2d Cir. 2016) ("The World Wide Web was not created until 1990, and we did not even begin calling it that until 1993."). Nothing in this Report and Recommendation, if adopted, would prevent plaintiffs from seeking to plead related claims under other provisions of the Communications Act, such as § 553 or § 605(e)(4), if plaintiffs can allege, in good faith, conduct that comes within the reach of those provisions.

Sept. 9, 1886 (Paris Text 1971), S. Treaty Doc. No. 99-27 (Berne Convention). *See* Compl. ¶¶ 124-25, 128-37. According to Infomir, this claim should be dismissed because "substantial questions exist as to whether and which copyright protections apply to Plaintiffs' unidentified foreign works," and plaintiffs "have not identified the exclusive rights which they assert defendants violated." Infomir Mem. of Law at 14. Even if copyright protections apply, Infomir argues, plaintiffs have not stated a claim for direct infringement against it because it is alleged merely to be an "equipment provider." *Id. See also* Goodzone Mem. of Law at 4 (adopting and incorporating Infomir's arguments). I agree that the Complaint, in its present form, fails adequately to identify the works allegedly infringed, fails to allege the facts necessary to demonstrate that plaintiffs possess exclusive rights in those works under Russian law, and fails to show that the moving defendants provided the type of service that could constitute direct infringement under the Copyright Act.

### 2. Elements of Direct Infringement

Direct copyright infringement occurs when defendants have "themselves engaged in the infringing activity." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984). The elements of a direct copyright infringement claim are ownership of a valid copyright and infringement of the copyright owner's exclusive rights. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010); *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012) (citing *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 109 (2d Cir. 2002)). In order to sufficiently plead both ownership and infringement, a plaintiff ordinarily must set forth:

> (1) which specific original works are the subject of the copyright claim, (2) that plaintiff owns the copyrights in those works, (3) that the copyrights have been registered in accordance with the statute, and (4) by what acts and during what time the defendant infringed the copyright.

*Energy Intelligence Grp., Inc. v. Jefferies, LLC*, 101 F. Supp. 3d 332, 338 (S.D.N.Y. 2015) (quoting *Jacobs v. Carnival Corp.*, 2009 WL 856637, at *4 (S.D.N.Y. Mar. 25, 2009)).

Where a work was created in a foreign country, the plaintiff's ownership of the copyright in the work is governed, as a general matter, by the law of the jurisdiction where the work was "'created' and 'first published.'" *Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*, 2016 WL 7507757, at *3 (S.D.N.Y. Dec. 30, 2016). If the work was created and first published in the Russian Federation, "Russian law is the appropriate source of law to determine issues of ownership of rights." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 90 (2d Cir. 1998). Moreover, the United States and the Russian Federation are signatories to the Berne Convention, which "provides that works copyrighted in signatory foreign countries and written by nationals of those countries or the United States are to be given copyright protection under United States law if first published in a nation adhering to the convention." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 886 F. Supp. 1120, 1125 (S.D.N.Y. 1995).

In the United States, the Berne Convention Implementation Act of 1988, Pub. L. No. 100-568 § 2, 102 Stat. 2853 (codified as amended at 17 U.S.C. § 101 *et seq.*), "allows owners of unregistered foreign copyrights from Berne Convention signatory nations to bring claims of copyright infringement in United States courts." *MPD Accessories B.V. v. Urban Outfitters*, 2014 WL 2440683, at *5 (S.D.N.Y. May 30, 2014) (citing 17 U.S.C. §§ 101, 104, 411). 17 U.S.C. § 411, which provides that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title," applies only to "United States works." The Berne Convention "prohibits signatories from imposing copyright formalities," such as registration requirements, "as a condition to the protection of works of nationals of other member countries." *Crunchyroll, Inc.*

23

*v. Pledge*, 2014 WL 1347492, at *16 (N.D. Cal. Mar. 31, 2014); *accord Itar-Tass*, 153 F.3d at 89;

*Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 473 (E.D.N.Y. 2009); *Elohim EPF USA, Inc. v. Total*

*Music Connection, Inc.*, 2015 WL 12655484, at *4 (C.D. Cal. Nov. 19, 2015).

> To take advantage of this exemption from the registration requirement of § 411, "the party

seeking to protect a work must first establish that the subject of copyright is not a United States

work." *Elohim EPF USA, Inc.*, 2015 WL 12655484, at *4 (citing *Kernal Records Oy v. Mosley*,

794 F. Supp. 1355, 1358-59 (S.D. Fla. 2011)). In the case of audiovisual works, such as television

programs, the statute defines a "United States Work" as, among other things, a work "first

published in the United States," or a work "published simultaneously in the United States and

another treaty party whose law grants a term of copyright protection that is the same or longer than

the United States." 17 U.S.C. § 101.

> A plaintiff must also establish that it meets the standing test of 17 U.S.C. § 501(b), "which

accords standing only to the legal or beneficial owner of an 'exclusive right.'" *Itar-Tass*, 153 F.3d

at 91. *See also Hutson v. Notorious B.I.G., LLC*, 2015 WL 9450623, at *3 (S.D.N.Y. Dec. 22,

2015) (plaintiff must be "the legal or beneficial owner of an exclusive right under a valid copyright

at the time of the alleged infringement" to have standing to sue). "[T]he holder of a nonexclusive

license may not sue others for infringement." *Davis v. Blige*, 505 F.3d 90, 101 (2d Cir. 2007)

(citing *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 32 (2d Cir. 1982)).

### 3.  Application to Complaint

#### a.  Specific Works

> Plaintiffs allege in general terms that their Channels and Programming are "protected by

the intellectual property laws of the Russian Federation and are therefore entitled to the protection

of United States copyright and trademark laws pursuant to international conventions." Compl. ¶

10. They further allege that "[e]ach Program is an original audiovisual work" that constitutes

copyrightable subject matter within the meaning of 17 U.S.C. § 102; that "[e]ach Program" was created or licensed for exhibition by plaintiffs (or their affiliates); and that plaintiffs never authorized defendants to exercise any rights with respect to "the copyrighted Programs." *Id.* ¶¶ 128-29, 132. However, plaintiffs never define the term "Program," and never identify a single program as to which any of them claims to own exclusive rights infringed by any defendant. Nor do they identify, as to any of the allegedly infringed works, when or how they acquired the exclusive rights upon which they base their copyright claims.

