USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/27/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOINT STOCK COMPANY CHANNEL
ONE RUSSIA WORLDWIDE, et al.,

        Plaintiffs,

        -against-

INFOMIR LLC, et al.,

        Defendants.

16-CV-1318 (GBD) (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

On June 6, 2016, the Honorable George B. Daniels, United States District Judge, issued a Stipulation, Order, and Permanent Injunction (the Stipulated Injunction) (Dkt. No. 70), which generally prohibits defendant Actava TV, Inc. (Actava), together with its Chief Executive Officer Rouslan Tsoutiev and its affiliates Master Call Communications, Inc., and Master Call Corporation (collectively the Actava Defendants) from "broadcasting," "re-broadcasting," "otherwise transmitting," "infringing," or "making any use" of various Russian-language television channels produced by plaintiffs, or their associated logos, without "authorization." On December 13, 2016, plaintiffs moved for civil contempt sanctions (Dkt. No. 149), claiming that the Actava Defendants violated the terms of the Stipulated Injunction by entering into a referral agreement with a former co-defendant, Matvil Corporation (Matvil), which is now licensed to broadcast plaintiffs' channels over the internet. Under the referral agreement, Actava markets subscriptions to Matvil's service, in exchange for a hefty portion of the subscription fees paid by the customers it refers.

Acting pursuant to a referral from Judge Daniels, I heard argument on the contempt motion on April 24, 2017. During that hearing I denied a motion by the Actava Defendants to strike plaintiffs' reply brief, *see* April 24, 2017 Tr. (4/24 Tr.) (Dkt. No. 243), at 13:11-17, but took the

contempt motion under submission. *Id*. at 59:2-5. For the reasons that follow, I decline to certify facts constituting contempt to the district judge.

## I.   BACKGROUND

### A.   Plaintiffs' Claims

Plaintiffs are a group of eight Russian broadcasters suing to redress what they characterize as the "pirating" and resale of their programming – without permission or license fees – to Russian-speaking consumers in the United States. Plaintiffs filed this action on February 19, 2016, alleging that they produce and distribute Russian-language television programming and licensed content (the Programming) in the Russian Federation and worldwide, via cable and satellite, and that they own and operate various "famous television channels" (the Channels), including "Channel One," "Channel One Russia Worldwide," "Dom Kino," "Muzika Pervogo," "Vremya:dalekoe i blizkoe," "Carousel International," "Telekafe," "CTC," "Che TV," "Domashny," "REN TV," "TNT-Comedy," "Rain TV-Channel," and "Nostalgia." Compl. (Dkt. No. 1), ¶¶ 1-7, 26-54.[1] Each of these Channels "bears a prominent trademark or trademarks and contains repeated identifications about the source of the Programming." *Id.* ¶ 5. Insofar as they are identified in the Complaint, the "famous marks" are the stylized logos that each Channel uses identify itself on-air. *Id*. ¶¶ 26-51 (describing Channels and depicting logos); *id*. ¶ 82 ("Plaintiffs' Channels are identified by the famous marks reproduced under the 'Parties' heading of this Complaint.").

Plaintiffs' Channels and Programming are distributed "via cable and satellite" in encrypted form, "such that only authorized recipients may access it." Compl. ¶¶ 3-4. In addition, each

---

[1] Plaintiffs filed a First Amended Complaint on April 5, 2017. (Dkt. No. 211.) By that time, however, they had settled with the Actava Defendants and executed the Stipulated Injunction now at issue. Since the Amended Complaint contains no allegations against the Actava Defendants, all citations in this Memorandum and Order are to the original Complaint.

plaintiff has entered into exclusive licensing agreements with third parties to distribute the Channels and Programming via internet protocol television (IPTV) in the United States. *Id*. ¶¶ 32, 35, 37, 39, 41, 44, 48, 53, 84.[2] Only the license holders are authorized "to broadcast, re-broadcast or otherwise transmit Plaintiffs' protected, copyrighted programming in the United States via IPTV or otherwise." *Id.* ¶¶ 4, 86.

The Complaint named nine defendants, alleging that none of them was licensed to broadcast, rebroadcast, or otherwise transmit plaintiffs' content over IPTV, but that all of them nonetheless did so, unlawfully, by "hack[ing], captur[ing] or otherwise acquir[ing] without permission the encrypted signals of the Plaintiffs' Channels and transmit[ing] those signals to [their] servers which in turn stream the wrongfully acquired signals over IPTV to paying customers in this judicial district and elsewhere." Compl. ¶¶ 6, 12-14, 86.[3] In addition, plaintiffs alleged, "defendants misled consumers by making it appear on their Websites that they have the right to rebroadcast Plaintiffs Programing [sic] and Channels by, among other things, displaying the Channels [sic] famous marks." *Id.* ¶ 15. The Actava Defendants allegedly accomplished this unlawful scheme by streaming plaintiffs' Channels to their subscribers through their website actava.tv (the Website). *Id*. ¶¶ 7, 87 & Ex. 11. Another defendant, Matvil (sued together with its CEO Mikhail Gayster), allegedly used a website at www.etvnet.com. *Id*. ¶¶ 7, 88 & Ex. 12.

---

[2] IPTV is "distribution of television programming over a network running the IP protocol." Ray Horak, *Webster's New World Telecom Dictionary* 252 (1st ed. 2008). A consumer using the IPTV software "is permitted to access a unique Internet Protocol ('IP') address from which the consumer can access a livestream of the program." Compl. ¶ 21.

[3] "Streaming" is "[t]he process of providing a steady flow of audio or video data so that an Internet user is able to access it as it is transmitted." *ABC, Inc. v. Aereo, Inc.*, 134 S. Ct. 2498, 2503 (2014) (quoting *A Dictionary of Computing* 494 (6th ed. 2008)).

The Complaint asserted claims against all defendants for: (1) unauthorized publication or use of communications in violation of the Federal Communications Act of 1934, 47 U.S.C. § 605(a); (2) circumvention in violation of the Digital Millenium Copyright Act, 17 U.S.C. § 1201; (3) trademark infringement in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (4) false advertising in violation of § 43(a) of the Lanham Act, *id.*; (5) tarnishment in violation of § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (6) copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.*; (7) secondary copyright infringement; (8) deceptive business acts and practices in violation of N.Y. Gen. Bus. L. § 349; (9) unfair competition in violation of New York common law; and (10) a declaratory judgment. Compl. ¶¶ 92-156.

On March 8, 2016, Judge Daniels referred the case to me for general pretrial management pursuant to 28 U.S.C. § 636(b)(1)(A) (Dkt. No. 35), and on June 1, 2016, the district judge expanded the reference to include dispositive motions for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. No. 64.)

In a series of notices filed pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) between March 3 and September 22, 2016, the plaintiffs voluntarily dismissed their claims against Matvil and Gayster. (Dkt. Nos. 28, 29, 41 86, 103, 122.)

