UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sep 28 2018

JOINT STOCK COMPANY CHANNEL ONE
RUSSIA WORLDWIDE, et al.,

               Plaintiffs,

     -against-

INFOMIR LLC, et al.,

               Defendants.

16-CV-1318 (GBD) (BCM)

**MEMORANDUM AND
ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

On July 10, 2017, the Honorable George B. Daniels, United States District Judge, issued a
Default Judgment and Permanent Injunction (Judgment) against defaulted defendants Panorama
Alliance, L.P. (Panorama) and Asaf Yevdayev (collectively, the Defaulted Defendants), and
referred the matter to me for an inquest on damages. (Dkt. No. 313.)

By order dated September 8, 2017 (9/8/17 Order) I directed the Defaulted Defendants to
provide written discovery concerning the damages that plaintiffs were entitled to recover from
them, and ordered Yevdayev to sit for deposition regarding the same topic. (Dkt. No. 351.)

On October 10, 2017, plaintiffs filed the motion now before the Court (Dkt. No. 372),
seeking a variety of sanctions against the Defaulted Defendants – including contempt sanctions –
for their failure to comply with the 9/8/17 Order. Panorama continued to do nothing. But Yevdayev
sought an extension of time to provide the required discovery, which I granted by order dated
October 25, 2017 (10/25/17 Order). (Dkt. No. 393.) Thereafter, Yevdayev sat for two days of
deposition testimony and produced some documents. However, he failed to produce other
responsive documents that were that were very likely in his possession, custody, and control, and
that would have assisted plaintiffs in the damages inquest.

Plaintiffs ultimately obtained some of the documents that Yevdayev failed to produce, or documents reflecting comparable information, by subpoena from non-parties. On December 11, 2017, they submitted their reply papers in further support of their sanctions motion, including a brief (Pl. Reply Mem.) (Dkt. No. 463) and a declaration (Dowd Reply Decl.) (Dkt. No. 462) attaching hundreds of pages of documents, including those produced by Yevdayev and those obtained by subpoena.

As a sanction for the Defaulted Defendants' post-default discovery misconduct, plaintiffs urge the Court: (a) to hold Yevdayev in civil contempt and impose a daily fine and a conditional order of imprisonment, "to coerce his compliance with his court-ordered discovery obligations" (Pl. Reply Mem. at 10); (b) to "cut to the chase" and award them at least $ 20,000,000 in statutory damages for the Defaulted Defendants' violations of § 605(e)(4) of the Federal Communications Act, 47 U.S.C. § 605(e)(4), and to "enhance such damages based on willfulness" (Pl. Reply Mem. at 10-11); and (c) to hold Yevdayev in criminal contempt and incarcerate him. (*Id*. at 11.)

Four days later, plaintiffs filed their Proposed Findings of Fact and Conclusions of Law regarding the damages inquest (Proposed Findings) (Dkt. No. 472), supported by a declaration (Dowd Inquest Decl.) (Dkt. No. 473) attaching many of the same documents. In their Proposed Findings, plaintiffs request that the Court award them at least $ 20,000,000 in statutory damages for the Defaulted Defendants' violations of § 605(e)(4).

Plaintiffs cite no authority for their request that the Court issue a $ 20 million statutory damages award *as a discovery sanction* during a post-default damages inquest. The request is especially puzzling here, because plaintiffs never alleged any § 605(e)(4) claim against the Defaulted Defendants. *See* Am. Compl. (Dkt. 211) ¶¶ 125-26, 216-19 (alleging that other defendants violated § 605(e)(4) and reserving the right to seek statutory damages against those

other defendants). It is well-settled that a plaintiff cannot recover damages against a defaulted defendant for claims never alleged in its pleading, even if new information about that defendant's conduct comes to light during the inquest. *See*, *e.g.*, *U.S. ex rel. Nat. Dev. & Const. Corp. v. U.S. Envtl. Universal Servs., Inc.*, 2014 WL 4652712, at *4 (S.D.N.Y. Sept. 2, 2014) (quoting *Gutman v. Klein,* 2010 WL 4975593, at *10 (E.D.N.Y. Aug, 19, 2010)) ("Because [i]t is the . . . [c]omplaint, not the inquest submissions, that establishes defendants' liability, the Court may not award damages against USEUS and Palonia based upon a Miller Act claim" not pled against them) (internal quotations marks omitted); Fed. R. Civ. P. 54(c) (a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings"). The fact that the Defaulted Defendants committed post-default discovery misconduct, during the inquest itself, does not permit plaintiffs to end-run this rule and obtain a damages award to which they would not otherwise be entitled.

Further, while both Defaulted Defendants violated this Court's discovery orders (Panorama by failing to respond at all and Yevdayev by failing to respond fully), contempt sanctions would not be well-tailored to "secure the just, speedy, and inexpensive determination" of the claims against them. Fed. R. Civ. P. 1. As to Yevdayev, plaintiffs never formally notified him that they would seek contempt sanctions based on his inadequate response to the 10/25/17 Order (rather than his complete failure to respond to the 9/8/17 Order). As to Panorama, which is a defunct foreign entity – and which has intentionally failed to respond to any order of this Court for the past 18 months – imposing contempt sanctions "would be an empty and inefficient exercise." *Funnekotter v. Republic of Zimbabwe*, 2011 WL 5517860, at *3 (S.D.N.Y. Nov. 10, 2011) (*Funnekotter I*). Moreover, as to both Defaulted Defendants, liability has already been established and damages (including statutory damages for the claims that were actually alleged against them)

can be calculated based on the information in hand, making further judicial efforts to coerce post-default discovery counterproductive.