A copyright plaintiff – including a holder of foreign copyrights – is ordinarily required to identify each specific work that is the subject of its claim. It is "inadequate to base an infringement claim on overly-inclusive lists of copyrighted works," and "it is also insufficient to list certain works that are the subject of an infringement claim, and then allege that the claim is also intended to cover other, unidentified works." *Cole*, 2012 WL 3133520, at *12 (granting motion to dismiss copyright claims when plaintiff provided a chart listing 66 photographs, but failed to identify which photographs were the subject of his copyright infringement claims, and further alleged that the infringement was "not limited to the photographic works identified"); *see also Lambertini v. Fain*, 2014 WL 4659266, at *3 (E.D.N.Y. Sept. 17, 2014) ("Plaintiff has the burden of identifying the specific works at issue in her pleading"); *Master Sound Int'l, Inc. v. PolyGram Latino U.S.*, 1999 WL 269958, at *2 (S.D.N.Y. May 4, 1999) ("in order to state a claim Master Sound must identify the specific works at issue . . . to establish its ownership of a valid copyright under Mexican law").

Where a copyright claim is based on the alleged wholesale infringement of a large number of copyrighted works, courts have relaxed this rule somewhat, but the plaintiff must still identify, at a minimum, representative examples of the works allegedly infringed, without which neither the

25

defendants nor the Court can evaluate whether the remaining elements of the claim – including ownership of exclusive rights and infringement – have been met. *See, e.g.*, *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 441 (S.D.N.Y. 2012) (where plaintiff alleged that defendants infringed their copyrights in a line of jewelry, they adequately "identified, claimed ownership over and offered proof of registration of representative specific works that are the subject of the copyright claim"). In this district, as elsewhere, copyright plaintiffs alleging that defendants unlawfully copied or retransmitted all or substantially all of their television programming typically provide representative, albeit "non-exhaustive" examples of the individual works broadcast. *See, e.g.*, Compl., *WPIX, Inc. v. ivi, Inc.*, No. 10-CV-7415 (S.D.N.Y. Sept. 28, 2010) (providing a "non-exhaustive list of . . . television programs, identifying representative examples of programs in which plaintiffs . . . own the pertinent copyright interests" and attaching as an exhibit a list of 96 episodes of a variety of specifically-named television shows and sports broadcasts including each episode's air date, the channel on which it aired, and the copyright owner); Compl., *Am. Broad. Cos., Inc. v. AEREO, Inc.*, No. 12-CV-1540 (S.D.N.Y. Mar. 1, 2012) (providing a "non-exhaustive list of . . . television programs, identifying representative examples of programs in which plaintiffs own the pertinent copyright interests" and attaching an exhibit listing 44 episodes of a variety of named television shows, including each episode's air date, channel, and copyright owner); Compl., *WNET v. AEREO, Inc.*, No. 12-CV-1543 (S.D.N.Y. Mar. 1, 2012) (providing a "non-exhaustive list identifying representative samples of . . . television programs" describing 94 episodes, including air dates, channels, and copyright owners).[12] Plaintiffs herein need not identify every

---

[12] *See also* Compl., *Dish Network L.L.C. v. Shava IPTV Network LLC*, No. 15-CV-706 (E.D. Va. June 5, 2015) (including an exhibit listing "examples of the copyrighted works" at issue, including the name and broadcast channel of 191 programs); Compl., *China Cent. Television v. Create New Tech., Ltd.*, No. 15-CV-1869 (C.D. Cal. Mar. 13, 2015) (naming certain specific copyrighted television programs within the text of the complaint and attaching two exhibits listing 459 episodes

program allegedly infringed by every defendant. Absent at least a representative listing for each plaintiff, however, the Complaint is deficient.

### b. Ownership of Exclusive Rights under Russian Law

Plaintiffs allege that they own various exclusive rights with respect to their unidentified programs, including the rights to make and distribute copies, publicly perform and display the works, and make derivative works. Compl. ¶ 130. Plaintiffs also allege that they "own the exclusive right to authorize others to exercise" their rights. *Id.* ¶ 131. Plaintiffs do not clearly describe the source of these exclusive rights, but do allege, elsewhere, they have "neighboring rights," which are "those rights that a Russian Federation-based broadcaster enjoys concerning broadcast transmissions originating in the Russian Federation," and that defendants' conduct violates those rights. *Id.* ¶ 23.[13] Assuming that the "neighboring rights" conferred by Russian law on broadcasts originating in the Russian Federation encompass the exclusive rights described in paragraphs 131 and 132 (a point of law that neither of the moving defendants disputes), plaintiffs must still allege the *factual* preconditions to these assertions, namely, that the allegedly infringed works were broadcast transmissions originating in the Russian Federation, and that they were not "United States works," *Elohim EPF USA*, 2015 WL 12655484, at *4, within the meaning of 17

---

as to which the plaintiff Chinese broadcasters held copyrights, the copyright registration number of each episode, and the broadcast dates of all episodes that aired live). *But see Intercom Ventures, LLC v. City Media Plus Ex-Yu Streaming*, 2013 WL 4011052, at *1, 3 (N.D. Ill. Aug. 6, 2013) (denying motion to dismiss copyright infringement claim filed by plaintiff Bosnian company claiming exclusive United States IPTV distribution rights in "all programming" produced and distributed by 15 Bosnian-language channels over a period of approximately seventeen months).