**B.      The Stipulated Injunction**

On April 26, 2016, plaintiffs and the Actava Defendants entered into a confidential Settlement Agreement and Release (Settlement Agreement), which they did not file on the docket of this action. *See* Declaration of Raymond J. Dowd dated Dec. 13, 2016 (Dkt. No. 150), ¶ 8 & Ex. 6.[4] On June 6, 2016, Judge Daniels entered the Stipulated Injunction, which noted that

---

[4] The version of the Settlement Agreement filed on the public docket is heavily redacted, in part to protect the confidentiality of its financial terms. *See* Dowd Decl. Ex. 6 (Dkt. No. 150-6, at ECF pages 7-14).

plaintiffs and the Actava Defendants had entered into a "confidential settlement" and went on to dismiss all of plaintiffs' claims against the Actava Defendants "[w]ith the exception of any claim arising from the enforcement of the terms of this Injunction." Stip. Inj. at ECF page 2. The operative terms of the Stipulated Injunction are as follows:

2.    Defendants [meaning, for purposes of the Stipulated Injunction, the Actava Defendants], as well as their parents, subsidiaries, affiliates, predecessors, successors, divisions, operating units, principals, officers, directors, shareholders, employees, attorneys, members, agents, heirs, representatives, spin-offs, and future assigns as well as any persons or entities in active concert or participation with Defendants are PERMANENTLY ENJOINED and RESTRAINED from:

    a.    Broadcasting, re-broadcasting or otherwise transmitting Plaintiffs' Broadcasts as identified in Annex 1 or any other channel that Plaintiffs may in the future broadcast via any medium, including but not limited to internet protocol television ("IPTV") and social media, without authorization;

    b.    directly or indirectly infringing or making any use, in any manner whatsoever, of Plaintiffs' Broadcasts including any associated programs without authorization;

    c.    directly or indirectly infringing or making any use, in any manner whatsoever, of Plaintiffs' Marks as identified in Annex 1 without authorization;

    d.    publishing or distributing any promotional materials referring to Plaintiffs' Broadcasts or Marks; in any medium, including, but not limited to the internet (including IPTV and social media), television, radio, newspapers, magazines, direct mail or oral communication without authorization;

3.    Defendants shall not register, purchase, manage or have any ownership interest in any website or device engaged in the unauthorized copying, caching, retransmission or distribution of Plaintiffs' Broadcasts;

4.    This Injunction shall apply to Defendants' parents, subsidiaries, affiliates, predecessors, successors, divisions, operating units, principals, officers, directors, shareholders, employees, attorneys, members, agents, heirs, representatives, spin-offs, and future assigns, if any;

5.    Failure to comply with this Injunction shall be deemed contempt of Court;

6.      This Court shall retain jurisdiction for the limited purpose of enforcement of this Injunction including determinations of damages and attorneys' fees which shall be recoverable in connection with any enforcement proceeding;

7.      The Clerk of this Court shall enter Judgment terminating this Action as to Defendants Actava TV, Inc. Master Call, Inc., Master Call Corporation and Rouslan Tsoutiev.

Stip. Inj. ¶¶ 2-7. Annex 1, attached to the Stipulated Injunction at ECF pages 5-7, is a two-column document titled "Broadcasts and Marks." The left-hand column lists the names of plaintiffs' Channels, in English (for example, "Channel One"). Thus, the term "Broadcasts" appears to mean plaintiffs' Channels. The right-hand column of Annex 1 displays the logos of the listed Channels, as previously depicted in the Complaint. The term "Marks" thus appears to mean these logos. The Stipulated Injunction does not define the terms "broadcasting," "re-broadcasting," "transmitting," "infringing," or "authorization."[5]

The Clerk of the Court entered a Judgment on June 6, 2016 (Dkt. No. 72), followed by a Corrected Judgment on June 14, 2016 (Dkt. No. 76), reciting the terms of the Stipulated Injunction and terminating the action as to the Actava Defendants.[6]

---

[5] Similarly, the redacted version of the Settlement Agreement presented to the Court does not define any of those terms. Paragraph 6(d), however, contains a representation and warranty that the Actava Defendants "are not presently and will not in the future broadcast, copy, distribute or otherwise use the Broadcasts in any manner, including on the Website, without the express written consent of the relevant Plaintiffs or an authorized representative thereof, as set forth in subparagraph (e) below." Subparagraph (e), in turn, permits Tsoutiev to "seek to enter into a license agreement with a Plaintiff or Plaintiffs."

[6] The Settlement Agreement resolved not only the claims against the Actava Defendants in this action, but also the claims previously asserted against Actava by some of the same plaintiffs in an earlier-filed action entitled *Closed Joint Stock Company "CTC" Network v. Actava TV, Inc.*, No. 15-CV-8681 (BCM) (S.D.N.Y.) (*CTC Network*), which was before me for all purposes pursuant to 28 U.S.C. § 636(c). On June 3, 2016, I entered a Stipulated Injunction in *CTC Network*, containing substantially the same terms as the Stipulated Injunction that Judge Daniels entered in the instant action. (*See* Dkt. No. 74 in *CTC Network.*) Also on June 3, 2016, the Clerk of the Court terminated the case. (*See* Dkt. No. 75 in *CTC Network.*) The motion papers now before the Court frequently refer to both injunctions. However, plaintiffs did not make any contempt motion in *CTC Network*.

### C.     The Actava Defendants' Conduct

On or about October 4, 2016, plaintiffs' counsel accessed Actava's Website and "discovered that the Actava Defendants were again selling subscriptions to the Broadcasts in violation of the Injunctions." Dowd Decl. ¶ 16. The "home" screen of the Website announced:

> Dear Friends!
> We are together again!
> Television service in a qualitatively new format:
>
> - Hundreds of TV channels from Ukraine, Russia, Israel and other countries
> - TV Archive for 14 years! NO ADS!
> - Video library – a wide selection of movies, TV shows, broadcasts, concerts, TV shows [sic]
> - Licensed service Russian Internet TV in America
> - Service provided by Matvil corp [sic]

Dowd Decl. Ex. 5. The same screen provided a toll-free number for the "Actava TV Team," described as a "hotline" for "reactivation subscription or connection." *Id*.[7]

Although the Website did not explicitly mention any of plaintiffs' Channels, nor display their logos, on October 19, 2016, plaintiffs sent the Actava Defendants a letter notifying them of a "suspected breach of the Settlement Agreement." Dowd Decl. Ex. 6, at 1. The letter accused Actava of acting "in concert with" Matvil to "sell[] IPTV packages that include [plaintiffs'] channels." *Id*. Plaintiffs asserted that "this relationship with Matvil is forbidden by the Settlement and enjoined by [the Stipulated Injunction]." *Id.* Plaintiffs did not claim that Matvil itself was forbidden from offering plaintiffs' Channels. However, plaintiffs wrote, the Stipulated Injunction prohibits "Actava from using Matvil to distribute [plaintiffs'] channels." *Id*. at 2.

---

[7] Plaintiffs provide both the original Russian text of the Website page and an English translation prepared by "Google translate." *See* Dowd Decl. ¶ 16. Although plaintiffs have not certified that translation, the Actava Defendants do not object to the motion on this ground and do not dispute the content of the translation.

The Actava Defendants replied on October 26, 2016, to "clarify the nature of Actava's relationship with Matvil, and to reassure your clients that Actava's conduct is consistent with its obligations" under the Stipulated Injunction. Dowd Decl. Ex. 7 (Dkt. No. 150-7), at 1. The letter explained that after settling (separately) with plaintiffs, Actava and Matvil entered into a Referral Agreement, "under which Actava, as 'Marketer,' has agreed to help generate subscribers for Matvil," which was "authorized to display, distribute, and broadcast" various Russian-language programs and channels via the internet. *Id*. at 1-2. Actava was "advertis[ing] and promot[ing] Matvil's IPTV offerings" on the Website, but did not stream any content itself. Instead, Actava explained, interested customers were redirected to Matvil's website, where they were required to "create accounts with Matvil directly for its streaming service. Matvil is responsible for collection of subscription fees and is responsible for providing any and all content to the user." *Id*. at 2. "In short," the letter went on, "Actava is simply marketing Matvil by referring additional subscribers. In so doing, Actava helps increase [plaintiffs'] viewers and licensing revenues." *Id*.