Therefore, and as more fully discussed below, plaintiffs' motion is GRANTED to the extent that (a) the Court will draw an adverse inference from the Defaulted Defendants' discovery misconduct in connection with the damages inquest; (b) certain facts will be taken as established for purposes of that damages inquest, including facts concerning the sums that the Defaulted Defendants earned from their unlawful conduct, as revealed by the partial discovery obtained from Yevdayev and the non-party discovery that plaintiffs were required to undertake; and (c) the Defaulted Defendants will be required to pay plaintiffs' reasonable expenses, including attorneys' fees, incurred in obtaining that non-party discovery and this Order.

## I.  BACKGROUND

Plaintiffs are a group of Russian television broadcasters suing to redress what they characterize as the "pirating" and resale of their Russian-language programming to consumers in the United States, over the internet, without authorization or license fees.[1] The Defaulted Defendants unlawfully sold subscriptions to a pirated version of plaintiffs' programming, which they streamed through their website at ww.mypanorama.tv (the Website), to consumers in New York and elsewhere, under the name "My Panorama TV." Am. Compl. ¶¶ 39, 42, 84, 96. Plaintiffs

---

[1] The factual background of this action, including the nature of plaintiffs' claims and certain conduct by Panorama and Yevdayev, are described in more detail in the Court's prior decisions, including *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC,* 2017 WL 696126 (S.D.N.Y. Feb. 15, 2017) (*Joint Stock I*), *report and recommendation adopted* 2017 WL 2988249 (S.D.N.Y. March 27, 2017) (*Joint Stock II*); *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 825482 (S.D.N.Y. Mar. 2, 2017) (*Joint Stock III*); *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 3671036 (S.D.N.Y. July 18, 2017) (*Joint Stock IV*), *report and recommendation adopted*, 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017) (*Joint Stock V*); *Joint Stock Co. Channel One Russia Worldwide v. Infomir, LLC*, 2017 WL 5067500 (S.D.N.Y. Sept. 27, 2018) (*Joint Stock VI*), *report and recommendation adopted at* Dkt No. 675 (Sept. 28, 2018). Only those facts pertinent to the instant motion are summarized here.

assert claims against the Defaulted Defendants for violations of § 605(a) or § 553 of the Communications Act; various provisions of the Digital Millennium Copyright Act; the Lanham Act; the Copyright Act; and N.Y. Gen. Bus Law § 349, as well as common-law claims for unfair competition and "infringement." *Id.* ¶¶ 204-313.

## A. The Defaulted Defendants

Panorama is a limited partnership organized under the laws of the United Kingdom with its principal place of business in London. *See* Am. Compl. ¶ 39. Yevdayev is a resident of Brooklyn, New York, *id.* ¶ 41, who owns the domain name of the Website and conducted Panorama's business in New York. This Court has previously found that Yevdayev "is and was, at all relevant times, Panorama's agent and representative with respect to the conduct at issue in this action." *Joint Stock IV*, 2017 WL 3671036, at *34.

Panorama was first named as a defendant in plaintiffs' original Complaint (Dkt. No. 1), filed on February 19, 2016. On October 20, 2016, Yevdayev testified at a non-party deposition that he sold "IPTV" (internet protocol television) service through a company he owned called Media Alliance. *See* Dowd Reply Decl. Ex. 1 (Yevdayev Dep. Tr. I) at 31:18-24, 32:10-21, 52:4, 97:17-18. For the past four or five years (that is, from 2011 or 2012 until the date of his deposition in 2016), Yevdayev had sold subscriptions to My Panorama TV, which included (among other offerings) plaintiffs' programming. *Id.* at 34:3, 38:8-9, 39:18-22, 45:6-18, 57:9-24. Yevdayev was added as a defendant in the Amended Complaint, filed on April 5, 2017.

## B. Procedural History

Panorama responded to the Complaint with a motion to dismiss for lack of personal jurisdiction. After losing that motion, *see Joint Stock III*, 2017 WL 825482, at *16, Panorama defaulted. Yevdayev was served with a summons and the Amended Complaint on May 8, 2017 (Dkt. No. 257), but never appeared, answered, or moved with respect to the claims against him.

On July 10, 2017, the District Judge entered the Judgment against both Defaulted Defendants, finding, among other things, that:

> Defendants intercept satellite communications and re-transmit[] Plaintiffs' Broadcasts via internet protocol television ("IPTV") on the Website to paying customers in New York and elsewhere without Plaintiffs' authorization;

> Defendants have purposefully intercepted, copied, redistributed, rebroadcast or otherwise misappropriated Plaintiffs' satellite broadcasts without permission and profited therefrom;

> Therefore, Defendants have engaged in willful infringement of the Broadcasts in violation of the Federal Communications Act, Copyright Act, and Lanham Act;

> Defendants have engaged in willful false designation of origin, false descriptions and false representations, and common law unfair competition;

> In light of Defendants' willful misconduct, this is an exceptional case; [and]

> Having established their rights in the Broadcasts, Defendants' infringement, and Defendants' defaults, Plaintiffs are entitled to damages and injunctive relief pursuant to the Copyright Act, Lanham Act, Federal Communications Act and Fed. R. Civ. P. 65, together with attorney's fees and costs.

Judgment ¶¶ 7, 13-17. The District Judge then enjoined the Defaulted Defendants from continuing their unlawful conduct and referred the matter to me for a damages inquest. *Id*. ¶ 26.

On August 15, 2017, plaintiffs moved for a "writ of assistance" as to both Defaulted Defendants, seeking damages-related discovery for use in the inquest. (Dkt. No. 339.) I construed the request as a motion for an order compelling responses to certain damages-related discovery requests that plaintiffs had served on Panorama prior to its default, and granted the motion as so construed. The 9/8/17 Order directed both Defaulted Defendants to respond to specified interrogatories and document requests by October 9, 2017. It also directed Yevdayev to sit for a second deposition, on damages-related topics, on September 22, 2017, or "such other date as may be agreed upon between plaintiffs' counsel and Yevdayev." 9/8/17 Order, at 4.