[13] Pursuant to Part 1 of Article 1303 of the Russian Federation Civil Code, subject matter that "can be protected under neighboring rights" includes "broadcasts by air or cable of radio and television transmissions; (broadcasts/transmissions of broadcasting and cable organizations)." 2 Irina Savelieva, *Copyright Throughout the World* § 30:24 (2016). "The origin, exercise, and protection of neighboring rights do not require registration or compliance with any other formalities." *Id.* (citing Part 2 of Article 1304 of the Russian Federation Civil Code).

U.S.C. § 101. *See Crunchyroll*, 2014 WL 1347492, at *16 (holding that plaintiffs' allegations that each of more than 3,265 television episodes was "first broadcast and publicly displayed in Japan" – a party to the Berne Convention – sufficiently alleged that the episodes were not "United States works").Works first published in the United States, as well as works "published simultaneously in the United States and another treaty party whose law grants a term of copyright protection that is the same or longer than the United States," are United States works. 17 U.S.C. § 101.

The Complaint alleges that the Programming at issue was "primarily" first broadcast in the Russian Federation, subject to "limited exceptions." Compl. ¶¶ 2, 78. It does not elaborate on those exceptions. Nor does it explain whether plaintiffs' copyright claims extend to works first broadcast elsewhere (or simultaneously broadcast in the Russian Federation and the United States) and, if so, on what basis. *See id.* ¶¶ 3, 21, 127 (plaintiffs' Programming is distributed worldwide "via cable and satellite," including to the United States, where defendants' customers "can access a livestream of the Programming"). Assuming that plaintiffs include a list of representative works in their amended pleading, they should also allege, at least with respect to those works, the facts that support their conclusion that they possess the necessary exclusive rights under Russian law.

### c.  Infringement

Unlike copyright ownership issues, which may be governed by foreign law, "the law of the jurisdiction where the allegedly infringing acts take place generally governs infringement issues." *Creazioni Artistiche Musicali, S.r.l.*, 2016 WL 7507757, at *3 (citing *Itar-Tass*, 153 F.3d at 91). Where alleged infringement took place in the United States, United States law applies. *See Itar-Tass*, 153 F.3d at 91. In order to satisfy the pleading requirements of Fed. R. Civ. P. 8, a plaintiff alleging copyright infringement "may not rest on bare-bones allegations that infringement occurred," but instead must set out the "particular infringing acts . . . with some specificity."

*Jacobs*, 2009 WL 856637, at *4 (quoting *Sharp v. Patterson*, 2004 WL 2480426, *12 (S.D.N.Y. 2004), and *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 n.3 (S.D.N.Y. 1992)).

"To be liable for direct infringement, a defendant must have 'engaged in some volitional conduct'" sufficient to show that it "'actively' violated one of the plaintiff's exclusive rights." *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 656-57 (S.D.N.Y. 2013) (quoting *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009)). Since the Copyright Act "makes it unlawful to copy or perform copyrighted works, not to copy or perform in general," the volitional-act requirement "demands conduct directed to the plaintiff's copyrighted material." *Aereo*, 134 S. Ct. at 2512 (Scalia, J. dissenting) (citing *Sony Corp. of Am.*, 464 U.S. at 434).

In *Aereo*, the Court held that the defendant violated the Copyright Act by streaming customer-selected broadcast television programs over the internet. When a customer chose a program, Aereo's servers "select[ed] an antenna, which it dedicate[d] to the use of that subscriber" by receiving the selected program. *Aereo*, 134 S. Ct. at 2503. Other Aereo equipment translated the broadcast signals into signals that could be transmitted over the internet, saved those signals into a customer-specific folder, and then, with a few seconds' delay, streamed the program to the customer. *Id*. In reaching its conclusion, the Court emphasized that Aereo "is not simply an equipment provider." *Id*. at 2506. Justice Breyer, writing for the majority, explained that it was irrelevant for Copyright Act purposes whether Aereo "transmitted constantly," like a cable system, or "remain[ed] inert until a subscriber indicates that she wants to watch a program." *Id*. It was sufficient that Aereo did not just sell equipment; it sold "a service that allows subscribers to watch television programs, many of which are copyrighted, virtually as they are being broadcast," and it used its own equipment, including antennas, transcoders, and servers, kept outside of its customers' homes, to do so. *Id. See also CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 96 (2d

29

Cir. 2016) (affirming order imposing sanctions on provider of video on demand service "which allowed users to access an archive of previously televised programs for streaming at any time" after provider was enjoined from distributing plaintiffs' copyrighted content).[14]

The Complaint does not, at present, sufficiently allege that Infomir sells "a service" as opposed to merely providing standalone equipment with which its customers can view programming originated by plaintiffs among others. *See* Compl. ¶ 56 & Ex. 14. Similarly, the Complaint alleges very little, at present, concerning the service provided by Goodzone. *See id.* ¶ 62. Once again, however, plaintiffs' motion papers indicate that they are likely to clear this hurdle on repleading. *See* Pl. Mem. of Law dated June 24, 2016, at 5-8 (asserting that Infomir's set-top boxes stream plaintiffs' Programming via IPTV from a U.S.-based website and that Infomir also offers customers "middleware, enabling them to view IPTV without any additional fees"); Infomir Reply Mem. of Law at 5-6 (suggesting that "other Infomir entities" operate websites from which its customers view plaintiffs' programs but arguing that it is not liable for their conduct). For this reason, should the District Judge reach the motions to dismiss, I recommend that Count Six be dismissed with leave to replead.

#### 4.  Secondary Infringement

"The Copyright Act does not expressly render anyone liable for infringement committed by another." *Capitol Records, LLC*, 934 F. Supp. 2d at 658 (quoting *Sony Corp. of Am.*, 464 U.S. at 435). However, federal common law imposes secondary liability "on a party that has not directly infringed a copyright, but has played a significant role in direct infringement committed by others, for example by providing direct infringers with a product that enables infringement." *Arista*

---

[14] *Cf. Fox Broad. Co. v. Dish Network LLC*, 160 F. Supp. 3d 1139, 1160-61 (C.D. Cal. 2015) (where defendant already had a license to retransmit plaintiff's programming into its customers' homes via satellite and set-top box, it did not violate the Copyright Act when it also provided them with equipment enabling them to view the same programs on their home computers and tablets).

*Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 422 (S.D.N.Y. 2011) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929-30 (2005), and *Sony Corp. of Am.*, 464 U.S. at 434-35). "The rationale for secondary liability is that a party who distributes infringement-enabling products or services may facilitate direct infringement on a massive scale, making it 'impossible to enforce [copyright protection] effectively against all direct infringers.'" *Lime Grp. LLC*, 784 F. Supp. 2d at 422 (alteration in original) (quoting *Grokster*, 545 U.S. at 930).

In Count Seven, plaintiffs allege that all defendants "induce, contribute to, and are vicariously liable for any copyright infringement committed by their subscribers," or others, "[t]hrough the creation, maintenance and operation of their unauthorized Websites and providing streaming services and credit card processing" for defendants' websites. Compl. ¶ 141. Plaintiffs do not make any additional factual allegations concerning Infomir or Goodzone (beyond those discussed earlier in this Report and Recommendation) to support their secondary infringement claim. Those allegations, Infomir argues, are insufficient to state a claim under any of the three judicially-recognized secondary liability theories: contributing to copyright infringement, inducement of copyright infringement, and vicarious copyright infringement. *See* Infomir Mem. of Law at 16-19. Plaintiffs do not directly address any of these theories in their opposition brief, but assert, relying on matters outside of the pleadings, that Infomir is more than a "seller of equipment." Pl. Mem. of Law dated June 24, 2016, at 14-15. Infomir is correct that the Complaint, as presently pleaded, fails to state a claim against it for secondary copyright infringement.

### a. Contributory Infringement

To state a claim for contributory copyright infringement, a plaintiff must allege that a defendant (1) "with knowledge of the infringing activity" (2) "induces, causes, or materially contributes to the infringing conduct of another.'" *Lime Grp. LLC*, 784 F. Supp. 2d at 432, 434 n.23 (quoting *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir.

1971)); *accord Rams v. Def Jam Recordings, Inc.*, 2016 WL 4399289, at *3 (S.D.N.Y. Aug. 15, 2016) (Daniels, J.); *Doe 3*, 604 F.3d at 117. With respect to the first element, "[t]he knowledge standard is an objective one; contributory infringement liability is imposed on persons who 'know *or have reason to know*' of the direct infringement." *Doe 3*, 604 F.3d at 118 (emphasis in original) (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001), *as amended* (Apr. 3, 2001)). "[A] claim for contributory infringement *does not* require a showing that the defendant intended to foster infringement." *Lime Grp. LLC*, 784 F. Supp. 2d at 432 (emphasis in original) (citing *Grokster*, 545 U.S. at 942). With respect to the second element, two types of activity lead to contributory liability: "(i) personal conduct that encourages or assists the infringement"; or "(ii) provision of machinery or goods that facilitate the infringement." *Rams*, 2016 WL 4399289, at *3 (internal citation omitted).

As to Infomir, plaintiffs' contributory infringement claim is presumably based on the second type of activity, since Infomir is alleged to sell "receivers with which it is possible to receive Plaintiffs' channels without authorization." Compl. ¶ 56. This is not enough. There is no allegation in the current Complaint (though there may be in the next one) that Infomir's receivers intercept plaintiffs' signals, or can only be used to receive plaintiffs' Channels, nor even that they are intended to facilitate infringement. *See Sony Corp. of Am.*, 464 U.S. at 442 ("the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes" or is "capable of substantial noninfringing uses"). Nor do plaintiffs allege that Infomir "acted in concert with the direct infringer." *Rams*, 2016 WL 4399289, at *4. Plaintiffs do not even identify the "direct infringer" whose conduct was induced, caused, or contributed to by Infomir. The allegations concerning Goodzone are similarly sketchy.

### b. Inducement

In its 2005 *Grokster* decision, which involved peer-to-peer file-sharing software, "the Supreme Court enunciated what some have interpreted as a new theory of secondary copyright liability: inducement of infringement." *Usenet.com*, 633 F. Supp. 2d at 150-51. The Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Grokster*, 545 U.S. at 936-37. However, "mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability." *Id.* at 937. This theory "premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful purpose." *Id.* To establish inducement of copyright infringement, a plaintiff must show that a defendant "(1) engaged in purposeful conduct that encouraged copyright infringement, with (2) the intent to encourage such infringement." *Lime Grp. LLC*, 784 F. Supp. 2d at 425. The Complaint, in its current form, does not allege any "clear expression or other affirmative steps taken to foster infringement" by either Infomir or Goodzone, and therefore fails to plead a claim for inducement of copyright infringement.

### c. Vicarious Infringement

A party commits vicarious infringement by "profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster,* 545 U.S. at 930 (citing *Gershwin Pub. Corp.*, 443 F.2d at 1162). Vicarious liability "rests not on the defendant's relationship to the direct infringement but rather on the defendant's relationship to the direct infringer." *Ez-Tixz, Inc. v. Hit-Tix, Inc.*, 919 F. Supp. 728, 732 (S.D.N.Y. 1996). Unlike contributory copyright infringement, vicarious infringement does not require knowledge of the infringing conduct. *See Rams*, 2016 WL 4399289, at *4; *Premier Fabrics, Inc. v. Woodland Trading Inc.*, 42 F. Supp. 3d 549, 555

(S.D.N.Y. 2014) ("While knowledge . . . is a required element of contributory copyright infringement, it is not required to state a claim for vicarious copyright infringement.").