### D.      Plaintiffs' Motion

Plaintiffs were not persuaded. After additional correspondence, *see* Dowd Decl. Ex. 8 (Dkt. No. 150-8), and some fencing over the arrangements for plaintiffs' counsel to review the Referral Agreement between Actava and Matvil, *see id*. Ex. 10 (Dkt. No. 150-10); Declaration of Jonathan A. Malki dated Jan. 13, 2017 (Dkt. No. 161), ¶¶ 12-18 & Exs. D & F, plaintiffs filed their motion on December 13, 2016, seeking a ruling that the Actava Defendants are in contempt of the Stipulated Injunction; damages (after discovery and a damages inquest) in the amount of the Actava Defendants' "profits from their contempt" (or, in the alternative, statutory damages under the Communications Act and the Copyright Act); attorneys' fees; and a $10,000 coercive penalty

"for each day following the Court's contempt order that the Actava defendants remain in contempt." Not. of Motion (Dkt. No. 149), ¶¶ 1-7.[8]

### 1.    Plaintiffs' Moving Papers

In their moving papers, plaintiffs argued that the Actava Defendants violated the Stipulated Injunction because they "(i) advertised subscriptions to the Broadcasts; (ii) collected subscriptions [sic] fees from viewers related to the Broadcasts; (iii) advertised the availability of Russian-language television on the Website; and (iv) distributed an Actava application (or 'app') to view the Broadcasts." Pl. Mem. of Law dated Dec. 12, 2016 (Dkt. No. 151), at 2. Plaintiffs did not tie any of these charges to any specific provision of the Stipulated Injunction. However, in addition to the Website page described above, they presented two additional items of evidence.

The first was the transcript of a "Russian-language radio advertisement[] for Actava," Dowd Decl. ¶ 24, in which "Voice #1" (identified in the transcript as "ACTAVA TV REP") stated, among other things:

> Actava offers an annual subscription to the best television service in America. The package includes all the leading TV channels, such as the Perviy, TNT, TCT, Dozhd, CTC, Domashniy, Sovershenno Sekretno, well and many others. We are together again! As they say: with a clear conscience and confidence in today and tomorrow!

> The TV service is licensed, so we have no need to hide behind other names, as some other companies are regularly forced to do. We have nothing to hide! Actava TV offers an honest and reliable service with ambitious plans for the future. We have been with you already for 7 years and have no plans to stop.

---

[8] Although the motion was filed by all eight plaintiffs, against all four of the Actava Defendants, plaintiffs' counsel later confirmed that plaintiff Closed Joint Stock Company "TV DARIAL" had no contempt claim (apparently because Matvil did not carry that plaintiff's Broadcasts) and that none of the plaintiffs had any contempt claim against Master Call Communications, Inc. or Master Call Corporation. *See* 4/24 Tr. at 31:14-32:3.

Dowd Decl. Ex. 9 (Dkt. 150-9), at ECF page 1.[9] Two of the channels mentioned in the transcript, "CTC" and "Domashny," are also identified (by those names) on Annex 1 to the Stipulated Injunction as plaintiffs' Broadcasts.[10] Voice #1 goes on to acknowledge that Actava lost customers during a period in which it "had no opportunity to provide service in full," but then assures listeners that as of "[t]oday," a "considerable number of clients of Actava TV returns [sic] to us from other companies and, most importantly, . . . they are extremely satisfied with our new format and the attention received by the caring service professionals from our experienced customers' department." *Id.* at ECF pages 1-2. Voice #1 urges listeners to call Actava's "800" number to receive "one year of tv-enjoyment for only $149!" *Id.* at ECF page 2. Near the end of the transcript, Voice #1 states, "Broadcasting carried out by Matvil, which has permission to broadcast." *Id.*

The second item of evidence submitted by plaintiffs was the affidavit of an investigator employed by plaintiffs' counsel, who attests that on November 11, 2016, using an Android Smart TV Box, he visited the Website, where he was able to download the "Matvil IPTV app." Affidavit of Christopher Vidulich dated Nov. 14, 2016 (Dkt. No. 150-8, at ECF page 4), ¶ 2. Vidulich logged

---

[9] The transcript of the radio ad is accompanied by a Certification declaring only that it was a "true and accurate translation" of "a 6.5 minute audio file in the Russian language." Dowd Decl. Ex. 9, at ECF page 4. Neither the Certification nor any other declaration in the record describes that "audio file," much less identifies the date on which or the source from which it was recorded. Thus, plaintiffs' moving papers failed to establish that the transcript is an accurate translation of an actual radio ad placed by any of the Actava Defendants on or after the date of the Stipulated Injunction. *See* Fed. R. Evid. 901(a); *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 264 (S.D.N.Y. 2003) (ruling that transcript of audiotapes was inadmissible where, among other things, "[t]he chain of custody of the tapes is less than perfect" and "the integrity of the transcript and the identity of the speakers has not been established"). However, the Actava Defendants do not object to the motion on this ground; in fact, they confirm that they placed the ad on a Russian-language radio station. *See infra* at 14-15.

[10] According to plaintiffs, two other channels mentioned in the transcript, "Perviy" and "Dozhd," actually signify two additional Broadcasts produced by plaintiffs, identified on Annex 1 by their English names as "Channel One" and "Rain," respectively. Dowd Decl. ¶ 25. The declarant, who does not claim to speak Russian, does not explain the basis for his translations.

into that app (presumably with Matvil credentials, though his affidavit does not address this issue) and was presented with a screen saying "Matvil IPTV" in the upper left hand corner and "All Broadcasts and content provided by Matvil Corp." in the lower right hand corner. *Id*. ¶ 4. Vidulich was then able to view a variety of plaintiffs' Channels, in Russian, with "the trademark of the respective channel . . . visible in the upper right corner of the screen." *Id*. ¶¶ 5-6. Vidulich attaches screenshots of Channel One, CTC, Nostalgia, and TNT – all listed on Annex 1 to the Stipulated Injunction as plaintiffs' Channels – "playing on the Matvil IPTV app." *Id*. ¶¶ 7-10 & Exs. 4-7.

## 2.     Actava Defendants' Opposition Papers

In response, the Actava Defendants submitted declarations from Actava CEO Tsoutiev and from two Matvil employees, CEO Gayster and systems administrator Alexandr Crivoi. In addition, they submitted an expert report authored by Brad Gilmer of Gilmer & Associates (the Gilmer Report) (Dkt. No. 157-1), concerning the source of the broadcasts advertised on Actava's Website.

Tsoutiev attests that Actava "voluntarily ceased broadcasting of Plaintiffs' channels" on February 23, 2016, as soon as it learned of plaintiffs' claims in the *CTC Network* action, "and has not resumed any such broadcasting thereafter." Declaration of Rouslan Tsoutiev dated Jan. 12, 2017 (Dkt. No. 158), ¶ 5. After settling with plaintiffs (which entailed making a "substantial" payment and consenting to the Stipulated Injunction), Actava was left "with virtually no business or income." *Id*. ¶ 10. It dismantled its "entire broadcasting infrastructure," put its computer servers up for sale, and offered "refunds to all Actava customers for any service that included channels that Actava would not be able to provide." *Id*. ¶¶ 11-12. Thereafter, Actava looked for a way to "try to restructure our business" without engaging in prohibited conduct. *Id*. ¶ 12.