On September 26, 2017 – at which point Yevdayev had taken no steps to schedule his deposition – plaintiffs sought leave to move for contempt sanctions, which I granted on October 3, 2017. (Dkt. No. 362.) That same day, Yevdayev contacted plaintiffs' counsel by email, expressing his willingness to arrange a deposition. *See* Dowd Decl. (Dkt. No. 373) Ex. B. Counsel responded by offering various deposition dates in October 2017 but warning that if Yevdayev did not produce documents by 5:00 p.m. on October 9 (the date contained in the 9/8/17 Order), "we will make a motion for contempt of the Court's Order." *Id*. Ex. C.

Yevdayev did not produce documents on October 9, and on October 10, 2017, plaintiffs filed the instant motion. In their Notice of Motion (Dkt. No. 372), they sought an adverse inference sanction; coercive civil contempt sanctions, including a fine of $5,000 per day and a "conditional order of Asaf's arrest" by the U.S. Marshal; $20 million in damages under § 605(e)(3)(C) of the Communications Act; an order holding Yevdayev in criminal contempt; and "such other and further relief as this Court deems just and equitable, including costs and attorneys' fees." *Id*. at 2.

On October 25, 2017, I held a discovery conference, at which an attorney appeared on behalf of Yevdayev and represented that his client was "willing to cooperate with the discovery." Tr. of Oct. 25, 2017 Conf. (Dkt. No. 397) at 4:22-25. Consequently, I extended Yevdayev's time to respond to the specified written discovery requests until November 3, and extended the deadline for his deposition to November 10, 2017. 10/25/17 Order at 2. I also directed the parties to meet and confer in good faith, prior to the Defaulted Defendants' deadline for responding to the sanctions motion, to determine whether that motion "can be withdraw[n] or narrow[ed] in light of Yevdayev's anticipated compliance" with his discovery obligations. *Id*.

### C.    Yevdayev's Discovery Responses

On November 3, 2017, Yevdayev served responses to plaintiffs' written discovery. In answer to interrogatories asking him to identify Panorama's "gross receipts" and "gross profits"

from selling plaintiffs' "signals," Yevdayev objected on the ground that he (through Media Alliance) was a distributor for Panorama "in the United States" and had no "access" to the information requested. Eisenberg Decl. (Dkt. No. 448) Ex. C. Yevdayev made no effort to respond to these interrogatories even partially, by, for example, providing receipts or profits earned by Media Alliance from selling subscriptions to plaintiffs' programming. Similarly, Yevdayev objected to plaintiffs' document requests – which generally asked for documents that would show customer orders, invoices, and payments "concerning [plaintiffs'] Programming," as well as "the number of subscribers to Panorama" – on the ground that "Media Alliance's customers paid for a programming package" that included other TV programs, not related to plaintiffs, and that the package "did not in any way breakdown, separate, differentiate or identify any portion of their payment as related to the [plaintiffs'] Programming." *Id.* Ex. D, at 2-3. Again, Yevdayev made no effort to produce documents that would show, for example, the number of My Panorama TV subscriptions sold by him in New York, or the associated orders, invoices, and payments.

Yevdayev appeared for his second deposition on November 9, 2017. Dowd Reply Decl. Ex. 6 (Yevdayev Dep. Tr. II). During this session, Yevdayev explained that he purchased My Panorama TV subscriptions from Panorama and resold them in the United States through Media Alliance, but could not recall how many subscriptions he had sold. Yevdayev Dep. Tr. II at 223:3-225:16, 231:16-17. Asked what price he charged, he testified that one-month subscriptions varied from $18 to $30, while annual subscriptions cost $180 to $250. *Id.* at 232:18-22.[2]

---

[2] Also during the deposition, counsel telephoned the Court for clarification as to the scope of the written discovery requests to which Yevdayev was required to respond. I advised them, among other things, that "if Mr. Yevdayev has documents or data showing, for example, how many Panorama TV subscriptions he sold and what he charged for them, that comes within what has been served," even if Yevdayev did not have company-wide figures for Panorama. Yevdayev Dep. Tr. II, at 136:25-137:5.

Both during and after the deposition, plaintiffs requested additional documents and information from Yevdayev. *See*, *e.g.*, Dowd Reply Decl. Ex. 7. On November 17 and 30, 2017, Yevdayev served supplemental discovery responses, *see* Eisenberg Decl. Exs. E-G, which provided certain information (for example, the names of the merchant accounts that he used with respect to Panorama) that arguably went beyond that which was required by the Court's 9/8/17 and 10/25/17 Orders.[3] In addition, Yevdayev produced 349 pages of documents, including bank records, tax returns (for 2013 and 2014), statements from his AMS merchant account, and monthly invoices from a company called Setplex LLC (Setplex), covering the months of March through October 2017. Dowd Reply Decl. ¶¶ 30-31, 34-36 & Exs. 8, 11-13. The Setplex invoices charged a "Panorama TV monthly client fee" that ranged from a high of $12,723 in March 2017 to a low of $5,064 in November 2017 (after the Judgment was entered). After further correspondence, Yevdayev produced the emails from Setplex to which those invoices had been attached, bringing his total document production to 349 pages. *Id.* ¶¶ 38-39 & Ex. 14. In addition, Yevdayev agreed to a third deposition session, which was held on December 8, 2017. *Id.* Ex. 30.