To state a claim for vicarious infringement, a plaintiff need only allege: (1) "that a defendant has declined to exercise the right and ability to supervise or control the infringing activity," and (2) that the defendant "enjoys a direct financial benefit from the infringing activity." *Rams*, 2016 WL 4399289, at *4 (citing *Grokster*, 545 U.S. at 930). The first element is satisfied if the defendant "had the ability to supervise or control the third parties' infringing activity and failed to do so." *Lime Grp. LLC*, 784 F. Supp. 2d at 435 (citing *Arista Records, Inc. v. Flea World, Inc.*, 2006 WL 842883, at *9 (D.N.J. Mar. 31, 2006), and *Playboy Enter. v. Webbworld Inc.*, 968 F. Supp. 1171, 1177 (N.D. Tex. 1997)). The second element requires showing a "causal relationship between the infringing activity and any financial benefit [the] defendant reaps." *Lime Grp. LLC*, 784 F. Supp. 2d at 434-35 (alteration in original) (citing *Ellison v. Robertson,* 357 F.3d 1072, 1079 (9th Cir. 2004), and *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996)); *accord Rams*, 2016 WL 4399289, at *5.

Plaintiffs have failed to allege facts as to either Infomir or Goodzone which, if true, would satisfy the elements of a contributory infringement claim on a vicarious liability theory. Most glaringly, they do not allege that the moving defendants "had the ability to supervise or control" the infringing activities of any third parties. Nor do they allege a causal relationship between the infringing activity of the (unnamed) third parties and a financial benefit reaped by the moving defendants. Plaintiffs may, however, be able to allege such facts in their amended complaint. For this reason, should the District Judge reach the motions to dismiss, I recommend that Count Seven be dismissed with leave to replead.

### 5.   Circumvention in Violation of the DMCA

The DMCA, enacted in 1998, was intended to implement the World Intellectual Property Organization Copyright Treaty (WIPO Treaty) and "to update domestic copyright for the digital age." *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 82 (2d Cir. 2016) (quoting *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 26 (2d Cir. 2012)). The WIPO Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17 (1997), requires contracting parties to "provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention." *Id.* art. 11. To meet this requirement, new sections were added to Title 17 of the United States Code "with the intention that these additional provisions would act as 'technological adjuncts' to the existing Copyright Act." *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, 2012 WL 3306600, at *4 (E.D.N.Y. June 13, 2012) (citing H.R. Rep. No. 105-551, pt. 1, at 9 (1998)), *report and recommendation adopted*, 2012 WL 3306575 (E.D.N.Y. Aug. 13, 2012).

The DMCA specifically targets "the circumvention of digital walls guarding copyrighted material (and trafficking in circumvention tools)." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 443 (2d Cir. 2001). To that end, the DMCA contains three provisions which separately target acts of circumvention and of trafficking in tools used for circumvention of copyrighted works. The "anti-circumvention" provision, 17 U.S.C. § 1201(a)(1)(A), which plaintiffs expressly invoke in Count Two, *see* Compl. ¶¶ 103, 107, provides that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under" the Copyright Act. "To 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). In the context

of the DMCA, a person "circumvents a technological measure" only when "he affirmatively performs an action that disables or voids the measure that was installed to prevent them from accessing the copyrighted material." *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 509 (S.D.N.Y. 2015) (quoting *Dish Network*, 893 F. Supp. 2d at 466). This act "can be characterized as 'breaking and entering (or hacking) into computer systems.'" *LivePerson*, 83 F. Supp. 3d at 509 (quoting *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*, 307 F. Supp. 2d 521, 532 (S.D.N.Y. 2004)).

Violating contractual restrictions on access to or distribution of encrypted transmissions is "not the type of 'circumvention' that Congress intended to combat in passing the DMCA." *Dish Network*, 893 F. Supp. 2d at 464 (holding that plaintiffs failed to state a claim under § 1201(a)(1)(A) against subscribers who used satellite signal decryption devices provided by plaintiffs – but in locations not permitted by their subscription agreements – and thereafter rebroadcast the transmissions via IPTV). Similarly, there is no liability under § 1201(a)(1)(A) where the defendant misuses a password, or otherwise uses "deceptive" methods (as opposed to its own technology) to circumvent the technology that the copyright owner relied on for protection. *See, e.g.*, *I.M.S. Inquiry Mgmt. Sys.*, 307 F. Supp. 2d at 532-33 (defendant's unauthorized use of a username and password did not qualify as circumvention under the DMCA); *Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 878, 889 (N.D. Ohio 2009) (a defendant does not "circumvent or bypass any technological measure" when he uses "the approved methodology," such as a user name and password, to access copyrighted material); *Dish Network*, 893 F. Supp. 2d at 465 ("even assuming that the use of deception to obtain the EchoStar receivers meant that the Defendants' *use*

of those receivers to decrypt the signals was without permission, it does not necessarily follow that the Defendants' *access* to the decrypted signals was unauthorized") (emphasis in original).[15]

Infomir moves to dismiss Count Two on the ground that it "is not alleged to participate in the circumvention" of a technological measure controlling access to plaintiffs' copyrighted broadcasts. Infomir Mem. of Law at 11. Infomir is correct. First, as noted above, plaintiffs fail adequately to plead that their Channels and Programming come within the protection of the Copyright Act. Circumventing protective technology does not violate the DMCA unless that technology "effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

Second, although plaintiffs plead in conclusory fashion that all defendants "have hacked or otherwise circumvented [plaintiffs'] technological measures, including encryption," Compl. ¶ 106, they do not provide any supporting facts regarding Infomir; that is, any factual allegations which, if true, would demonstrate that Infomir "affirmatively perform[ed] an action that disables or voids the measure that was installed to prevent [it] from accessing the copyrighted material," *LivePerson*, 83 F. Supp. 3d at 509, as opposed to (for example) obtaining plaintiffs' signals after they are decrypted by another party, acquiring them through misuse of a password, making unlawful use of lawfully acquired signals, or other misconduct that is not within the reach of § 1201(a)(1)(A). *See also* Compl. ¶ 12 (alleging on information and belief that all defendants "knowingly and purposefully hack into *or otherwise circumvent and intercept* Broadcasters' encrypted satellite signals in violation of the DMCA") (emphasis added); *id.* ¶ 86 (alleging on information and belief that all defendants "hack, capture *or otherwise acquire without permission*

---

[15] The DMCA also contains "anti-trafficking" provisions, 17 U.S.C. §§ 1201(a)(2) and (b)(1), which plaintiffs do not cite in connection with Count Two or in their brief, making them irrelevant to the pending  motions to dismiss.

the encrypted signals of the Plaintiffs' Channels") (emphasis added). As discussed above, the current Complaint contains very few allegations specific to Infomir, *see id.* ¶¶ 55-56 & Exs. 1, 14, and those that it does contain fall short of alleging conduct within the ambit of § 1201(a)(1)(A).