Actava found that opportunity when Matvil's CEO "suggested to me that Matvil might hire Actava to serve as a dealer for its services." Tsoutiev Decl. ¶ 14. On September 8, 2016, the two companies signed a Referral Agreement (*id*. ¶ 19), which provides, in pertinent part, that Actava

(called Marketer in the contract) will "serve as a source of referrals" for Matvil (called Broadcaster) but "will not be engaged in broadcasting television content." Ref. Ag. (Tsoutiev Decl. Ex. D), at 1.[11] Actava's job is to "diligently promote" Matvil's Service Offerings (defined as both real-time and on-demand broadcasting), sign up customers for Matvil's IPTV service, "register" them "to [Matvil's] site/database," provide customer support, and "manage" the customers' payments. *Id.* ¶ 1.b. Matvil, for its part, is responsible for providing the Service Offerings, billing and collecting payment from the customers, and providing Actava with any information "necessary to sign up customers and to provide customer support to said customers." *Id.* ¶ 1.a. Matvil must also pay Actava a referral fee, which varies depending on (among other things) whether the referred customer is an "existing customer" or a "new customer," but in most cases appears to cede Actava a substantial percentage of the fee paid by the customer. Matvil warrants, in the Referral Agreement, that "it is fully licensed to transmit, broadcast, display, and otherwise use all programs, channels, content, and other materials . . . constituting or comprising the Service Offerings." *Id.* ¶ 1f.ii.

Tsoutiev attests that he carefully scrutinized the Referral Agreement before Actava entered into it, to make sure that Actava would not "run afoul of the restrictions in the Injunctions," and concluded that nothing prohibited Actava from "promoting an authorized third party's broadcast of Plaintiffs' channels, so long as the promotion did not visually display Plaintiffs' marks without authorization." Tsoutiev Decl. ¶ 16. He explains that under the Referral Agreement, "it is Matvil, not Actava, that broadcasts Plaintiffs' channels." *Id.* ¶ 21. "No video content is streamed to users via the ActavaTV.com [sic] website or any other site owned or operated by Defendants." *Id.* ¶ 23.

---

[11] The Actava Defendants filed a redacted copy of the Referral Agreement on the public docket. The full text of the contract was made available to the Court and to plaintiffs' counsel, but was filed under seal. *See* 4/24 Tr. at 3:24-5:21; Dkt. Nos. 242, 249.

In fact, according to Tsoutiev, Actava no longer has any "broadband internet service," does not own, maintain, or operate any content delivery network (CDN), and "does not provide streaming video, IPTV or television service to anyone." *Id*. ¶ 24.

These assertions are backed up, in somewhat greater technical detail, by Matvil CEO Gayster and systems administrator Crivoi, who attest that Matvil uses its own CDN to deliver content to subscribers, including those referred to it by Actava. *See* Declaration of Mikhail Gayster dated Jan. 10, 2017 (Dkt. No. 159), ¶ 12; Declaration of Alexandr Crivoi dated Jan. 6, 2017 (Dkt. No. 160), ¶ 3. The CDN, in turn, "feeds the content to edge servers (on which Matvil has leased space), which then deliver Matvil's broadcasting streams to Matvil's customers (including those subscribed by Actava TV)," all of whom must be "registered in [the] Matvil database" and have Matvil "credentials." Gayster Decl. ¶¶ 11-12; *id*. ¶ 18 (customers "must create accounts with Matvil in order to access Matvil's streaming service"); Crivoi Decl. ¶ 3. Actava "does not have any access to, or means of controlling, Matvil's CDN" or the edge servers. Gayster Decl. ¶ 12; Crivoi Decl. ¶ 4.

Some Matvil customers access Matvil's servers directly, for example, via their computers. Gayster Decl. ¶ 13. As to those customers, "Actava does not provide the stream, any application, or any software." *Id*. Other customers use a set-top box provided by Actava, which is pre-loaded with the Matvil app. *Id*. ¶¶ 14, 22; *see also* Tsoutiev Decl. ¶ 15 & Ex. C. As to those customers, the stream is still provided by Matvil, and the Matvil app "works only with the Matvil CDN." Gayster Decl. ¶ 14. No content goes through Actava's Website. *Id*. ¶ 18.[12]

---

[12] These assertions, in turn, are supported by the Gilmer Report, which describes various tests performed by Gilmer to determine "the source of the channel streams" available to viewers who sign up through the Website. Gilmer concludes that the Website "redirects viewers to a password protected Matvil web page," where a customer must enter her Matvil usename and password, and be "authorized" by Matvil's servers, in order to access "Matvil's streams." Gilmer Rep. at 1. Even

Moreover, according to Gayster, it is Matvil, not Actava, that charges the customer's credit card for the content provided by Matvil. Gayster Decl. ¶ 20. Actava gets a cut of the subscription payments made to Matvil, in the form of a referral fee, but that fee is paid by Matvil. *Id*. ¶¶ 20-21. "The only payment Actava collects directly from Matvil customers is with respect to set-top boxes or other equipment or technical support services that Actava sells to Matvil customers." *Id*. ¶ 22; *see also* Tsoutiev Decl. ¶ 25 (same).

Tsoutiev does not deny that Actava benefits economically from the Referral Agreement. However, he points out, the arrangement also benefits plaintiffs, in that "Plaintiffs have license agreements with Matvil, and our promotion of Matvil's service serves to increase Plaintiffs' profits under those agreements." Tsoutiev Decl. ¶ 31. Gayster, for his part, confirms that Matvil possesses "licenses, pursuant to confidential license agreements" with six of the plaintiffs in this action, which "authorize" Matvil to "transmit, broadcast, distribute, display and/or otherwise use all of these plaintiffs' channels, programs, content, and other materials (including Plaintiffs' trademarks, logos and names)." Gayster Decl. ¶ 5. Gayster does not believe that Matvil's agreements with plaintiffs prohibit it from engaging Actava as a "dealer and/or marketer" on the terms set forth in the Referral Agreement. *Id*. ¶ 24. He notes that "none of the Plaintiffs have complained to Matvil about our work with Actava," or threatened to terminate Matvil's license agreements, "and we do not believe that any of them would have the right to do so." *Id*. ¶ 25.

As for the radio ad, Tsoutiev acknowledges that Actava helped prepare the script and arranged to run the ad on "Radio Davidzon." Tsoutiev Decl. ¶ 26. However, he points out, only

---

when viewing content through an Actava set-top box, it is Matvil's servers that "authorize the set top box so it can receive Matvil's streams and the user can view the Channels." *Id*. Gilmer found "nothing that indicates that Actava TV has access to or controls the [Matvil] CDN, or the Channels." *Id*.

Russian words were used in the ad, including (as transliterated by Tsoutiev) the Russian words "Pervvy, Ten-n-te, Te-ve-tse and Dozhd," rather than the English words "Channel One, TNT-Comedy, CTC or Rain TV," which are listed on Annex 1 to the Stipulated Injunction as plaintiffs' Broadcasts. *Id*. ¶¶ 26-27. Nor, of course, did the radio ad display the logos listed on Annex 1 as plaintiffs' Marks. *Id*. Therefore, Tsoutiev concludes, the radio ad could not violate the literal terms of the Stipulated Injunction. *See id*. ¶ 16 ("I saw nothing in the injunctions to suggest that in addition to prohibiting display or other use of the 'Marks' shown in the Annexes, the injunctions also included a prohibition on speaking the Russian words which are the names of the various channels.").