As part of their damages discovery, plaintiffs sent subpoenas to various non-parties, including Setplex, which produced additional copies of the monthly invoices it had sent to Yevdayev, *see* Dowd Inquest Decl. Ex. 12, as well as additional email correspondence with Yevdayev. Dowd Reply Decl. ¶¶ 64-66 & Exs. 21-23. These emails show that Yevdayev arranged a Network Services Agreement between Setplex and Panorama pursuant to which Setplex provided Panorama with the ability to distribute IPTV content, and Panorama paid Setplex at the

---

[3] However, Yevdayev continued to claim that he could not say how many Panorama subscriptions he had sold, because "Panorama without warning terminated the access that Mr. Yevdayev had" to the information and documents necessary to answer this question when it shut down the Website in the wake of the Judgment in this action. Eisenberg Decl. Ex. E, at 2, ¶ 2.

rate of $3.50 per subscriber to "Panorama TV." It thus became clear that the "quantity" column in the Setplex invoices, which ranged from a high of 4,241 in March 2017 to a low of 1,688 in October 2017 (after the Judgment was entered), referred to the number of My Panorama TV subscribers that month.[4]

Setplex also produced a 108-page spreadsheet that appears to list all of the customers for whom Setplex charged Panorama. Dowd Reply Decl. Ex. 33. Yevdayev never produced any comparable documents or information concerning the number of My Panorama TV customers. Nor, insofar as can be determined from the present record, did he ever produce documents showing how much he, Media Alliance, or Panorama earned from those customers.[5]

On December 1, 2017, in opposition to plaintiffs' sanction motion, Yevdayev filed an declaration stating, "I believe that I have fully complied with the Court's order." Yevdayev Decl. (Dkt. No. 447) ¶ 4. Among other things, Yevdayev attested he produced "documentation of all payments to my business by its customers." *Id.* ¶ 5. This is presumably a reference to his AMS merchant account statements, which were not submitted to the Court.

---

[4] Yevdayev never produced the Network Services Agreement or the other emails with Setplex. Nor, for that matter, did he produce any other emails or electronically stored information (ESI), despite having several different email addresses and multiple online accounts (with Google Web Services, Amazon Web Services, Stamps.com, Cloudflare, and FORTE Payment Systems) that plaintiffs believe likely contain documents responsive to this Court's discovery orders. Dowd Reply Decl. ¶¶ 52-61.

[5] As noted above, Yevdayev did produce statements from his AMS merchant account. When he supplemented his responses to plaintiffs' document production requests on November 30, 2017, he represented (through counsel) that these statements show "all payments to [Media Alliance] by its customers." Eisenberg Decl. Ex. G, at 1. Plaintiffs' counsel, however, represents that the AMS statements "do not delineate what charges were related to Panorama or Media Alliance." Dowd Reply Decl. ¶ 36. The account statements themselves have not been submitted to the Court.

## II.    LEGAL STANDARDS

### A.    Discovery Sanctions Generally

A magistrate judge has broad authority to impose sanctions for failure to comply with discovery orders. Orders imposing sanctions on this basis "are ordinarily considered non-dispositive, and therefore fall within the grant of Rule 72(a), 'unless the sanction employed disposes of a claim.'" *Joint Stock IV*, 2017 WL 3671036 at *16 (quoting *Seena Int'l Inc. v. One Step Up, Ltd.*, 2016 WL 2865350, at *10 (S.D.N.Y. May 11, 2016)). The magistrate judge's authority to order (rather than recommend) a discovery sanction does not depend on the relief requested, but rather depends on the "sanction the magistrate judge actually imposes." *Id.* (quoting 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 3068.2, at 383 (Thomson Reuters 2014)).

Where, as here, sanctions are sought because a party (or non-party) has "fail[ed] to obey an order to provide or permit discovery," the motion is usually analyzed under Fed. R. Civ. P. 37(b)(2)(A), which permits the court where the action is pending to "issue further just orders," including:

(i)    directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)    striking pleadings in whole or in part;

(iv)    staying further proceedings until the order is obeyed;

(v)    dismissing the action or proceeding in whole or in part;

(vi)    rendering a default judgment against the disobedient party; or

(vii)    treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

The only predicates to the imposition of sanctions under Rule 37(b) are (a) a "court order directing compliance with discovery requests," and (b) "non-compliance with that order." *Shanghai Weiyi Int'l Trade Co. v. Focus 2000 Corp.*, 2017 WL 2840279, at *9 (S.D.N.Y. June 27, 2017) (Moses, M.J.). In addition, Rule 37(b)(2)(C) requires the court to order a disobedient party to pay the "reasonable expenses, including attorney's fees" incurred by the moving party, either "instead of or in addition to" the sanctions permitted by Rule 37(b)(2)(A).

Discovery sanctions are imposed for three purposes: "(1) to ensure that a party will not benefit from its failure to comply; (2) to obtain compliance with the Court's orders; and (3) to deter noncompliance, both in the particular case and in litigation in general." *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 319 F.R.D. 122, 126 (S.D.N.Y. 2016) (Moses, M.J.). In seeking to achieve these purposes, any sanction the court imposes under Rule 37(b) must be "just," and its severity "must be commensurate with the non-compliance." *Joint Stock IV*, 2017 WL 3671036 at *21 (quoting *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007)). While a Court "should always seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future," *Id.* (quoting *Grammar v. Sharinn & Lipshie, P.C.*, 2016 WL 525478, at *3 (S.D.N.Y. Feb. 8, 2016)), it need not "exhaust possible lesser sanctions." *Shcherbakovskiy v. Seitz*, 450 F. App'x. 87, 88 (2d Cir. 2011).

Where a court seeks to impose more severe discovery sanctions, such as an adverse inference or finding a fact established, it "must also assess whether the requesting party suffered prejudice as a result of the loss or withholding of evidence." *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, 2010 WL 3173785, at *3 (E.D.N.Y. Aug. 11, 2010). The party seeking the sanction must also show:

> (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a

culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *Short v. Manhattan Apartments, Inc.*, 286 F.R.D. 248, 253 (S.D.N.Y. 2012) (taking fact as established as discovery sanction for failure to produce relevant documents after defendant violated three separate court orders).