Plaintiffs may well be able to allege such conduct in an amended complaint. For this reason, should the District Judge reach the motions to dismiss, I recommend that Count Two be dismissed as against Infomir with leave to replead.

### D.  Counts Three, Four and Five – Lanham Act

In Counts Three, Four, and Five, plaintiffs assert claims under the Lanham Act for trademark infringement, false advertising, and trademark tarnishment, respectively. Both moving defendants seek the dismissal of all three trademark claims. They do not dispute that plaintiffs' marks (that is, the logos of their Channels) are protected by the laws of the Russian Federation and therefore by the Lanham Act. *See* Infomir Mem. of Law at 12. Rather, according to Infomir, plaintiffs fail to allege that it (as opposed to other defendants) "used their marks at all – let alone in a legally impermissible manner." *Id*. On this point, Infomir is correct, but its argument does not assist Goodzone. The Complaint alleges – barely, but adequately – that Goodzone uses some of plaintiffs' marks to promote programming that it is not entitled to offer, in manner that is likely to cause confusion among consumers. Counts Three and Four therefore survive as against Goodzone. Count Five fails, however, because plaintiffs do not allege facts sufficient to show that their marks are widely recognized by the general consuming public of the United States, as is required to state a tarnishment claim under the Lanham Act.

#### 1.  Counts Three and Four – Trademark Infringement and False Designation of Origin

The Lanham Act "broadly proscribes the use of false descriptions and false designations of origin in the advertising and sale of goods or services in commerce." *Rosenfeld v. W.B.*

*Saunders*, 728 F. Supp. 236, 241 (S.D.N.Y.), *aff'd*, 923 F.3d 845 (2d Cir. 1990). Counts Three and

Four are pleaded under 15 U.S.C. § 1125(a), which protects marks acquired by use (as opposed to

registered marks, which are protected by 15 U.S.C. § 1114(1)). *See* Compl. ¶¶ 111, 115.[16]

To establish an infringement claim under § 1125(a), "a plaintiff must demonstrate that it

has a valid trademark entitled to protection and that the defendant's use of it is likely to cause

confusion of an appreciable number of ordinarily prudent purchasers as to the source of goods or

services in question." *Info. Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 50 (S.D.N.Y.

2005) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993));

*see also Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citing *Time, Inc. v.*

*Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999)).

To establish a claim for false designation of origin, a plaintiff must show that:

> (1) the defendant has made a false or misleading statement; (2) the false or
> misleading statement has actually deceived or has the capacity to deceive a
> substantial portion of the intended audience; (3) the deception is material in that it
> is likely to influence purchasing decisions; (4) the defendant placed the false or
> misleading statement in interstate commerce; and (5) the plaintiff has been injured
> as a result of the misrepresentation, either by direct diversion of sales or by a
> lessening of goodwill associated with its products.

---

[16] Section 1125(a)(1) imposes civil liability on:

> Any person who, on or in connection with any goods or services, or any container
> for goods, uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which –

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with another person, or as to
> the origin, sponsorship, or approval of his or her goods, services, or commercial
> activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another person's
> goods, services, or commercial activities.

*Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 416-17 (S.D.N.Y. 2013) (citing *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001)); *accord Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016). A claim of false advertising may be based on "at least one of two theories: 'that the challenged advertisement is literally false, i.e., false on its face,' or 'that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers.'" *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112 (2d Cir. 2010) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007)). Count Four is presumably based on the second theory, since plaintiffs nowhere allege that any defendant has made literally false statements in its advertising or promotional materials.

Plaintiffs' marks – that is, the logos for plaintiffs' Channels – are specified and reproduced in their pleading. Compl. ¶¶ 26-31, 34, 36, 38, 40, 43, 47, 51. Plaintiffs allege that these marks are "famous," *id*. ¶ 82, and that they are "protected pursuant to the laws of the Russian Federation and therefore entitled to protection under the Lanham Act by virtue of the Paris Convention." *Id*. ¶ 110.[17] Plaintiffs further allege that "Defendants' infringement is accomplished through the use of interactive websites," including www.infomirusa.com and www.gudzon.tv, *id*. ¶ 7, which

---

[17] Both the United States and the Russian Federation are parties to the Paris Convention for the Protection of Industrial Property, Mar. 20, 1883, as revised at Stockholm, July 14, 1967, 21 U.S.T. 1583, 828 U.N.T.S. 305 (Paris Convention), which among other things provides "national treatment" to foreign nationals of member nations with respect to trademark and related rights. *See Empresa Cubana Del Tabaco v. Culbro Corp.*, 399 F.3d 462, 484-85 (2d Cir. 2005). National treatment means that "foreign nationals should be given the same treatment in each of the member countries [of the Paris Convention] as that country makes available to its own citizens." *Int'l Cafe, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001) (quoting *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 640 (2d Cir. 1956)); *see also* 15 U.S.C. §§ 1126(b), (h). Foreign nationals of signatory countries are therefore entitled to the same rights and protections afforded to United States citizens by the Lanham Act.

defendants operate for the purpose of "marketing the Channels and Programming to U.S. consumers." *Id.* ¶ 14. Defendants "mislead consumers by making it appear on their Websites that they have the right to rebroadcast Plaintiffs Programing [sic] and Channels by, among other things, displaying the Channels [sic] famous marks." *Id.* ¶ 15. *See also id.* ¶ 91 ("consumers will likely be confused into believing that Defendants are authorized to broadcast or rebroadcast the Channels and the Programming"); *id.* ¶ 111 (defendants' use of the marks "to promote, market, or sell products and services on the moidom.tv website constitutes trademark infringement"); *id.* ¶ 119 (consumers "are and will likely continue to be confused into believing that Defendants are authorized to display Plaintiffs' Channels and Programming"). Plaintiffs' complaint, in other words, is not that defendants use plaintiffs' marks (or copies thereof) to sell different, competing, or inferior programming; it is that defendants use plaintiffs' marks to promote the sale of plaintiffs' own Programming, which likely gives consumers the misleading impression that defendants are authorized to do so when in fact they are not.