### 3.    Plaintiffs' Reply Papers

Plaintiffs do not dispute the facts set forth in the Actava Defendants' opposition papers.[13] To the contrary: they argue that the opposition papers "admit[] all the facts necessary" to make a contempt finding and "make clear that [the Actava Defendants] are in knowing, contumacious contempt of this Court's clear Injunctions." Pl. Reply Mem. at 2. Refining their arguments somewhat, plaintiffs assert that the radio ad violated ¶¶ 2(c) and 2(d) of the Stipulated Injunction (prohibiting the Actava Defendants from "infringing" or "making any use" of Plaintiffs' Marks, and from "publishing or distributing any promotional materials referring to Plaintiffs' Broadcasts

---

[13] Among the facts that plaintiffs make no effort to dispute is that Matvil itself is licensed to broadcast plaintiffs' Channels via IPTV. *See* Gayster Decl. ¶ 5; 4/24 Tr. at 22:2-5 ("Matvil is authorized to engage with consumers and distribute to consumers."). As to Gayster's related assertion that Matvil's agreements with plaintiffs "do not prohibit it from engaging Actava (or any other third party) to act as a dealer and/or a marketer for Matvil's services," Gayster Decl. ¶ 24, plaintiffs argue that Gayster is incorrect, *see, e.g.*, Pl. Reply Mem. dated Jan. 20, 2016 (Dkt. No. 170), at 4 ("Matvil has no such authority"); 4/24 Tr. at 21:9-10 ("[t]here's no distributor with an ability to sub-license"), but have conspicuously failed to submit any actual evidence on the point (such as, for example, their license agreements with Matvil). Gayster's assertion that Matvil had whatever authority it needed from plaintiffs to engage Actava pursuant to the Referral Agreement must therefore be deemed undisputed.

or Marks," in both cases without "authorization"), *see id.* at 3, and that helping consumers access plaintiffs' Broadcasts violates ¶ 2(a) (prohibiting the Actava Defendants from "[b]roadcasting, re-broadcasting or otherwise transmitting Plaintiffs' Broadcasts . . . without authorization") and ¶ 2(b) (prohibiting them from "directly or indirectly infringing or making any use, in any manner whatsoever, of Plaintiffs' Broadcasts including any associated programs without authorization"), even if Matvil streamed the Broadcasts through its own servers. *See id.* at 7. "At a minimum," in plaintiffs' view, Actava's sale of set-top boxes pre-loaded with the Matvil app violates ¶¶ 2(a) and 2(b), because the set-top boxes – for which customers pay Actava directly – allow those customers "to wrongfully access the Broadcasters' Programming." *Id.* at 7-9.

## II.   APPLICABLE LAW

### A.   Civil Contempt

The standards applicable to a motion for civil contempt are well-settled. A party may be held in civil contempt for failure to comply with a court order if: (1) the order is clear and unambiguous; (2) the proof of noncompliance is clear and convincing; and (3) the contemnor has not diligently attempted to comply with the order in a reasonable manner. *Paramedics Electromedicina Comercial, Ltd.*, *v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004); *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995); *A.V. By Versace, Inc. v. Gianni Versace S.p.A.*, 446 F. Supp. 2d 252, 257 (S.D.N.Y. 2006). All three elements must be met before contempt sanctions may be imposed. *King*, 65 F.3d at 1058; *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989).

"A clear and unambiguous order is one that leaves 'no uncertainty in the minds of those to whom it is addressed.'" *King*, 65 F.3d at 1058 (quoting *Hess v. New Jersey Transit Rail Operations, Inc.,* 846 F.2d 114, 116 (2d Cir. 1988)). The alleged contemnor "'must be able to ascertain from the four corners of the order precisely what acts are forbidden.'" *King*, 65 F.3d at

16

1058 (quoting *Drywall Tapers & Pointers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n,* 889 F.2d 389, 395 (2d Cir. 1989)). Thus, "the only question for the Court" on a contempt motion is whether the defendant's conduct "has fallen within the coverage of the injunction, as phrased," not whether that conduct would have violated the underlying statutes on which the suit was based. *GMA Accessories, Inc. v. Eminent, Inc.*, 2008 WL 2355826, at *4 (S.D.N.Y. May 29, 2008) (citing *Wella Corp. v. Wella Graphics, Inc*. 37 F.3d 46, 47-48 (2d Cir. 1994); *cf. CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 96, 98 (2d Cir. 2016) (where injunction expressly prohibited infringement of "plaintiffs' exclusive rights under Section 106(1)-(5) of the Copyright Act," the question whether its terms were "clear and unambiguous" was "directly related to whether the Plaintiffs' exclusive rights under the Copyright Act were clear and unambiguous").

Some courts also consider whether the defendant's conduct "clearly and unambiguously violated the spirit of the . . . Order." *Panix Promotions, Ltd. v. Lewis*, 2004 WL 421937, at *5 (S.D.N.Y. Mar. 5, 2004) (declining to hold defendant in contempt where he violated the "letter" of the order, which restricted him from engaging in financial transactions that could dilute his liquidity, but where his conduct, "in hindsight, increased his net worth"). *See also Titra California, Inc. v. Titra Film*, 2001 WL 1382587, at *5 (S.D.N.Y. Nov. 6, 2001) ("[I]t is the spirit of the order, not the letter, than must be obeyed.").

"In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." *Levin v. Tiber Holding Corp.,* 277 F.3d 243, 250 (2d Cir. 2002) (citation omitted); *accord Leser v. U.S. Bank Nat'l Ass'n,* 2011 WL 1004708, at *10 (E.D.N.Y. Mar. 18, 2011); *City of New York v. Golden Feather Smoke Shop, Inc.,* 2010 WL 2653369, at *5 (E.D.N.Y. June 25, 2010). The movant bears the burden of producing the required "clear and convincing" evidence. *BeautyBank, Inc. v. Harvey*

17

*Prince LLP*, 811 F. Supp. 2d 949, 956 (S.D.N.Y. 2011) (citing *City of New York v. Local 28, Sheet Metal Workers' Int'l Ass'n*, 170 F.3d 279, 282 (2d Cir. 1999)); *see also Latino Officers Ass'n City of N.Y., Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009). "Evidence that would not be admissible under established federal rules regarding the competency of evidence at trial may not be considered on a motion for contempt." *Ceslik v. Miller Ford, Inc.*, 2006 WL 1582215, at *1 (D. Conn. June 5, 2006) (citing *United States v. Bukowski,* 435 F.2d 1094, 1105-06 (7th Cir. 1970), and 17 C.J.S. *Contempt* § 89).

"Although the defendant's conduct need not be willful, a plaintiff must also prove that . . . the defendant has not been reasonably diligent and energetic in attempting to comply." *GMA Accessories*, 2008 WL 2355826, at *2 (quoting *Chao v. Gotham Registry, Inc.,* 514 F.3d 280, 291 (2d Cir. 2008)); see also *O'Hearn v. Bodyonics, Ltd.*, 56 F. Supp. 2d 302, 312-13 (E.D.N.Y. 1999) (quoting *Schmitz v. St. Regis Paper Co.*, 758 F. Supp. 922, 927 (S.D.N.Y. 1991)) (denying contempt motion, even though plaintiffs presented clear and convincing evidence of noncompliance with unambiguous order, because "the actions of the defendants were based on 'a good faith and reasonable interpretation of the court order'").

"Civil contempt sanctions may serve dual purposes, namely 'to secure future compliance with court orders and to compensate the party that has been wronged.'" *Cordius Trust v. Kummerfeld,* 2009 WL 3416235, at *6 (S.D.N.Y. Oct. 23, 2009) (quoting *Paramedics*, 369 F.3d at 657). Compensatory damages are available only where the moving party has suffered actual damage. *Time Warner Cable of New York City, a Div. of Time Warner Entm't Co., L.P. v. U.S. Cable T.V., Inc.*, 920 F. Supp. 321, 329 (E.D.N.Y. 1996) (refusing to award statutory damages under Communications Act because "[i]n civil contempt proceedings, the plaintiff is not entitled to compensation for damages that it did not actually experience"); *see also Leadsinger, Inc. v.*

*Cole*, 2006 WL 2266312, at *17 (S.D.N.Y. Aug. 4, 2006) ("Plaintiff is not entitled to compensatory damages without some evidence that defendant's contemptuous conduct caused plaintiff to suffer actual damages."); *U2 Home Entm't, Inc. v. Wei Ping Yuan,* 245 F. App'x 28, 30 (2d Cir. 2007) ("the district court erred in imposing *civil* contempt sanctions equivalent to the maximum statutory damages for 'willful' copyright violations under 17 U.S.C. § 504(c)(2)") (emphasis in the original). More generally, although federal courts have "broad discretion" to determine an appropriate contempt sanction, "'a court is obliged to use the least possible power adequate'" to bring about compliance. *Cordius Trust,* 2009 WL 3416235, at *6 (quoting *Spallone v. United States,* 493 U.S. 265, 276 (1990)).