### B.    Contempt

In cases where the parties have not consented to the jurisdiction of the magistrate judge, and the alleged contempt takes place outside the magistrate judge's presence, her power to impose contempt sanctions is limited by statute. Where, in the opinion of the magistrate judge, the conduct constitutes civil or criminal contempt, the magistrate judge "shall forthwith certify the facts to the district judge," who shall then "hear the evidence as to the act or conduct complained of," and determine if it "warrant[s] punishment." 28 U.S.C. § 636(e)(6)(B)(iii). Faced with a motion for civil contempt, a magistrate judge must determine whether the moving party can adduce sufficient evidence to establish a *prima facie* case of contempt. *Joint Stock VI*, 2017 WL 5067500, at *10; *McCutcheon v. Colgate-Palmolive Co.*, 2017 WL 7693049, at *2 (S.D.N.Y. Dec. 21, 2017) (same). If the magistrate judge certifies that certain facts constitute contempt, the final "'determination of whether the conduct constitutes contempt and, if so, what sanctions are appropriate are left to the discretion of the district court." *Joint Stock VI*, 2017 WL 5067500, at *10 (quoting *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 2006 WL 1148110, at *1 (S.D.N.Y. Apr. 28, 2006)).

"If, on the other hand, the moving party does not establish a *prima facie* case of contempt, the magistrate judge must decline to certify facts constituting contempt to the district judge." *Joint Stock VI*, 2017 WL 5067500, at *10. Where a magistrate judge declines to so certify facts

constituting contempt, "the motion for contempt must be denied." *Id.* (quoting *Comverse, Inc. v. Am. Telecomms., Inc. Chile S.A.*, 2009 WL 464446, at *2 (S.D.N.Y. Feb. 24, 2009)) (internal quotation marks omitted).

### 1. Civil Contempt

A party may be held in civil contempt for failing "to obey any order" relating to discovery, except an order to submit to a mental or physical examination. Fed. R. Civ. P. 37(b)(2)(A)(vii). The party seeking civil contempt sanctions must demonstrate that "(1) the order is clear and unambiguous; (2) the proof of noncompliance is clear and convincing; and (3) the contemnor has not diligently attempted to comply with the order in a reasonable manner." *Joint Stock VI*, 2017 WL 5067500, at *8 (quoting *Paramedics Electromedicina Comercial, Ltd., v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004)) *accord S.E.C. v. Durante*, 641 F. App'x 73, 76 (2d Cir. 2016) (same). All three elements must be met. *Joint Stock VI*, 2017 WL 5067500, at *8. For the purposes of imposing contempt sanctions, a "clear and unambiguous order is one that leaves 'no uncertainty in the minds of those to whom it is addressed." *Id.* at *9 (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)).

Civil contempt sanctions "may serve two purposes: 'to coerce the contemnor into complying in the future with the court's order, or to compensate the complainant for losses resulting from the contemnor's past noncompliance.'" *United Fabrics Int'l, Inc. v. Metro 22, Inc.*, 2016 WL 6310775, at *2 (S.D.N.Y. Oct. 27, 2016) (quoting *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 56 (2d Cir. 1982)). "Although federal courts have "broad discretion" to determine an appropriate contempt sanction, 'a court is obliged to use the least possible power adequate' to bring about compliance." *Id.* (quoting *Cordius Tr. v. Kummerfeld*, 2009 WL 3416235, at *6 (S.D.N.Y. Oct. 23, 2009)).

In the civil contempt context, compensatory sanctions may only be awarded to compensate for harm actually suffered as a result of the contemptuous conduct. *Joint Stock VI*, 2017 WL 5067500 at *9. When the contempt proceedings arise from a violation of an injunction or consent decree prohibiting specified unlawful conduct, "statutory damage values may be used to estimate the value of actual damage in order to compensate an aggrieved party who suffered actual damage." *Time Warner Cable of New York City, a Div. of Time Warner Entm't Co., L.P. v. U.S. Cable T.V., Inc.*, 920 F. Supp. 321, 329 (E.D.N.Y. 1996). However, no damages (statutory or otherwise) may be awarded as a civil contempt sanction "without some evidence that defendant's contemptuous conduct caused plaintiff to suffer actual damages." *Leadsinger, Inc. v. Cole*, 2006 WL 2266312, at *17 (S.D.N.Y. Aug. 4, 2006); *see also Time Warner*, 920 F. Supp. at 328-29 (refusing to award statutory damages under the Communications Act, even though defendant "took decisive steps to import approximately 8,500 illegal descrambler devices in violation of the Consent Judgment's specific prohibition of those actions," where no actual damage accrued "because Time Warner acted so promptly").

### 2. Criminal Contempt

Unlike civil contempt, criminal contempt serves to vindicate the authority of the court and punish the contemnor. "To find a person in criminal contempt, the evidence must show beyond a reasonable doubt that: "'(1) the court entered a reasonably specific order; (2) defendant knew of that order; (3) defendant violated that order; and (4) his violation was willful.'" *Dvorkin v. New York-Presbyterian Hosp.*, 2011 WL 280801, at *2 (S.D.N.Y. Jan. 19, 2011) (quoting *United States v. Cutler,* 58 F.3d 825, 834 (2d Cir.1995)) (Daniels, J.).

## III. DISCUSSION

### A. Applicability of Rule 37(b)

As noted above, plaintiffs seek a wide range of sanctions against Defaulted Defendants, from an adverse inference to civil and criminal contempt. Oddly, however, they do not cite Rule 37(b), relying instead on the Court's "inherent power" and the general contempt statute, 18 U.S.C. § 401. *See* Pl. Mem. at 5, 9. The Second Circuit has noted, albeit in *dicta*, that imposing discovery sanctions pursuant to a court's "inherent power" can be "needless and confusing" when Rule 37 applies directly to the problem confronting the court. *S. New England Tel. Co. v. Global NAPs, Inc.*, 624 F.3d 123, 144 n.7 (2d. Cir. 2010); *see also Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 207 (1958) (holding that whether a district court "has the power" to impose dismissal as a discovery sanction "depends *exclusively* on Rule 37, which addresses itself with particularity to the consequences of a failure to make discovery by listing a variety of remedies which a court may employ as well as by authorizing any order which is 'just.'") (emphasis added). Consequently, I look to Rule 37(b) as the source of the Court's authority to impose the requested sanctions.