As noted above, the moving defendants do not contest, for purposes of the pending motions, that plaintiffs' marks are protectable under the Lanham Act. Nor do they deny that the use of plaintiffs' marks as alleged would constitute both trademark infringement and false designation of origin in violation of § 1125(a).[18] Infomir correctly points out, however, that the

---

[18] This is by no means a settled point of law. "As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner." *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1993) (footnote omitted). Thus, if a defendant merely transmits a plaintiff's television programming, albeit without authorization, the inclusion of plaintiff's logos as part and parcel of the transmission is not be grounds for liability under the Lanham Act. *See, e.g.*, *Zuffa, LLC v. Justin.tv, Inc.*, 838 F. Supp. 2d 1102, 1106 (D. Nev. 2012) (where defendant allegedly live-streamed a mixed martial-arts sporting event as to which plaintiff held the relevant copyrights and associated trademarks, plaintiff's trademark claims were limited to "the display of Zuffa's trademarks which are not an inherent part of the video broadcast"); *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 650 F. Supp. 838, 846 (D. Mass. 1986) (where defendant taverns used dish antennas to intercept network signals intended only for plaintiff

current Complaint does not identify any website belonging to or operated by Infomir that uses plaintiffs' marks as alleged.

Paragraph 55 alleges that Infomir operates www.infomirusa.com, but does not allege that plaintiffs' marks appear anywhere on that website. Exhibit 14 shows a screenshot from another website, www.infomir.us, but it contains no reference to plaintiffs and makes no use of plaintiffs' marks. Paragraph 111, which is within Count Three, alleges that "Defendants' use of the Channel's trademarks . . . to promote, market, or sell products and services on the moidom.tv website constitutes trademark infringement," but plaintiffs nowhere allege that Infomir owns, operates, or has any connection to moidom.tv. There is no allegation or combination of allegations in the Complaint that clearly connects Infomir to a website (or any other medium) that uses plaintiffs' marks for advertising or promotional purposes, or that makes misleading statements about the origins of its goods or services. Absent such allegations, plaintiffs cannot state a Lanham Act claim against Infomir.

Goodzone, hoping for the same result, "adopts and incorporates" Infomir's arguments. Goodzone Mem. of Law at 3-4. Goodzone is correct that plaintiffs fail to connect it to the moidom.tv website. However, Exhibit 15 to the Complaint, which appears to be a screenshot from

---

Quincy, and exhibited network program to their patrons without a license, Lanham Act claims were dismissed because the mere act of displaying the programs, with embedded network logos, did not "misrepresent the source of the programming"). However, if the defendant also uses the plaintiff's marks to promote or advertise its service (above and beyond displaying the marks as an "inherent part of the video broadcast," *Zuffa*, 838 F. Supp. 2d at 1106), and if it does so in a manner that implies that it is authorized to offer plaintiff's programming, plaintiff may also have Lanham Act claims. *Id.* As the Second Circuit noted in *Tiffany (NJ) Inc.*, the Lanham Act "generally does not prevent one who trades a branded product from accurately describing it by its brand name, *so long as the trader does not create confusion by implying an affiliation with the owner of the product.*" 600 F.3d at 104 (emphasis added) (holding that eBay did not violate the Lanham Act by allowing its customers to display Tiffany's marks in connection with resales of Tiffany jewelry).

gudzon.tv, displays what looks like a schedule of programs, in Russian, illustrated with the logos of the relevant channels, including the logos used by plaintiffs CTC and Comedy TV. According to plaintiffs, Exhibit 15 shows that "Defendants have misappropriated the logos and other protected marks of Plaintiffs' Channels for their own commercial gain and to the detriment of Plaintiffs." Compl. ¶ 116. While thin, these allegations do at least connect Goodzone to a website that uses (some of) plaintiffs' marks, for what could be termed promotional purposes, in a manner that is arguably misleading if Goodzone does not have the right to stream plaintiffs' programs to the public. For these reasons, should the District Judge reach the motions to dismiss, I recommend that Counts Three and Four be dismissed as to Infomir, with leave to replead within 21 days, but that Goodzone's motion be denied as to these counts.

### 2.   Count Five – Trademark Tarnishment

The Lanham Act protects "famous" marks from dilution by "blurring" or by "tarnishment." 15 U.S.C. § 1125(c). Dilution by tarnishment is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." *Id.* § 1125(c)(2)(C). "A trademark may be tarnished when it is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 110 (2d Cir. 2009) (quoting *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996)). "Even more to the point, a mark can be tarnished when its likeness is placed in the context of sexual activity, obscenity, or illegal activity." *Mattel, Inc. v. Internet Dimensions Inc.*, 2000 WL 973745, at *8 (S.D.N.Y. July 13, 2000) (citing *Eastman Kodak Co. v. Rakow*, 739 F. Supp. 116 (W.D.N.Y. 1989), and *Dallas*

*Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F. Supp. 366 (S.D.N.Y. 1979)) (holding that linking the BARBIE doll with pornography could constitute tarnishment).