### B.    Magistrate Judge's Authority

Where, as here, the parties have not consented to the magistrate judge's exercise of plenary jurisdiction pursuant to 28 U.S.C. § 636(c), her role with regard to a civil contempt motion is circumscribed by § 636(e). If the magistrate judge determines that "the moving party can adduce sufficient evidence to establish a *prima facie* case of contempt," *Nimkoff Rosenfeld & Schechter, LLP v. RKO Props., Ltd.*, 2014 WL 1201905, at *4 (S.D.N.Y. Mar. 24, 2014), *objections overruled in part*, 2016 WL 3042733 (S.D.N.Y. May 24, 2016) (quoting *Bowens v. Atl. Maint. Corp.,* 546 F. Supp. 2d 55, 71 (E.D.N.Y. 2008), *report and recommendation adopted*, *id.* at 60), she "shall forthwith certify the facts to a district judge," who must then "hear the evidence as to the act or conduct complained of" and impose contempt sanctions if warranted. 28 U.S.C. § 636(e)(6)(B)(iii). *Accord*, *Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Cooperation v. Duncan & Son Carpentry, Inc.*, 2015 WL 3935760, at *3 (E.D.N.Y. June 26, 2015); *Servaas Inc. v. Republic of Iraq,* 2013 WL 5913363, at *2 (S.D.N.Y. Nov. 4, 2013); *Alston v. Select Garages LLC*, 2013 WL 3357172, at *2 (S.D.N.Y. July 3, 2013).

Once the facts have been certified by the magistrate judge, "[t]he determination of whether the conduct constitutes contempt and, if so, what sanctions are appropriate are left to the discretion of the district court." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 2006 WL 1148110, at *1 (S.D.N.Y. Apr. 28, 2006); *see also Comverse, Inc. v. Am. Telecomms., Inc. Chile S.A.*, 2009 WL 464446, at *2 (S.D.N.Y. Feb. 24, 2009) ("Here, the parties did not consent to having [Magistrate] Judge Pitman exercise jurisdiction over the entirety of this case, and thus this Court reviews the facts certified to determine whether the conduct constitutes contempt and to fashion an appropriate remedy.").

If, on the other hand, the moving party does not establish a *prima facie* case of contempt, the magistrate judge must decline to certify facts constituting contempt to the district judge and may close the motion. *See, e.g., MPD Accessories B.V. v. Urban Outfitters, Inc.*, 2013 WL 6869919, at *9 (S.D.N.Y. Dec. 23, 2013) (finding that "no basis exists for the Court to certify facts to the assigned district judge in connection with the plaintiff's motion for contempt" and closing contempt motion); *Alston*, 2013 WL 3357172, at *3 (same); *Ceslik*, 2006 WL 1582215, at *2 ("the court declines to certify the facts to the assigned district judge, as contemplated by 28 U.S.C. § 636(e)"); *see also Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Cooperation*, 2015 WL 3935760, at *4 (denying contempt motion, without prejudice to renewal, where no "clear and unambiguous order" had yet been entered, such that there was "no rational basis at this juncture for finding Duncan in contempt").

"[A] motion for contempt must be denied where the magistrate judge does not certify any facts to the district court concerning the conduct." *Comverse*, 2009 WL 464446, at *2 (citing *Esso Exploration and Prod. Chad, Inc. v. Taylors Int'l Servs. Ltd.,* 2008 WL 5146965, at *2 (S.D.N.Y. Dec. 4, 2008)). Thus, in *Comverse*, the district judge limited his review to the question whether

20

"ATI Chile should be found in civil contempt, as the Magistrate Judge did not certify facts finding [various individual defendants] in contempt of this Court." 2009 WL 464446, at *2. *See also Nova Biomedical Corp. v. i-STAT Corp.,* 182 F.R.D. 419, 424 (S.D.N.Y. 1998) (denying motion for contempt where magistrate judge did not certify any of the alleged contemnor's conduct to the district judge for determination of contempt); *Bowens*, 546 F. Supp. 2d at 71-72 (district court "may not proceed further on a motion for contempt" where magistrate judge declined to certify the conduct to the district judge) (internal quotation marks and citation omitted); *Michelson v. Found. Fin., Inc*., 2014 WL 7366793, at *1 (S.D. Cal. Dec. 23, 2014) ("If the magistrate judge does not to [sic] certify facts to the district court which may constitute contempt, the matter is considered disposed of and the district court may not proceed further.").

## III.   ANALYSIS

Given that the facts relevant to plaintiffs' contempt motion are largely undisputed – indeed, no party sought an evidentiary hearing – the primary question for the Court is whether Actava's conduct, as described in its own motion papers, violates one or more "clear and unambiguous" provision(s) of the Stipulated Injunction. In making that determination, the Court must ask whether the alleged contemnor could "ascertain from the four corners of the order" that its conduct was forbidden. *King*, 65 F.3d at 1058. The "four corners" rule is fully applicable to injunctions entered on consent. *Crumpton v. Bridgeport Educ. Ass'n*, 993 F.2d 1023, 1028 (2d Cir. 1993) (quoting *United States v. Armour & Co.,* 402 U.S. 673, 682 (1971)) ("like a contract, the scope of a consent decree 'must be discerned within its four corners'"); *accord GMA Accessories*, 2008 WL 2355826, at *4; *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 867 F. Supp. 262, 267 (S.D.N.Y. 1994) (collecting cases).[14] Thus, the meaning of the Stipulated Injunction must be determined from

---

[14] Like a contract, a consent decree may also be interpreted – where ambiguous – in accordance with extrinsic evidence of the parties' intent, including "the circumstances surrounding the

its language, not the language of the parties' Settlement Agreement, the terms of which were never "so-ordered" by the Court or incorporated into the Stipulated Injunction.[15]

### A.   Paragraph 2(a)

Paragraph 2(a) of the Stipulated Injunction prohibits the Actava Defendants from "[b]roadcasting, re-broadcasting or otherwise transmitting" plaintiffs' Broadcasts (that is, their Channels) "without authorization." Advertising and promoting Matvil's service, whether on the Website or on the radio, does not violate this provision. Nor is Actava in contempt merely by redirecting customers from its Website to the Matvil website, where they can sign up for Matvil's service or download the Matvil app, so long as it is Matvil, not Actava, that delivers plaintiffs' content through its own servers, using its own software, and authenticates the customers through

---

formation of the decree." *King*, 65 F.3d at 1059. Here, it is clear that the Stipulated Injunction was intended to settle, in part, claims that the Actava Defendants were broadcasting plaintiffs' Channels without any license, sublicense, or other authority to do so. Beyond that, however, the parties have presented no evidence concerning the "circumstances surrounding the formation of the [Stipulated Injunction]," and very little evidence concerning the intent of the specific provisions now at issue. Tsoutiev attests, in general terms, that it is his "understanding" that the Stipulated Injunction permits Actava to promote "an authorized third party's broadcast of Plaintiffs' channels," Tsoutiev Decl. ¶ 16, but does not explain the basis of his understanding. Plaintiffs, for their part, provide no evidence at all concerning their negotiation of the Stipulated Injunction or their understanding of its terms.