### B. The Defaulted Defendants' Noncompliant Conduct

Before the Court can impose sanctions for the violation of its orders, it must first conclude that its orders have been violated. With respect to Panorama, plaintiffs have shown that it violated the 9/8/17 Order by failing to answer interrogatories, respond to plaintiffs' document requests, or do anything else to comply, or attempt to comply, with that order. Dowd Decl. ¶ 13.

Yevdayev has also violated this Court's orders – in his case, the 9/8/17 Order as modified by the 10/25/17 Order – by failing to "produce all documents responsive" to the specified document production requests by November 10, 2017, or at all. *See* 9/8/17 Order at 4, ¶ 2; 10/25/17 Order at 2, ¶ 1. Those requests required him to produce, among other things, documents concerning

16

"payments from customers in connection with" plaintiffs' programming; "payments made by Panorama concerning [plaintiffs'] Programming," and "customer orders, subscriptions, invoices, [or] payments by customers," as well as "documents sufficient to identify the number of subscribers to Panorama." Eisenberg Decl. Ex. D at 2-3 (Requests No. 6, 15, 16, & 19). Yet when Yevdayev responded to the discovery requests on November 3, 2017, he produced no documents, answering all of these requests (and others) by asserting that "no such document is within Mr. Yevdayev's possession, custody or control." *Id.*

On November 30, 2017, Yevdayev produced further documents, including invoices from Setplex that showed the number of subscribers for seven months in 2017. Dowd Reply Decl. Ex. 14. But he never provided comparable information for earlier time periods; never produced the underlying customer orders or invoices that would show how much they paid for their subscriptions; and never produced the checks he wrote to Setplex to pay for its IPTV services. (Plaintiffs ultimately obtained some of those checks from Setplex. *Id.* Ex. 24.)

The documents that Yevdayev failed to produce (or produced late) are within the scope of the 9/8/17 and 10/25/17 Orders and should have been produced on November 3, 2017. Moreover, given that Yevdayev arranged the Setplex/Panorama contract, and was the Panorama representative to whom Setplex sent its invoices, his claim that he lost access to the basic information and data exchanged between Panorama and Setplex (such as the number of My Panorama TV customers) when Panorama shut down its Website is not credible.

### C. Choice of Discovery Sanctions

When applying discovery sanctions under Rule 37, the Court's discretion is limited to the imposition of sanctions that are both "just" and commensurate in severity with the non-compliance. *Joint Stock IV*, 2017 WL 3671036 at *21. The Court's discretion is also cabined by the application of four factors: "(1) the willfulness of the non-compliant party or the reason for

noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, 2015 WL 3526661, at *4 (S.D.N.Y. June 3, 2015) (*Funnekotter II*) (quoting *Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 302–03 (2d Cir. 2009)) (internal quotation marks omitted). "Noncompliance with discovery orders is considered willful when the court's orders have been clear, when the party has understood them, and when the party's noncompliance is not due to factors beyond the party's control." *Thompson v. Jam. Hosp. Med. Ctr.*, 2015 WL 7430806, at *3 (S.D.N.Y. Nov. 20, 2015) (internal citation omitted). *See also Joint Stock IV*, 2017 WL 3671036, at *21. As noted above, a court "should always seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future." *Grammar*, 2016 WL 525478, at *3 (citing *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 46 (S.D.N.Y. 2014)).

### D. Application of Standards to Defaulted Defendants

For the reasons stated below, the Court finds that the Defaulted Defendants' conduct is sanctionable, but does not warrant either civil or criminal contempt sanctions.

#### 1. Factors Considered

As to the first factor – willfulness – I find that the Defaulted Defendants understood this Court's orders and that their noncompliance was willful. The 9/8/17 and 10/25/17 Orders were clear. Yet Panorama made no efforts whatsoever to respond, while Yevdayev was chronically a day (or more) late and a dollar (or more) short.

Yevdayev argues, through counsel, that he initially did not understand the 9/8/17 Order, because the relevant discovery requests sought information concerning Panorama, "to which Mr. Yevdayev has no access," Eisenberg Decl. ¶ 9, and he "did not realize" that he was required to "interpret" the requests as seeking information "from him." *Id.*; *see also* Yevdayev Decl. ¶ 3 ("I

18

did not comply with that order [initially] because I thought it was impossible for me to do so."). However, Yevdayev is no stranger to federal litigation, and has a history of discovery noncompliance followed by sanctions. *See* Dowd Reply Decl. Ex. 3. His claim that he ignored the 9/8/17 Order because it was "impossible" for him to comply is therefore not credible. Moreover, Yevdayev retained counsel prior to the October 25, 2017 discovery conference, but still failed to produce a single document on his extended production deadline of November 3, 2017 – or at any time until after his November 9, 2017 deposition.

The second factor – efficacy – weighs in favor of sanctions harsher than a fee award, but against either civil or criminal contempt. Panorama and Yevadayev have already defaulted. They have little if anything to gain from further cooperation in discovery designed to accurately assess the amount of damages to be awarded against them. Minor sanctions, such as a fee award or an order to provide additional discovery, would do little if anything to remedy the Defaulted Defendants' evasive conduct. Moreover, unless incorporated into this Court's final judgment, any fee award or monetary sanction would likely go unpaid and uncollectable, potentially leading to additional rounds of expensive and time-consuming motion practice but no real relief for plaintiffs. However, the Court need not resort to a civil or criminal contempt finding to prevent the Defaulted Defendants from benefiting from their discovery misconduct. The Court can achieve that goal – and compensate plaintiffs for the harm done by that misconduct – by drawing an adverse inference against the Defaulted Defendants and taking certain damages-related facts as established for purposes of plaintiffs' pending damages inquest, as discussed in more detail below.