Not all valid trademarks qualify for protection from dilution. The element which "most narrows the universe of potentially successful claims is the requirement that the senior mark be truly famous" before a court will afford the owner of the mark the "vast protections" of § 1125(c). *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 449 (2d Cir. 2004). A mark is famous "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). "In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors," including: (1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties"; (2) "[t]he amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3) "[t]he extent of actual recognition of the mark"; and (4) "[w]hether the mark is registered." *Id.* This standard operates to protect only those marks which "possess a substantial degree of fame," rather than those with fame that is "limited to a particular channel of trade, segment of industry or service, or geographic region." *Small Bus. Bodyguard, Inc. v. House of Moxie, Inc.*, 2014 WL 5585339, at *7 (S.D.N.Y. Oct. 30, 2014) (quoting *TCPIP Holding Co., Inc. v. Haar Commc'ns., Inc.*, 244 F.3d 88, 99 (2d Cir. 2001), and *Christopher D. Smithers Found., Inc. v. St. Luke's-Roosevelt Hosp. Ctr.*, 2003 WL 115234, at *5 (S.D.N.Y. Jan. 13, 2003)) (dismissing dilution claim with prejudice because complaint contained only "conclusory language" that its "Small Business Bodyguard" mark was "widely recognized by consumers").

Only a "small group of elite companies of long standing" are protected under § 1125(c). *Small Bus. Bodyguard*, 2014 WL 5585339, at *7. *See also Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 702 (S.D.N.Y. 2014) ("courts generally have limited famous marks to those that receive multi-million dollar advertising budgets, generate hundreds of millions of dollars in sales annually, and are almost universally recognized by the general public"). Allegations that a mark "is known to a niche population" do not satisfy the "famous mark" requirement. *Heller Inc. v. Design Within Reach, Inc.*, 2009 WL 2486054, at *4 (S.D.N.Y. Aug. 14, 2009).

In Count Five of the Complaint, plaintiffs allege that all defendants display their "logos, other marks and related content in the same lineup as adult-only programming and broadcasting them together with adult content," thereby "creat[ing] an association between Plaintiffs' trademarks and explicit content." Compl. ¶ 120. The association of plaintiffs' logos and other marks with adult content, "including pornography," "irreversibly and irreparably harms the carefully maintained reputation of the Channels and the trademarks." *Id.* ¶ 121.

If plaintiffs' marks were "truly famous," *Savin Corp.*, 391 F.3d at 449, these allegations might be sufficient to state a tarnishment claim against Goodzone. However, plaintiffs provide only conclusory allegations as to the nature of most of their marks, alleging, for example, that they "own and operate numerous famous television channels," each of which "bears a prominent trademark or trademarks." Compl. ¶ 5. The only concrete facts offered to show that any of plaintiffs' marks are "widely recognized by the general consuming public of the United States," 15 U.S.C. § 1125(c)(2)(A), are that plaintiff Channel One produces television channels with "the largest audience in the Russia Federation [sic]," Compl. ¶ 26, that its channels include a "U.S. version of Channel One Russia Worldwide," *id.*, and that it distributes its programs in the United States via IPTV through "one or more third parties." *Id.* ¶ 32. There are no allegations concerning

the size or distribution of its audience outside of the Russian Federation, or the "extent of actual recognition of the mark" in the United States. 15 U.S.C. § 1125(c)(2)(A)(iii). Plaintiffs CTC, Darial, New Channel, Accept, Comedy TV, Rain TV, and Veriselintel allege only that they have agreements with third parties to distribute their programs "via IPTV in the United States and around the world." Compl. ¶¶ 35, 37, 39, 41, 44, 48, 53. They offer no facts whatsoever concerning the audience for their channels or the extent of their recognition by the public in any territory.

Plaintiffs' allegations are insufficient to establish that any of their marks enjoy more than "niche fame" in the United States, that is, "fame limited to a particular channel of commerce, segment of industry, demographic, or geographic region," which is "insufficient as a matter of law to maintain a dilution claim." *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 69 F. Supp. 3d 175, 220 (D.D.C. 2014) (holding that "the alleged awareness of [plaintiff's] PROLACTO's brand among Hispanic immigrants or within certain localized regions of the country, without more, would be insufficient for a dilution claim because that is the very definition of a niche marketplace"). *See also Luv N' Care, Ltd. v. Regent Baby Prods. Corp.*, 841 F. Supp. 2d 753, 757 (S.D.N.Y. 2012) (dismissing dilution claim where "[a]t best, plaintiffs plead fame among baby product consumers"); *Harp v. Rahme*, 984 F. Supp. 2d 398, 422 (E.D. Pa. 2013) (granting summary judgment for defendant on dilution claim where plaintiff "has presented no evidence on the record to demonstrate national distribution, let alone national recognition"); *Heller*, 2009 WL 2486054, at *4 ("the trademark must be famous to the 'general consuming public of the United States,' not merely the contemporary furniture niche of the population").

46

It seems unlikely that plaintiffs, who are all Russian-language broadcasters headquartered in the Russian Federation, could plead facts showing that their marks are famous to the "general consuming public of the United States." 15 U.S.C. § 1125(c)(2)(A). Certainly nothing in their cross-motion for leave to amend suggests that they can do so. If plaintiffs are given leave to amend generally, however, I would not deny them the opportunity to attempt to replead their tarnishment claim as well. *See Heller*, 2009 WL 2486054, at *4 (dismissing dilution claim but granting leave to replead "with sufficient factual allegations" to make plausible the contention that plaintiff's chair design was famous "within the meaning of the statute" and not merely famous to modern furniture buyers). If the District Judge reaches the motions to dismiss, therefore, I recommend that Count Five be dismissed and that plaintiffs be given leave to replead within 21 days.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that plaintiffs' motion for leave to amend be GRANTED, that plaintiffs be given 21 days to file an amended complaint, and that the motions to dismiss be DENIED AS MOOT. In the alternative, I recommend that Counts One, Two, Five, Six and Seven be DISMISSED as to both moving defendants, that Counts Three and Four be dismissed as to defendant Infomir, and that plaintiffs be given leave to replead the dismissed counts within 21 days.

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. George B. Daniels at 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to

file objections must be directed to Judge Daniels. Failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Dated: New York, New York
        February 15, 2017

                          **SO ORDERED**.

                          **BARBARA MOSES**
                          **United States Magistrate Judge**