[15] Had the Settlement Agreement been incorporated into the Stipulated Injunction, the Court would not only have the power to consider its terms but could enforce them through its contempt power. *See Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 381, 114 S. Ct. 1673, 1677 (1994); *Roberson v. Giuliani,* 346 F.3d 75, 82 (2d Cir. 2003); *Latino Officers Ass'n v. City of New York*, 519 F. Supp. 2d 438, 443 n.23 (S.D.N.Y. 2007) (court had "the authority to issue a contempt order" for violation of parties' settlement agreement where the terms of that agreement were approved by district judge and incorporated into judgment and order in which court expressly retained jurisdiction for enforcement purposes). But none of those things happened here. The Settlement Agreement was intentionally kept confidential by the parties and has never been submitted to the Court except in redacted form. Moreover, the Stipulated Injunction makes only a passing reference to the Settlement Agreement – reciting that the parties "entered into a confidential settlement pursuant to which Defendants have satisfied Plaintiffs' claims for financial damages," Stip. Inj. at ECF Page 2 – and limits the Court's continuing enforcement jurisdiction to "this Injunction." *Id.* ¶ 6.

its own website. Thus, in the scenario where the customer accesses Matvil's CDN directly, via computer or "smart TV," *see* Vidulich Decl. ¶¶ 2-5, Actava's role in "referring" the customer to Matvil does not appear to violate ¶ 2(a) of the Stipulated Injunction.

Plaintiffs argue that even if the referral itself does not violate ¶ 2(a), Actava is disobeying the Stipulated Injunction by selling set-top boxes pre-programmed with the Matvil app to its own customers. When those customers watch one of plaintiffs' Channels, plaintiffs contend, some form of "transmission" must occur between the Matvil servers and the Actava set-top box, and/or between the set-top box and the television set itself. *See* Pl. Reply Mem. at 7-8; Gilmer Rep. at 1 (Actava's set-top box "communicates with Matvil servers," which "authorize" the set-top box "so it can receive Matvil's streams and the user can view the Channels"). Under this scenario, the content is delivered from Matvil to the customer via a technological chain that includes, as a necessary link, the Actava set-top box. Therefore, plaintiffs conclude, Actava must be deemed to be "transmitting" plaintiffs' Channels in the ordinary dictionary sense of the word. *See, e.g.*, *Merriam-Webster Online*, www.merriam-webster.com/dictionary/transmit (last accessed Sept. 27, 2017) ("to send or convey from one person or place to another"); *American Heritage College Dictionary* (3d ed. 1993) ("[t]o send from one person, thing, or place, to another; convey").

This argument has some force. However, even assuming that Actava is "transmitting" plaintiffs' Channels through its pre-programmed set-top boxes, such transmission violates the injunction only if Actava is acting without "authorization." Stip. Inj. ¶ 2(a). Plaintiffs urge the Court to read that phrase as requiring express authorization from plaintiffs themselves, in the form of a direct license. This is consistent, they say, with the language of the Settlement Agreement, which prohibits the Actava Defendants from broadcasting, copying, distributing or otherwise using plaintiffs' Programming and Channels "without the express written consent of the relevant

Plaintiffs or an authorized representative thereof." Sett. Ag. ¶ 6(d)(iv). Similarly, the Settlement Agreement permits Tsoutiev to "seek to enter into a license agreement with a Plaintiff or Plaintiffs . . . without breaching this Agreement." *Id*. ¶ 6(e). Thus, in plaintiffs' view, the Stipulated Injunction is "so broad" that the Actava Defendants "literally can't do anything . . . except as provided in the Settlement Agreement." 4/24 Tr. at 20:11-14; *see also id*. at 24:1-4 ("we say in the settlement agreement the only way that Actava can do any of this [stuff] . . . is to get the express[] written consent of the plaintiffs"); Pl. Reply Mem. at 4 ("as part of the Settlement Agreement, [plaintiffs] provided Actava with a way to obtain legitimate access to [plaintiffs'] Programming which they have not sought to utilize").

The Actava Defendants counter that the word "authorization" is nowhere defined in the Stipulated Injunction, and therefore is at best ambiguous, such that they cannot be held in contempt so long as their conduct is "authorized" by Matvil, which is itself licensed – that is, authorized by plaintiffs – to broadcast plaintiffs' Channels via IPTV. *See* Def. Mem. in Opp. dated Jan. 13, 2016 (Dkt. No. 162), at 21 ("Actava reasonably understood authorization to mean with a license, and structured its dealer partnership with Matvil accordingly"); Gayster Decl. ¶ 5 (Matvil "has obtained licenses" permitting it to "transmit, broadcast, distribute, display and otherwise use all of plaintiffs' channels, programs, content and other materials (including Plaintiffs' trademarks, logos, and names).").

In the context of civil contempt, the Actava Defendants have the better end of this argument. Plaintiffs' reliance on the Settlement Agreement to expand the prohibitions of the Stipulated Injunction violates the "four corners" rule. *See King*, 65 F.3d at 1058 ("Because a decree is the sole source of the parties' rights, a district court may not impose obligations on a party that are not unambiguously mandated by the decree itself.") (internal citations omitted). It also serves

to illustrate how the parties might have clearly and unambiguously defined "authorization" in the Stipulated Injunction to mean "the express written consent of plaintiffs," had they wished to do so. *See A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 292 (S.D.N.Y. 2000) (denying contempt motion where preliminary injunction obtained by Gianni Versace did not unambiguously prohibit certain activity abroad and noting that "had Gianni truly wanted such activity prohibited, it could easily have proposed and drafted an order that explicitly forbid it"). Moreover, to the extent that the intent of the Stipulated Injunction was to prevent the Actava Defendants from offering unlicensed content (or, put another way, to make sure that plaintiffs earned license fees whenever the Actava Defendants provided their Channels to viewers), construing the term "authorization" to include indirect authorization would be consistent with "the spirit of the order." *Titra California*, 2000 WL 1382587, at *5. *See* Tsoutiev Decl. ¶ 31 (since "[p]laintiffs have license agreements with Matvil," "our promotion of Matvil's service serves to increase Plaintiffs' profits under those agreements.")

Plaintiffs concede that Matvil itself has the necessary licenses to transmit plaintiffs' Channels via IPTV. *See* 4/24 Tr. at 22:2-5. Further, while plaintiffs *argue* that Matvil cannot sublicense its rights – and therefore cannot provide "authorization" – to the Actava Defendants, *see*, *e.g.*, 4/24 Tr. at 22:25-23:1 (Matvil "has breached any license agreement that was issued"), they have not submitted any *evidence* to support that claim. Nor, for that matter, have they "complained to Matvil" about the Referral Agreement. Gayster Decl. ¶ 25. Plaintiffs therefore fall well short of establishing the alleged contemnors' noncompliance by "clear and convincing" evidence. *See BeautyBank, Inc.*, 811 F. Supp. 2d at 955-56; *Latino Officers Ass'n*, 558 F.3d at 164; *Ceslik*, 2006 WL 1582215, at *1. Given this record, I cannot conclude that Actava's sale of set-top boxes pre-loaded with the Matvil app violates ¶ 2(a) of the Stipulated Injunction.

### B.      Paragraph 2(b)

Paragraph 2(b) of the Stipulated Injunction prohibits the Actava Defendants from "directly or indirectly infringing or making any use, in any manner whatsoever, of Plaintiffs' Broadcasts including any associated programs without authorization." Plaintiffs apparently read this language to prohibit Actava from marketing Matvil's IPTV service in any way, regardless of which company's servers, software, or website deliver plaintiffs' Channels to the customers. *See* Pl. Reply Mem. at 7 (arguing that both ¶ 2(a) and ¶ 2(b) are violated when Actava's Website redirects viewers to the Matvil website, because "minor technological differences cannot defeat the [contempt] motion").