The third factor – the duration of the noncompliance – also weighs in favor of moderate sanctions. Panorama has taken no steps whatsoever to comply with the 9/8/17 Order, and its period of noncompliance now extends for more than a year. As to Yevdayev, his period of noncompliance

is less clear. In the 10/25/17 Order, the Court extended Yevdayev's time to respond to the written discovery requests to November 3, 2017, at which point he responded, but did not provide any information (in response to the interrogatories) or documents (in response to the document requests). Thereafter, he produced some documents, but only with continued prodding, forcing plaintiffs to seek discovery from third parties. Moreover, Yevdayev has yet to produce other responsive documents, which he likely possesses, such as customer counts prior to March 2017, subscription pricing information, and at least some rudimentary accounting records tracking revenues and profits. Thus, although the degree of Yevdayev's noncompliance lessened somewhat over time, it has now been nine months since he produced his last page. Moreover, as he well understood in October and November 2017, plaintiffs needed whatever documents and information he could give them by December 15, 2017, when their inquest submissions were due.

The final factor – notice – would support whatever level of sanction the Court determines to be appropriate. By the time I issued the 10/25/18 Order plaintiffs had already moved for contempt, seeking a wide array of harsh sanctions. Yevdayev was thus on extremely clear notice that if he did not comply with his Court-ordered discovery obligations, plaintiffs could and likely would pursue any or all of those sanctions.

### 2. Sanctions Are Appropriate

The Defaulted Defendants' conduct is sanctionable. Plaintiffs were forced to incur additional costs and burdens to obtain documents and information from third parties that should have been promptly provided by the Defaulted Defendants. Moreover, plaintiffs still do not have some of the documents and information that they requested, such as customer counts prior to March 2017 and a clear picture of the revenues and profits earned by the Defaulted Defendants from their unlawful scheme. The Defaulted Defendants' failure to comply (or, in Yevcdayev's

case, failure to comply fully) with the 9/8/17 and 10/25/17 Orders has also, likely, prejudiced plaintiffs' pending damages inquest.

Plaintiffs have not, however, made a *prima facie* case that either Defaulted Defendant should be held in contempt.

As to Yevdayev, plaintiffs' motion for contempt sanctions was based on his failure to comply with the Court's 9/8/17 Order. *See* Pl. Mem. at 6 (Yevdayev's "non-compliance is clear: neither documents nor response[s] to interrogatories have been provided in response" to the 9/8/17 Order). Thereafter, the Court modified Yevdayev's obligations somewhat when issuing the 10/25/17 Order, and Yevdayev partially complied with those obligations. However, plaintiffs neither withdrew their original contempt motion, nor filed a new one. Instead, they argue in their reply papers – for the first time – that Yevdayev was in contempt of a different order (the 10/25/17 Order rather than the 9/8/17 Order) for a different reason (inadequate performance rather than failure to perform altogether).

This sequence of events raises due process concerns. Ordinary discovery sanctions can be assessed and imposed in a relatively informal manner. *See*, *e.g*., Local Civil Rule 37.2. However, "[p]rior to the imposition of sanctions upon an individual charged with civil contempt, 'due process requires that the person receive notice and an opportunity to be heard.'" *Ginter Logistics Serv. Co. v. ACH Freight Forwarding, Inc.*, 2010 WL 4455402, at *2 (S.D.N.Y. Oct. 21, 2010) (quoting *Sterling Nat'l Bank v. A–1 Hotels Intern., Inc.*, 2004 WL 1418201, at *2 (S.D.N.Y. June 30, 2004)). Here, plaintiffs did not give Yevdayev formal notice as to the new basis for their contempt motion. Nor did Yevdayev have an opportunity to be heard concerning the sufficiency of his responses, since plaintiffs' argument on this point was contained in their reply brief. The

Court therefore declines to certify facts constituting Yevdayev's contempt under 28 U.S.C. § 636(e).

As to Panorama, there are no similar due process concerns. However, "[i]n imposing a sanction, 'where the purpose is to make the defendant comply . . . [the court] must . . . consider . . . the probable effectiveness of any suggested sanction in bringing about the result desired.'" *Funnekotter I* , 2011 WL 5517860, at *3 (quoting *United States v. United Mine Workers of Am.,* 330 U.S. 258, 304, (1947)). In *Funnekotter I*, as here, the plaintiff sought coercive sanctions against a defaulted defendant in order to coerce compliance with its post-default discovery obligations. Although its violation was clear, Magistrate Judge Katz found that there was "no reason to believe that the contempt sanctions being sought would be effective in compelling [the defaulted defendant] to comply with its discovery obligations," and concluded that certifying contempt "in order to impose monetary sanctions against [the defaulted defendant] would be an empty and inefficient exercise." *Id.* The same is true of the coercive contempt sanctions that plaintiffs now seek against Panorama. Given the record in this action (and the questions that plaintiffs themselves have raised as to whether Panorama has any real existence apart from Yevdayev himself), there is no reason to believe that certifying the facts concerning its potential contempt to the District Judge pursuant to 28 U.S.C. § 636(e) would be anything other than a bootless exercise.