I cannot conclude that the Actava Defendants are "infringing . . . Plaintiffs' Broadcasts" by redirecting customers or engaging in the related marketing conduct contemplated by the Referral Agreement. Indeed, the term "infringing" is inherently ambiguous where, as in ¶ 2(b), a party is prohibited from infringing a "Broadcast," that is, a television channel, without identifying any specific rights that are capable of infringement and intended to be protected. In *CBS Broad. Inc. v. FilmOn.com*, repeatedly cited by plaintiffs (*see* Pl. Mem. of Law at 8, 9, 11, 12, 13-14, 18), the injunction expressly prohibited infringement of "plaintiffs' exclusive rights under Section 106(1)-(5) of the Copyright Act." 814 F.3d at 98. The court found this language sufficiently clear and unambiguous to support contempt sanctions when FilmOn continued to "us[e] its Teleporter System to broadcast the Plaintiffs' copyrighted content" after the Supreme Court held in *Aereo*, 134 S. Ct. at 2511, that such systems violated the Copyright Act. *CBS Broad Inc.*, 814 F.3d at 97-99 ("there is no doubt that the Supreme Court's holding [in *Aereo*] explicitly slammed shut the possibility that FilmOn could continue deploying the Teleporter System throughout the Second Circuit, absent a license, without violating the Copyright Act"). Here, by way of contrast, ¶ 2(b) does not even inform Actava whether it must avoid infringing plaintiffs' copyrights, their

trademarks, their patents, or some other rights. It therefore leaves considerable "doubt" as to "precisely what acts are forbidden." *CBS Broad Inc.*, 814 F.3d at 98 (quoting *Drywall Tapers & Pointers*, 889 F.2d at 395).[16]

Nor is plaintiffs' motion saved by ¶ 2(b)'s broad language prohibiting the Actava defendants from "making any use, in any manner whatsoever," of plaintiffs' Broadcasts. During oral argument, plaintiffs' counsel characterized the language of the Stipulated Injunction as "extremely broad," such that the Actava Defendants "can't do anything with our mark or our product" and are "specifically forbidden" from, among other things, making "[a]ny agreement with Matvil." 4/24 Tr. at 20:17-21:1. Plaintiffs are correct that the "making any use" language is "extremely broad." In this case, however, that is a weakness, not a strength, at least insofar as plaintiffs rely on it to penalize conduct that "uses" the Broadcasts only in the attenuated sense of marketing (and being paid to market) another company's lawful transmission of those Broadcasts, using its own servers and software, pursuant to a license.

By the same logic, plaintiffs might claim that it would be contemptuous for the Actava Defendants to manufacture "smart TVs" capable of being programmed to receive plaintiffs' Channels. Although plaintiffs do not make that assertion here (in fact, they disclaimed it at oral argument, *see* 4/24 Tr. at 17:18:12; *id.* at 26:9-13), the hypothetical illustrates the difficulty of concluding that ¶ 2(b) "clearly and unambiguously" prohibits the conduct contemplated by the Referral Agreement. *Cf. A.V. By Versace, Inc.*, 446 F. Supp. 2d at 273 (where injunction prohibited defendant from "making any use anywhere in the world of the name 'Versace,'" defendant's production of cigarette packaging "with the words 'Designed by Mark Versace' plainly violates

---

[16] Moreover, plaintiffs have presented no evidence that the Actava Defendants have actually infringed any of their copyrights, trademarks, or other intellectual property rights in the Broadcasts.

27

the injunction's prohibition"). Moreover, even if the Referral Agreement and all attendant activities could be deemed within the prohibition of ¶ 2(b), plaintiffs would still be required to establish that the Actava Defendants acted "without authorization." As explained above, the term "authorization" is itself ambiguous, preventing me from concluding that the Actava Defendants have violated ¶ 2(b).

### C.    Paragraphs 2(c) and 2(d)

Paragraphs 2(c) and 2(d) specifically prohibit the Actava Defendants from, among other things, using plaintiffs' "Marks as identified in Annex 1," and from publishing or distributing any "promotional materials referring to Plaintiffs' Broadcasts or Marks," in both cases "without authorization." These provisions, unlike ¶ 2(b), are both concrete and precise in that they refer specifically to the Channels and logos listed on Annex 1 to the Stipulated Injunction. Hoping to turn that specificity to advantage, the Actava Defendants argue that they have never listed plaintiffs' Broadcasts or displayed plaintiffs' Marks on their Website, and that while they "referred to" the Broadcasts in their radio ad, they did so orally, in Russian, rather than using the English names or the visual logos listed on Annex 1. *See* Def. Mem. in Opp. at 18 ("[I]n no way was Actava's oral enunciation of these Russian words a use of plaintiffs' visual trademarks identified in the Annex[].]"). Defendants' argument elides the crux of the problem, which is that ¶ 2(d) prohibits them from (without authorization) publishing or distributing any "promotional material" that "refer[s] to Plaintiffs' Broadcasts." Clearly the radio ad was "promotional material." Just as clearly, the ad "referred to" plaintiffs' Broadcasts (that is, their Channels) by naming several of them in the language most familiar to the radio audience.

For these reasons, I would conclude that the radio ad violated a clear and unambiguous provision of the Stipulated Injunction – but for the recurring question of "authorization." Once again, plaintiffs' motion founders on this point, because Gayster has asserted under oath that

Matvil is "authorized to . . . use," among other things, "Plaintiffs' trademarks, logos, and names." Gayster Decl. ¶ 5; *see also* Ref. Ag. ¶ 1.f.ii (warranting that Matvil is "fully licensed" to "use," among other things, "all channels, programs, content, and other materials . . . comprising the Service Offerings," including "all third party trademarks, logos, and names"). Plaintiffs have presented no evidence to the contrary. Nor (in all likelihood) could they, since a licensed IPTV broadcaster could hardly operate as such without the right to use the names of the channels it offers in advertisements. Once again, therefore, I cannot conclude that the alleged contemnors' conduct violates the clear and unambiguous terms of the Stipulated Injunction.

Because plaintiffs have not presented clear and convincing proof that the Actava Defendants violated one or more clear and unambiguous provisions of the Stipulated Injunction, there is no need for me to consider the third prong of the test for civil contempt, namely, whether the alleged contemnors "diligently attempted to comply in a reasonable manner," *Paramedics*, 369 F.3d at 655 (quoting *King*, 65 F. 3d at 1058).[17]

## IV.   CONCLUSION

For the reasons set forth above, I find that plaintiffs have not made out a *prima facie* case of contempt, and therefore that no basis exists for the certification of facts constituting contempt

---

[17] I note, however, that the Actava Defendants' failure to "seek clarification" from the Court before entering into the Referral Agreement, *see* Pl. Mem. of Law at 11, would not, standing alone, establish their lack of diligence. To be sure, an enjoined party genuinely unsure of its obligations may petition the court "for a modification, clarification, or construction" of the order, *see, e.g.*, *CBS Broad Inc.,* 814 F.3d at 99-100 (quoting *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 192 (1949)), and perhaps would be well advised, in some cases, to do so. But the Actava Defendants had no affirmative duty to file such a petition before testing their own interpretation of the Stipulated Injunction. To the contrary: "[t]he longstanding, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt." *A.V. by Versace*, 87 F. Supp. 2d at 291 (quoting *Drywall Tapers,* 889 F. 2d at 400 (Mahoney, J., concurring in part and dissenting in part)).

to the district judge. Plaintiffs' motion for civil contempt sanctions is DENIED. The Clerk of the

Court is respectfully directed to close Dkt. No. 149.[18]

Dated: New York, New York
      September 27, 2017

**SO ORDERED**.

_____
**BARBARA MOSES**
**United States Magistrate Judge**

_____

[18] As noted above, the parties' Settlement Agreement is not before the Court for enforcement. Consequently, I express no opinion as to whether the Actava Defendants have violated that contract.