Nor are plaintiffs entitled to $20 million (or any other amount) in statutory damages under § 605(e)(3)(C) of the Communications Act. As noted above, plaintiffs did not sue the Defaulted Defendants under § 605(e)(3)(C), nor seek such damages, as against them, in the Amended Complaint. Even more fundamentally, when monetary awards are imposed as a discovery sanction, the amount "must be commensurate with the non-compliance." *Joint Stock IV*, 2017 WL 3671036

at *21; that is, no greater than necessary to compensate for the harm done *by the discovery misconduct* that underlies the motion. The Defaulted Defendants have no doubt caused some economic harm to plaintiffs by failing to comply (or comply fully) with their post-default discovery obligations. There is no basis in the record, however, for me to value that harm as the equivalent of 2,000 violations of § 605(e)(3)(C). *See* Pl. Reply Mem. at 10.[6]

A more appropriate sanction here is an award of plaintiffs' expenses incurred as a result of the Defaulted Defendants' misconduct (including the expenses associated with obtaining the non-party discovery they would not have needed had the Defaulted Defendants promptly complied), coupled with an adverse inference and an order directing that certain facts be taken as established. Where "discovery misconduct has deprived the opposing party of key evidence needed to litigate a contested issue, an order prohibiting the disobedient party from contesting that issue – or simply directing that the matter be taken as established – is also appropriate." *Shanghai Weiyi*, 2017 WL 2840279, at *11.

To obtain such a sanction, the moving party must show:

> (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). A party withholding evidence acts with a "culpable state of mind" where he acts "negligently." *Id.* at 108; *see also Doug's Word Clocks.com Pty Ltd. v. Princess Int'l, Inc.*, 323 F.R.D. 167, 173 (S.D.N.Y. 2017) (applying negligence standard for culpability in failing to produce evidence); *Valentini v.*

---

[6] By the same token, I cannot "cut to the chase" and award $4,241,000 (or $42,410,000) in statutory damages, as a discovery sanction, based on the fact that Panorama had 4,241 subscribers (at its peak) and plaintiffs' contention that "each subscription is a violation." Pl. Mem. at 10.

*Citigroup, Inc.*, 2013 WL 4407065, at *3 (S.D.N.Y. Aug. 16, 2013) (same). The court must also consider the "the extent of the prejudice to the moving party." *Anthropologie, Inc. v. Forever 21, Inc.*, 2009 WL 690126, at *3 (S.D.N.Y. Mar. 13, 2009).

Here, each of these factors are satisfied as to both Defaulted Defendants. First, there is no dispute that the Defaulted Defendants had an obligation to timely produce documents and interrogatory answers as directed by the 9/8/17 and 10/25/17 Orders, yet failed to do so. Panorama took no steps to produce the requested discovery. Yevdayev responded, but was evasive in deposition and slow to provide responsive documents. Further, it seems fairly clear that he possesses, but has failed to produce, other responsive documents, some of which (for example, his emails back and forth with Setplex and the Panorama/Setplex contract) plaintffs ultimately obtained only by sending subpoenas to non-parties.

Second, the Defaulted Defendants acted with a culpable state of mind. Panorama has produced no documents, indicating willful noncompliance, while Yevdayev, even when represented by counsel, has chronically dragged his feet, and consistently denied knowledge or possession of information and documents that plaintiffs later learned, from other sources, that he did in fact possess.

Third, the missing materials are relevant to the damages inquest. In order to seek damages based on defendant's profits, plaintiffs need to know, among other things, how many subscribers Panorama had, and how much they paid for the service. But Panorama failed to provide any damages-related discovery, and Yevdayev provided only seven months' worth of subscriber counts and his own vague estimate of what those subscribers paid. Thus, the Defaulted Defendants are unable to paint a full picture of the facts underlying what might otherwise have been a colorable actual damages theory.

An order directing that certain facts be taken as established is also wholly consistent the purposes of sanctions under Rule 37, which are, *inter alia*, to ensure that a party will not benefit from its failure to comply with a discovery order, and to deter noncompliance, both in the particular case and in litigation in general. *Royal Park Inv*., 319 F.R.D. at 126.

## IV.    CONCLUSION

For the reasons stated above, plaintiffs' motion is GRANTED.

It is hereby ORDERED that Panorama and Yevdayev, jointly and severally, must pay the reasonable expenses, including attorneys' fees and out-of-pocket costs, caused by their failure to obey this Court's discovery orders issued on September 8 and October 25, 2017, including plaintiffs' expenses incurred in (a) seeking and obtaining additional damages-related discovery as to Panorama and/or Yevdayev, formally or informally, from October 10, 2017, to December 15, 2017; and (b) preparing and pursuing their sanctions motion.

It is further ORDERED that plaintiffs shall file one or more declarations setting forth those expenses no later than **November 1, 2018**, and shall attach the relevant time and expense records, including attorney time records and invoices for out of pocket expenses. Panorama and Yevdayev may file responding papers, limited to the amount of fees and costs to be awarded, no later than **November 15, 2018**. There shall be no reply.

It is further ORDERED that, as an additional sanction, the Court will draw an adverse inference against Panorama and Yevdayev, for purposes of the pending damages inquest, with respect to the documents and information they failed to produce.

It is further ORDERED that, as an additional sanction, the following facts shall be taken as established for purposes of this action, and shall not be contested by Panorama or Yevdayev, even if one or both of them should succeed in vacating or overturning their default judgments:

(1)      The Defaulted Defendants, and each of them, sold each of the "Panorama TV" subscriptions listed in the Setplex invoices.

(2)      The Defaulted Defendants, and each of them, sold those subscriptions for the price of $30 per month or $250 per year.

(3)      The Defaulted Defendants' only known costs in selling the subscriptions were the fees to Setplex (in the amount of $3.50 per month for each subscription).

(4)      Prior to the commencement of the Setplex relationship, and going back to 2012, Yevdayev sold My Panorama TV subscriptions in the United States in conjunction with other, unknown, providers of network management and encoding/transcoding services.

(5)      From at least January 2016 (*see* Am. Compl. Ex. 13) through the period covered by the Setplex invoices, the My Panorama TV subscribers were given access to an unauthorized version of the programming belonging to one or more of the plaintiffs.

It is further ORDERED that the Defaulted Defendants are precluded from offering evidence or argument to contest these established facts.

All relief not granted herein is DENIED.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 372.

Dated:    New York, New York
           September 28, 2018

**SO ORDERED**

_____
**BARBARA MOSES**
**United States Magistrate Judge**