UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOINT STOCK COMPANY CHANNEL ONE RUSSIA WORLDWIDE, et al., | |
| Plaintiffs, | |
| -against- | |
| INFOMIR LLC, et al., | |
| Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  10/25/2019

16-CV-1318 (GBD) (BCM)

**REPORT AND RECOMMENDATION TO THE HON. GEORGE B. DANIELS**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiffs in this action are a group of Russian television broadcasters suing to redress the "pirating" and resale of their programming at cut-rate prices to Russian-speaking consumers in the United States, via Internet Protocol Television (IPTV), without authorization or license fees. In their First Amended Complaint (FAC) (Dkt. No. 211), filed on April 5, 2017, plaintiffs assert claims against thirteen defendants, including Panorama Alliance, L.P. (Panorama) and Asaf Yevdayev, pursuant to, *inter alia*, § 605(a) of the Federal Communications Act (FCA), 47 U.S.C. § 605(a), which prohibits the unauthorized interception, publication, and use of interstate or foreign radio communications. On July 10, 2017, the Honorable George B. Daniels, United States District Judge, issued a "Default Judgment and Permanent Injunction" (the Default Injunction) (Dkt. No. 313) against Panorama and Yevdayev (collectively the Defaulted Defendants) and referred the matter to me for an inquest on damages.

For the reasons that follow, I respectfully recommend that plaintiffs be awarded:

(1)    $4,241,000 in statutory damages pursuant to § 605(e)(3)(C)(i)(II) of the FCA, 47 U.S.C. § 605(e)(3)(C)(i)(II), comprising $1000 for each of the 4,241 subscribers to the Defaulted Defendants' unlawful IPTV streaming service at its peak in May 2017;

(2)     $8,482,000 in enhanced damages pursuant to § 605(e)(3)(C)(ii) of the FCA, 47

U.S.C. §§ 605(e)(3)(C)(ii); and

(3)     $30,607.50 in discovery sanctions previously assessed against the Defaulted

Defendants for their post-default discovery misconduct;

for a total of $12,753,607.50, with the judgment to run jointly and severally against Panorama and

Yevdayev.  In addition, I recommend that plaintiffs be awarded:

(4)     $61,475.97 in discovery sanctions previously assessed against Panorama and its

then-counsel, with that portion of the judgment running solely against Panorama.

## I.    BACKGROUND[1]

### A.    Plaintiffs

Plaintiffs Joint Stock Company Channel One Russia Worldwide (Joint Stock Company

Channel One), Closed Joint Stock Company CTC Network, Closed Joint Stock Company TV

DARIAL, Closed Joint Stock Company "New Channel," Limited Liability Company "Rain TV-

Channel," and Limited Liability Company "Comedy TV," n/k/a Limited Liability Company

Global Entertainment TV (sometimes referred to collectively as the Broadcasters) are all located

in and organized under the laws of the Russian Federation, FAC ¶¶ 6, 15, 19, 21, 23, 26, and most

---

[1] The factual background and procedural history relevant to the instant damages inquest is described in more detail in the Court's prior opinions in this action, including *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 696126 (S.D.N.Y. Feb. 15, 2017) (the 2/15/17 R&R), *report and recommendation adopted sub nom. Joint Stock Co. v. Infomir LLC*, 2017 WL 2988249 (S.D.N.Y. Mar. 27, 2017) (the 3/27/17 Order); *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 825482 (S.D.N.Y. Mar. 2, 2017) (the 3/2/17 R&R), *report and recommendation adopted*, 2017 WL 1321007 (S.D.N.Y. Mar. 30, 2017) (the 3/30/17 Order); *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 3671036 (S.D.N.Y. July 18, 2017) (the 7/18/17 Order and R&R), *report and recommendation adopted*, 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017) (the 9/28/17 Order); and *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2018 WL 4760345 (S.D.N.Y. Sept. 28, 2018) (the 9/28/18 Order). Familiarity with these opinions is assumed.

are headquartered in Moscow. *Id.* ¶¶ 6, 23, 26.[2] They produce various television channels (Channels) and licensed content (Programming), which is "first broadcast in the Commonwealth of Independent States ('CIS'), including Russia," via "transmission to a satellite," FAC ¶¶ 62-64, and therefore constitutes "'radio-originated communications' within the meaning of 47 U.S.C § 605(a)." *Id.* ¶ 65. The programming is "encrypted in a manner to ensure that only authorized recipients may lawfully access it." *Id.* ¶ 66. Authorized recipients within that footprint (including authorized cable operators who redistribute the programming to consumers "via an approved cable system," are issued de-encryption devices "that permit the satellite transmission to be viewed." *Id.* ¶¶ 68-71.

Each plaintiff has entered into license agreements with third parties to distribute its content in the United States via IPTV. FAC ¶¶ 12, 16, 20, 22, 24, 28. However, none of the defendants named in the FAC held such a license or was otherwise authorized to distribute plaintiffs' Channels or Programming. *Id.* ¶¶ 14, 18, 20, 22, 25, 29.

### B.    The Defaulted Defendants

Panorama is (or was) a limited partnership registered under the laws of the United Kingdom. FAC ¶ 39.[3] It "intercept[ed] Broadcasters' encrypted foreign satellite transmissions, transform[ed] the transmissions into digital data, then re-transmit[ted] the channels over the internet to paying subscribers in the United States using [a] password protected streaming

---

[2] As discussed in more detail in § II.A of this Report and Recommendation, *infra*, the Court "is required to accept all of [plaintiffs'] factual allegations as true" as against the Defaulted Defendants, "and draw all reasonable inferences in [plaintiffs'] favor," except concerning damages. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

[3] On December 6, 2018, Panorama filed a Form LP 6 with Companies House in the United Kingdom, stating that "[t]he Partnership dissolved on 22.11.18." *See Panorama Alliance, L.P.*, Companies House, https://beta.companieshouse.gov.uk/company/SL013886/filing-history (last visited Oct. 25, 2019).

service[ ]." FAC ¶ 1. Panorama owned and operated the website www.mypanorama.tv (the Website), through which it provided "unauthorized access to video streams of [a] pirated version of the Programming," under the brand name My Panorama TV, in exchange for subscription payments. *Id*. ¶¶ 39, 42, 96 & Ex. 17.

Yevdayev is a resident of Brooklyn, New York. FAC ¶ 41. He registered the Website's domain name and operated Panorama's "principal place of business" at 1702 Avenue Z, Brooklyn, New York, 11235, where he "fill[ed] subscriptions for its illegal service, answer[ed] technical support questions, and process[ed] payments," *id*. ¶¶ 39-42, thereby "promoting, directing, and profiting from" the unlawful business. *Id*. ¶ 42.

### C.      Procedural History

#### 1.      The Motion to Dismiss

Plaintiffs' initial Complaint (Dkt. No. 1) asserted claims against Panorama (originally sued as "Panorama TV ('www.mypanorama.tv')") but not Yevdayev. On August 25, 2016, Panorama moved to dismiss all of plaintiffs' claims against it pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. (Dkt. No. 108.) Plaintiffs thereupon requested and were granted leave to conduct jurisdictional discovery, including a deposition of Yevdayev, who appeared to be selling Panorama's service out of a storefront at the Avenue Z address in Brooklyn. (Dkt. No. 126.) During his deposition on October 20, 2016, Yevdayev acknowledged that he sold IPTV service to consumers in New York and elsewhere, including subscriptions to My Panorama TV, explaining that he did so through a company he owned called Media Alliance. *See* Yevdayev Dep. Tr. I (Dkt. No. 137-1), at 31:18-24, 32:10-21, 52:4, 97:17-20. My Panorama TV subscriptions included (among other offerings) plaintiffs' Programming. *Id*. at 34:3, 38:8-9, 39:18-22, 45:6-18, 57:9-24.

On October 17, 2016, with the motion to dismiss still pending, plaintiffs moved for discovery sanctions against Panorama and its attorney, Alan P. Fraade, pursuant to Fed. R. Civ. P. 37(b), arising out of Panorama's failure, despite a court order, to produce documents in jurisdictional discovery. (Dkt. No. 127.) On October 28, 2016, plaintiffs moved for additional sanctions pursuant to Fed. R. Civ. P. 11, asserting that Panorama's motion to dismiss was based on objectively unreasonable factual contentions that were contradicted by evidence in attorney Fraade's hands. (Dkt. No. 134.)

On March 2, 2017, I recommended that Panorama's Rule 12(b)(2) motion be denied because plaintiffs had made "a factually-supported *prima facie* showing that Panorama is subject to personal jurisdiction in this Court." 3/2/17 R&R at 14.[4] The District Judge adopted my recommendation and denied the motion on March 30, 2017. *See* 3/30/17 Order at 3 ("Panorama purposefully conducted business in New York through its transactions with Asaf Yevdayev, an authorized dealer in New York, by selling him multiple subscriptions to Panorama's IPTV services through Panorama's website, www.mypanorama.tv ('the Website'), over the course of four to five years.").

On April 5, 2017, plaintiffs filed their FAC, which among other things added Yevdayev as an individual defendant. In the FAC, plaintiffs allege that all defendants, including the Defaulted Defendants, violated § 605(a) or (in the alternative) § 553 of the FCA, 47 U.S.C. § 605(a) or § 553[5]; the Digital Millennium Copyright Act (DMCA), 17 U.S.C. §§ 1201(a)(1)(A), 1201(a)(2),

---

[4] For the sake of clarity, all citations herein to prior opinions issued in this action (whether or not published) identify the opinion by its date and use the page numbers appearing in the original opinion as posted on the Court's electronic docket.

[5] As noted above, § 605(a) of the FCA prohibits the unauthorized interception, publication, or use of "radio" communications, including satellite transmissions. Section 553(a) prohibits the unauthorized interception or receipt of communications offered over a cable system. *See* 47 U.S.C.

and 1201(b); the Lanham Act, 15 U.S.C. §§ 1125, 1125(a); the Copyright Act, 17 U.S.C. § 501; New York General Business Law § 349; and the common law of New York. FAC ¶¶ 203-15, 220-316.

Yevdayev was served with process on May 8, 2017 (*see* Dkt. No. 257), but failed to appear or respond to the claims against him. Similarly, once Panorama lost its Rule 12(b)(2) motion it stopped communicating with (or paying) its New York attorney and took no further steps to defend this action. On May 9, 2017, I granted attorney Fraade's motion for leave to withdraw as counsel for Panorama and extended its time to respond to the FAC through new counsel. (Dkt. No. 255.) No new counsel ever appeared, and no response to the FAC was ever filed on Panorama's behalf.

On June 21, 2017, plaintiffs obtained certificates of default against Panorama and Yevdayev (Dkt. Nos. 304, 305), and on June 30, 2017, they moved for a default judgment against the same defendants, seeking a permanent injunction, "damages discovery," and other relief. (Dkt. No. 309.)

## 2.    The Default Injunction

On July 10, 2017, the District Judge issued the Default Injunction, finding, among other things, that this Court has subject-matter jurisdiction over plaintiffs' claims and personal jurisdiction over both Defaulted Defendants; that venue is proper in the Southern District of New York; that the Defaulted Defendants "own and operate the website accessed through the uniform resource locater ('URL') www.mypanorama.tv ('Website')"; that they "intercept satellite

---

§§ 605(a), 553(a). Plaintiffs explain that they asserted both claims because, "[w]ithout further Discovery from and/or admission by Defendants, Broadcasters cannot determine if Defendants intercepted Broadcasters' signal via a cable system, in violation of 47 U.S.C. § 553, or via a satellite transmission, in violation of 47 U.S.C. § 605. As such, Broadcasters are alleging two (2) counts in its Complaint. Broadcasters recognize that each Defendant can be liable for only (1) of these statutes." FAC ¶ 233.

communications and re-transmit[ ] Plaintiffs' Broadcasts via internet protocol television ('IPTV') on the Website to paying customers in New York and elsewhere without Plaintiffs' authorization"; that they "purposefully intercepted, copied, redistributed, rebroadcast or otherwise misappropriated Plaintiffs' satellite Broadcasts without permission and profited therefrom"; that they "engaged in willful infringement of the Broadcasts in violation of," *inter alia*, "the Federal Communications Act"; and therefore that plaintiffs "are entitled to damages and injunctive relief pursuant to," *inter alia*, the FCA, together with attorney's fees and costs. Default Inj. ¶¶ 2-4, 6-7. 13-14, 17. The District Judge enjoined the Defaulted Defendants from continuing their unlawful conduct, *id*. ¶ 18(a)-(d), and referred the matter to me for an inquest on damages. *Id*. ¶ 26.

### 3.    Damages Discovery

In a Scheduling Order dated July 18, 2017 (the 7/18/17 Order) (Dkt. No. 321), I directed plaintiffs to submit proposed findings of fact and conclusions of law regarding damages (Proposed Findings) by August 16, 2017. 7/18/17 Order at 1. The Scheduling Order instructed plaintiffs to "tie the proposed damages figure(s) to the legal claim(s) on which liability has been established," to "demonstrate how plaintiffs have arrived at the proposed damages figure(s)," and to submit declarations and documentary evidence as "necessary to support the proposed damages amount." *Id*. at 2. I also directed plaintiffs to support any request for attorneys' fees with "contemporaneous time records showing, for each attorney or other timekeeper, the date of service, the hours expended, and the nature of the work performed." *Id*.

Also on July 18, 2017, I granted plaintiffs' motion for discovery sanctions against Panorama and Fraade and recommended that the District Judge grant their motion for Rule 11

sanctions. 7/18/17 Order and R&R, at 68-69.[6] As a discovery sanction, I directed Panorama and Fraade to pay the reasonable attorneys' fees and other expenses incurred by plaintiffs in pursuing jurisdictional discovery, and further directed that certain facts be taken as established "for all purposes of this action," including that "Asaf Yevdayev is and was, at all relevant times, Panorama's agent and representative with respect to the conduct at issue in this action." *Id.* at 54. Neither Panorama nor Fraade objected to my Rule 37(b) decision pursuant to Fed. R. Civ. P. 72(a). Fraade did object to my Rule 11 recommendation, pursuant to Fed. R. Civ. P. 72(b)(2), but on September 28, 2017, the District Judge adopted that recommendation, granted the Rule 11 motion, directed  Panorama and Fraade to pay the reasonable attorneys' fees and other expenses incurred by plaintiffs in opposing Panorama's Rule 12(b)(2) motion, and again directed that it be taken as established that Yevdayev was Panorama's agent with respect to the conduct at issue in this action. 9/28/17 Order, at 2-3, 6.[7]

---

[6] Throughout the Rule 12(b)(2) proceedings, Panorama steadfastly denied that it had any office, agent, or representative in New York. In fact, Brooklyn resident Yevdayev registered Panorama's Website, sold Panorama's IPTV service from his storefront in Brooklyn (which was listed on that Website as Panorama's "authorized dealer"), and was reachable through an "@panorama.tv" email address and through Panorama's "800" number. Moreover, Yevdayev retained attorney Fraade to represent Panorama, coordinated Fraade's communications with the "U.K. office," and paid the bills that Fraade issued to Panorama, using checks drawn on the accounts of Media Alliance and other Brooklyn-based businesses that he operated. *See* 7/18/17 Order and R&R, at 3-5. On these facts, I had no difficulty concluding that Panorama and its counsel "violated Rules 11(b)(3) and (4) by signing, filing and submitting papers in support of [Panorama's] Rule 12(b)(2) motion without any objectively reasonable evidentiary basis for their key factual allegations" and that attorney Fraade "either failed to make an objectively reasonable inquiry or pursued a claim for which no basis was disclosed by such an inquiry." *Id.* at 64.

[7] On May 24, 2019, I fixed the amount of the monetary sanctions against Panorama and Fraade with respect to their Rule 37(b) violations at $61,475.97 (consisting of $60,089.82 in fees and $1,386.15 in costs), and recommended that they be assessed an additional $29,671.78 in fees with respect to their Rule 11 violations, all payable to plaintiffs. (Dkt. No. 747.) On June 7, 2019, attorney Fraade moved for reconsideration. (Dkt. No. 753.) On June 13, 2019, I denied the reconsideration motion. (Dkt. No. 759.) On June 27, 2019, Fraade filed objections with the District Judge (Dkt. No. 767), which remain *sub judice*.

On August 15, 2017, plaintiffs requested an extension of time to file their Proposed Findings (Dkt. No. 341), and moved for a "writ of assistance" to compel the Defaulted Defendants to provide damages-related discovery for use in the inquest. (Dkt. No. 339.) I construed the request as a motion made pursuant to Fed. R. Civ. P. 37(a) to compel responses to certain damages-related discovery requests that plaintiffs had served on Panorama prior to its default, and as so construed granted it in part, directing Panorama and Yevdayev – its agent – to respond to specified interrogatories and document requests (those relating to damages) by October 9, 2017. *See* Order dated September 8, 2017 (Dkt. No. 351), at 4. In addition, I directed Yevdayev to sit for a second deposition (limited to "matters relevant to the calculation of plaintiffs' damages"). *Id*. at 4.

On October 10, 2017, after the Defaulted Defendants failed to produce any of the requested damages-related documents, plaintiffs again moved for discovery sanctions. (Dkt. No. 372.) Shortly thereafter, Yevdayev retained counsel and moved the Court for more time to respond. (Dkt. No. 389.)

On October 25, 2017, following a conference, I extended Yevdayev's deadline to respond to plaintiffs' written discovery requests and ordered again that he sit for a damages-related deposition. (Dkt. No. 393.) On November 3, 2017, Yevdayev served written responses to plaintiffs' damages-related document requests and interrogatories, consisting primarily of objections, coupled with a claim that he had no "access" to information or documents concerning Panorama's subscription sales, receipts or profits. (Dkt. No. 448-4.) On November 9, 2017, Yevdayev appeared for deposition and testified, among other things, that although he personally purchased and resold Panorama subscriptions for years in Brooklyn, he had no records and no recollection concerning how many of those subscriptions he sold, what he paid for them, or what he charged for them. Yevdayev Dep. Tr. II (Dkt. No. 462-6) at 110:16-112:18, 117:4-9, 222:15-225:16, 231:16-17,

232:18-22. His best estimate was that monthly subscriptions cost "from 18 to $30" and annual subscriptions cost "from 180 to 250." *Id.* at 232:15-22. Although Yevdayev later served supplemental written discovery responses, produced additional documents, and appeared for yet another deposition session, he never provided more precise information about pricing or profits.[8]

Meanwhile, plaintiffs served subpoenas on numerous non-parties, including Setplex, LLC (Setplex), which provided "network services" to Panorama for a period of eight months, from March through October 2017, pursuant to a Network Services Agreement (NSA) that was arranged on Panorama's behalf by Yevdayev. (*See* Dkt. Nos. 462-21, 462-22, 462-23, 473-11.)[9] Under the NSA, Setplex provided Panorama with the ability to distribute IPTV content, and Panorama paid Setplex for its services at the rate of $3.50 for each subscriber to "PanaromaTV." (Dkt. Nos. 462-23, 473-11.) Setplex's monthly invoices (sent directly to Yevdayev) listed the number of Panorama subscribers on which Setplex based its fee for that month. According to these invoices, Panorama

---

[8] Yevdayev spent most of his final deposition session on December 8, 2017 evading the questions put to him by plaintiffs' counsel. For example, he declined to name the entity to which he transferred money for the Panorama subscriptions he purchased and resold, saying he did not "have [it] in front of me" and wanted to be "precise." *See* Yevdayev Dep. Tr. III (Dkt. No. 462-30) at 267:6-268:4. Thereafter, Yevdayev claimed not to recall various emails and other communications that he sent or received, and similarly drew a blank as to the purpose of various checks he wrote. *See, e.g.*, *id.* at 303:21-304:18, 357:14-360:6, 360:11-363:6.

[9] Setplex sent the NSA directly to Yevdayev by email on January 26, 2017, asking him to "initial all pages in the attachment [and] sign on the signature page" on behalf of Panorama. *See* Yevdayev Dep. Tr. III at 340:9-341:23. At deposition, Yevdayev acknowledged receiving the January 26 email and identified the attachment as a contract for "IPTV services." *Id.* A few moments later, however, the witness stated that he "didn't even read this agreement" because it "was not for me." *Id.* at 343:14-344:11, 346:14-15, 354:15. When asked why the contract was sent directly to him for signature, Yedayev said, "You might ask them," and "I don't know." *Id.* at 344:12-13; 345:4-8. When asked why his name was pre-printed in the contract's Panorama signature block, Yevdayev said, "I don't know. Typo." *Id.* at 344:21-345:12. On April 5, 2017, Setplex sent Yevdayev another email thanking him for "sending us the agreement" and attaching a signed copy. *Id.* at 357:12-358:2. When asked about the April 5 email at deposition, Yevdayev testified, "It must be a typo because I did not send this agreement." *Id.* at 358:3-4.

had a high of 4,241 subscribers in May 2017 and a low of 1,688 subscribers in October 2017 (after

the Default Injunction was entered):

| Invoice No. | Invoice Date | Month Covered | "PanaromaTV" Subscribers |
|---|---|---|---|
| 1109 | 04/06/2017 | March 2017 | 4,226 |
| 1116 | 05/04/2017 | April 2017 | 4,236 |
| 1130 | 06/01/2017 | May 2017 | 4,241 |
| 1144 | 07/10/2017 | June 2017 | 2,354 |
| 1153 | 08/10/2017 | July 2017 | 2,029 |
| 1161 | 09/05/2017 | August 2017 | 3,912 |
| 1169 | 10/02/2017 | September 2017 | 1,794 |
| 1185 | 11/01/2017 | October 2017 | 1,688 |

Dowd Decl. dated Dec. 15, 2017 (12/15/17 Dowd Decl.), Ex. 11 (Dkt. No. 473-11).

During his final deposition session, Yevdayev attempted to walk away from the Setplex

documents, claiming that the reference to Panorama on its invoices was an "error," *see* Yevdayev

Dep. Tr. III at 282:15-283:20, and that the subscriber counts on those invoices were too high. *See*

*id*. at 282:15-283:10 ("I know we did not have so many subscribers"). However, he never produced

any contrary documents or provided any more specific evidence concerning Panorama's subscriber

base. *Id*. Apart from the documents and testimony supplied by Yevdayev, Panorama never

responded to any of plaintiffs' post-default discovery requests.

On December 11, 2017, when plaintiffs filed their reply brief in further support of their

motion for post-default discovery sanctions, they urged the Court to: (a) draw an adverse inference

from Yevdayev's failure to produce various documents responsive to plaintiffs' discovery requests;

(b) hold Yevdayev in civil contempt and impose a daily fine, and a conditional order of

imprisonment, to coerce his compliance with his court-ordered discovery obligations; (c) "cut to

the chase" and award plaintiffs $20 million to $200 million in statutory damages for the Defaulted

Defendants' violations of § 605(e)(4) of the Federal Communications Act, 47 U.S.C. § 605(e)(4);

and (d) hold Yevdayev in criminal contempt and incarcerate him. *See* Pl. Reply Mem. dated Dec. 11, 2017 (Dkt. No. 463), at 9-11.

### 4.   Plaintiffs' Proposed Findings

Four days later, on December 15, 2017, plaintiffs filed their Proposed Findings (Dkt. No. 472), accompanied by the declaration of Raymond J. Dowd dated December 15, 2017 (12/15/17 Dowd Decl.) (Dkt. No. 473), attaching various documents obtained from Yevdayev and from third parties (including the Setplex invoices, *see id*. Ex. 11). Plaintiffs once again sought statutory damages of $20 to $200 million for the Defaulted Defendants' violations of § 605(e)(4) of the FCA. Prop. Findings at 24-25, ¶¶ 25-30.

Section 605(e)(4) prohibits the import, sale, or distribution of a "device or equipment" with knowledge that "the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming." 47 U.S.C. § 605(e)(4). Section 605(e)(3)(C)(i)(II), in turn, permits a person aggrieved by a violation of § 605(e)(4) to recover statutory damages of $10,000 to $100,000 "for each violation." 47 U.S.C. § 605(e)(3)(C)(i)(II). In the Proposed Findings, plaintiffs noted that (according to the deposition testimony of non-party witness Albert Benjamin), Yevdayev possessed 2,000 IPTV set-top boxes when he was managing Panorama's business in Brooklyn. Prop. Findings at 17, ¶ 131. Reasoning that each such "device" constituted a separate violation of § 605(e)(4), plaintiffs argued that the Defaulted Defendants should be assessed statutory damages of $10,000 to $100,000 per box, for a total of $20 to $200 million. *Id*. at 24-25, ¶¶ 25-26, 30.

However, plaintiffs never asserted any § 605(e)(4) claim against the Defaulted Defendants. As noted above, the FAC accused them of violating § 605(a) (intercepting a radio transmission) or, in the alternative, § 553 (intercepting a cable transmission), but not § 605(e)(4).[10]

Additionally, plaintiffs sought statutory damages of $4,241,000 to $42,410,000 for the Defaulted Defendants' violations of § 605(a) of the FCA. Prop. Findings at 25, ¶ 31. Section 605(e)(3)(C)(i)(II) permits a person aggrieved by a violation of § 605(a) to recover statutory damages of $1,000 to $10,000 "for each violation." 47 U.S.C. § 605(e)(3)(C)(i)(II). Noting that Panorama had 4,241 active subscriptions in May 2017 (according to the Setplex invoices), and reasoning that "each subscription is a violation," plaintiffs argued that this would entitle them to "additional damages of, at minimum $4,241,000 to a maximum of $42,410,000." Prop. Findings at 25, ¶ 31.

### 5.     Plaintiffs' Supplemental Request

On September 28, 2018, I granted plaintiffs' motion for post-default discovery sanctions against the Defaulted Defendants, directing them to pay the reasonable attorneys' fees and other expenses incurred by plaintiffs in seeking and obtaining additional damages-related discovery as to Panorama and/or Yevdayev from October 10 to December 15, 2017. 9/28/18 Order at 25. I further directed that certain damages-related facts be taken as established for purposes of this action, including that:

> (1)     The Defaulted Defendants, and each of them, sold each of the "Panorama TV" subscriptions listed in the Setplex invoices.

---

[10] Plaintiffs allege that certain other defendants (the "Infomir Defendants") violated § 605(e)(4) of the FCA. *See* FAC §§ 216-19. However, no such claim was asserted against Panorama or Yevdayev.

(2)     The Defaulted Defendants, and each of them, sold those subscriptions for the price of $30 per month or $250 per year.

(3)     The Defaulted Defendants' only known costs in selling the subscriptions were the fees to Setplex (in the amount of $3.50 per month for each subscription).

(4)     Prior to the commencement of the Setplex relationship, and going back to 2012, Yevdayev sold My Panorama TV subscriptions in the United States in conjunction with other (unknown) providers of network management and encoding/transcoding services.

(5)     From at least January 2016 (*see* [FAC] Ex. 13) through the period covered by the Setplex invoices, the My Panorama TV subscribers were given access to an unauthorized version of the programming belonging to one or more of the plaintiffs.

*Id.* at 26.[11]

In the same order, I noted that plaintiffs could not be entitled to $20 million (or any other amount) in statutory damages "as a discovery sanction," 9/28/18 Order at 2, and that, in any event, "plaintiffs never alleged any § 605(e)(4) claim against the Defaulted Defendants." *Id.* "It is well-settled that a plaintiff cannot recover damages against a defaulted defendant for claims never alleged in its pleading." *Id.* at 3; *see also* Fed. R. Civ. P. 54(c) (a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings"). During a conference on October 5, 2018, I offered plaintiffs the opportunity to supplement their Proposed Findings to "point out for the court what alternatives may exist in terms of damages as against [the] defaulted defendants." Tr. of Oct. 5, 2018 Discovery Conf. (Dkt. No. 682), at 4:2-14.

On November 1, 2018, plaintiffs filed a Supplemental Memorandum of Law (Supp. Mem.) (Dkt. No. 691), in which they argue that they are entitled to between $3,974,390 and $5,657,390

---

[11] On June 13, 2019, I fixed the amount of the monetary sanctions against Panorama and Yevdayev with respect to their post-default discovery misconduct at $30,607.50, assessed jointly and severally against both Defaulted Defendants. (Dkt. No. 758.)

in actual damages and between $217,260,000 and $2,170,260,000 in statutory damages for the Defaulted Defendants' violations of § 605(a) of the FCA. *See* Suppl. Mem. at 2, 5; *id.* Ex. B. Both of these ranges, as explained in more detail below, are extrapolated from the Setplex invoices.

## II.     ANALYSIS

When conducting a damages inquest, "a district court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence." *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors, Inc.*, 699 F.3d 230, 234 (2d Cir. 2012); *see also Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53 (2d Cir. 1993) (quoting *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991)) ("Rule 55(b)(2) of the Federal Rules of Civil Procedure . . . 'allows but does not require the district judge to conduct a hearing.'"). Since no party has requested a hearing on the issue of damages, and since defendants have not submitted any written materials, I have conducted the inquest based solely upon the materials submitted by plaintiffs.

### A.     Legal Standards

Following a default, the district court must accept all well-pleaded factual allegations in the plaintiff's complaint as true, except those relating to damages. *See Finkel*, 577 F.3d at 84; *Cotton v. Slone*, 4 F.3d 176, 181 (2d Cir. 1993); *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). However, a default "only establishes a defendant's liability if those allegations are sufficient to state a cause of action against the defendants." *Gesualdi v. Quadrozzi Equip. Leasing Corp.*, 629 F. App'x 111, 113 (2d Cir. 2015). Ordinarily, therefore, the inquest court must determine "whether the allegations in the complaint establish the defendants' liability as a matter of law." *Id.* (*citing Finkel*, 577 F.3d at 84). If they do, the only remaining issue is "whether plaintiff has provided adequate support for [her requested] relief."

*Gucci Am., Inc. v. Tyrrell-Miller*, 678 F. Supp. 2d 117, 119 (S.D.N.Y. 2008) (citing *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)).

Conversely, if the well-pleaded factual allegations in the complaint fail to state a claim upon which relief can be granted, no damages can be awarded, even if the post-default inquest submissions supply the missing information. *See United States ex rel. Nat'l Dev. & Constr. Corp. v. U.S. Envtl. Universal Servs., Inc.*, 2014 WL 4652712, at *4 (S.D.N.Y. Sept. 2, 2014) (quoting *Gutman v. Klein*, 2010 WL 4975593, at *10 (E.D.N.Y. Aug. 19, 2010)) ("[i]t is the . . . [c]omplaint, not the inquest submissions, that establishes defendants' liability") (alterations in the original); *J & J Sports Prods., Inc. v. Abdelraouf*, 2019 WL 457719, at *2 (E.D.N.Y. Feb. 5, 2019) ("It is the moving party's burden to demonstrate that it is entitled to recovery based on the factual allegations pleaded in the complaint.").

## B.     Jurisdiction and Venue

Plaintiffs brought suit under four federal statutes: the FCA, the DMCA, the Copyright Act, and the Lanham Act. This Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). *See* FAC ¶ 57.

I am also satisfied as to personal jurisdiction over the Defaulted Defendants, which is "a necessary prerequisite to entry of a default judgment." *Sheldon v. Plot Commerce*, 2016 WL 5107072, at *6 (E.D.N.Y. Aug. 26, 2016), *report and recommendation adopted*, 2016 WL 5107058 (E.D.N.Y. Sept. 19, 2016). Personal jurisdiction over Panorama was established before it defaulted. *See* 3/30/17 Order at 3. Personal jurisdiction over Yevdayev is properly based on his residence in Brooklyn and the personal service made upon him there on May 8, 2017. Additionally, as noted above, Yevdayev retained counsel after his default, participated in limited damages

discovery, and never moved to vacate the default against him, on jurisdictional grounds or otherwise.

Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1) (a civil action may be brought in "a judicial district in which any defendant resides") and § 1391(c)(2) (a defendant corporation resides "in any judicial district in which such defendant is subject to the court's personal jurisdiction"). *See also* Default Inj. ¶¶ 2-4 (finding that this Court has subject-matter jurisdiction over this action and personal jurisdiction over both Defaulted Defendants, and that venue is proper in the Southern District of New York).

## C.      Liability under § 605(a) of the FCA

In their Proposed Findings, as modified by their Supplemental Memorandum, plaintiffs seek damages pursuant to § 605(e)(3)(C)(i) of the FCA, based in turn on the Defaulted Defendants' violations of § 605(a) of the FCA. *See* Supp. Mem. at 2-5. Specifically, plaintiffs seek damages measured by the profits that the Defaulted Defendants earned from selling Panorama subscriptions, as well as statutory damages of $1,000 to $10,000 per subscription, on the premise that each such subscription constituted "an independent violation" of § 605(a). *Id*. at 3-4.

The Default Injunction, issued by the District Judge on July 10, 2017, found in general terms that plaintiffs' allegations, accepted as true, establish the Defaulted Defendants' liability under various federal statutes, including the FCA:

> Defendants intercept satellite communications and re-transmit[] Plaintiffs' Broadcasts via internet protocol television ("IPTV") on the Website to paying customers in New York and elsewhere without Plaintiffs' authorization;
>
> Defendants have purposefully intercepted, copied, redistributed, rebroadcast or otherwise misappropriated Plaintiffs' satellite broadcasts without permission and profited therefrom;
>
> Therefore, Defendants have engaged in willful infringement of the Broadcasts in violation of the Federal Communications Act, Copyright Act, and Lanham Act;

17

> Having established their rights in the Broadcasts, Defendants' infringement, and Defendants' defaults, Plaintiffs are entitled to damages and injunctive relief pursuant to the Copyright Act, Lanham Act, Federal Communications Act and Fed. R. Civ. P. 65, together with attorney's fees and costs.

Default Inj. ¶¶ 7, 13, 14, 17.  However, the Default Injunction does not specifically discuss § 605(a) of the FCA.  Since plaintiffs alleged two FCA claims in the FAC, but now seek damages expressly tied to § 605(a), I briefly review their well-pleaded allegations to ensure that they are "sufficient to state a cause of action against the [Defaulted] Defendants" under that section. *Gesualdi*, 629 F. App'x at 113. *See generally Int'l Cablevision, Inc. v. Sykes*, 997 F.2d 998 (2d Cir. 1993) (*Sykes I*) (discussing the different elements required for liability under various provisions of the FCA, including §§ 553, 605(a), and 605(e)(4)).

Section 605(a) "generally prohibits the unauthorized use or publication of wire or radio communications." *Sykes I*, 997 F.2d at 1007. As most recently recodified in connection with the Cable Communications Policy Act of 1984, Pub. L. 98-549, 98 Stat. 2997, § 605(a) states, in relevant part:

> [N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.
>
> No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.
>
> No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

18

> No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a) (line breaks between sentences added). These four sentences are generally analyzed separately.

The first sentence of § 605(a) was "intended to regulate the conduct of communications personnel . . . rather than to address the problem of unauthorized interception or reception of communications." *Dish Network L.L.C. v. World Cable Inc.*, 893 F. Supp. 2d 452, 468-69 (E.D.N.Y. 2012) (quoting *Int'l Cablevision, Inc. v. Noel*, 859 F. Supp. 69, 75 (W.D.N.Y. 1994)), and therefore is not relevant here. *Accord Int'l Cablevision, Inc. v. Sykes*, 75 F.3d 123, 131 (2d Cir. 1996) (*Sykes II*).

The second, third, and fourth sentences of § 605(a) refer only to "radio" (not "wire") communications. The term "radio communication," as used in the FCA, has long been understood in include satellite transmissions. *See, e.g.*, *Sykes I*, 997 F.2d. at 1008. In contrast, transmissions via cable or internet, including IPTV, are generally considered "wire communications." *See Sykes II*, 75 F.3d at 130-131 (distinguishing between "cable-borne" and "over the air" transmission); *Joe Hand Promotions, Inc. v. Maupin*, 2016 WL 6459631, at *5 (E.D.N.Y. Oct. 31, 2016) ("courts in the Second Circuit consider communication sent over the internet to be communication sent via wire").

However, the Second Circuit has applied these provisions to unauthorized cable (wire) transmissions where the original communication was transmitted by satellite. *Sykes II*, 75 F.3d at 132 ("situations arising with respect to the reception of services which are transmitted over-the-air

(or through another technology), but which are also distributed over a cable system, *continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system*") (emphasis in original). Thus, as long as the initial transmission was via satellite, the fact that the defendant subsequently intercepted and/or transmitted that signal via the internet does not defeat liability under § 605(a). *Sykes II*, 75 F.3d at 132. *See also* 2/15/17 R&R at 14 ("the statute reaches the unauthorized retransmission of a signal that originated as a satellite transmission, even when it is thereafter received or transmitted over the internet"); *J & J Sports Prods., Inc. v. Emily Bar Rest. Inc.*, 2016 WL 6495366, at *1 (E.D.N.Y. Sept. 27, 2016) (§ 605(a) applies to "thefts of cable communications, provided that the cable programming originated as a radio or satellite communication"), *report and recommendation adopted*, 2016 WL 6495526 (E.D.N.Y. Nov. 2, 2016).

The second and fourth sentences of § 605(a) "indisputably require an 'interception'" by their express terms. *Dish Network*, 893 F. Supp. 2d at 471. The term "intercept" or "interception," as used in § 605(a), "means to stop, seize, or interrupt prior to arrival; or taking or seizing before arrival at the destined place." *Premium Sports Inc. v. Connell*, 2012 WL 691891, at *2 (S.D.N.Y. Mar. 1, 2012). Liability under the second and fourth sentences, therefore, requires pleading and proof that the transmission was intercepted. *See id.* (dismissing claim under second and fourth sentences of § 605(a) because "there must be an 'interception' of a signal or a transmission").

The third sentence of § 605(a) does not include the word "interception." Instead, it prohibits "receiv[ing]" or "assist[ing] in receiving" radio communications by a person "not being entitled thereto . . . for his own benefit or for the benefit of another not entitled thereto." While "some cases have held that, similar to the second sentence, the third sentence of § 605(a) also

requires an interception . . . the vast majority of cases have persuasively held that '[s]ection 605(a) prohibits much more than just the unauthorized interception of signals.'" *Dish Network*, 893 F. Supp. 2d at 472 (collecting cases); *see also Directv, LLC v. Wright*, 2016 WL 3181170, at *4 (W.D.N.Y. June 3, 2016) ("[c]ourts have repeatedly interpreted [the third] sentence [of § 605(a)] to prohibit the 'unauthorized divulgence or use of [satellite] communications,' even if the communications have been 'received legally'") (citing *Dish Network*, 893 F. Supp. 2d at 472); *Joe Hand Promotions, Inc. v. That Place, LLC*, 2012 WL 2525653, at *3 (E.D. Wis. June 29, 2012) ("While the second and fourth sentences of § 605(a) require both an unauthorized 'interception' and a divulgence of the transmission in order to establish liability under the Act, the first and third sentences of [§] 605(a) do not similarly require an 'interception'").

Thus, to plead a violation of the third sentence of § 605(a), a plaintiff need not allege facts demonstrating that the defendant "intercepted" a satellite-originated signal; it is sufficient if the factual allegations, accepted as true, show that the defendant "received" a satellite-originated signal and then retransmitted that signal to third parties (for example, via IPTV) without authorization and for financial gain. *See Dish Network*, 893 F. Supp. 2d at 473 (plaintiffs "plausibly allege[d] that the Defendants violated the third sentence of § 605(a)" by alleging that they "received" plaintiff's signal and then "divulged" it to World Cable and its subscribers, for financial gain, without authorization).

In their inquest submissions, plaintiffs argue that the Defaulted Defendants are liable under sentences two, three, and four of § 605(a) because their Programming originated in the Russian Federation; was originally transmitted by satellite; and was subject to interception and use by the Defaulted Defendants without plaintiffs' authorization. *See* Prop. Findings at 19, ¶¶ 3-4. Plaintiffs also point out that the FCA is a "strict liability statute," in the sense that it "prohibits rebroadcasting

and reselling satellite communications regardless of how or when the signals are obtained so long as the signal [was] 'at one point transmitted by satellite.'" *Id*. at 19, ¶ 5 (quoting the 2/15/17 Order at 19). Plaintiffs argue that since the Defaulted Defendants "do not have authority to display the Programming on the Website or through any other medium," *id*. at 20, ¶ 6, they violated § 605(a) when they did so, regardless of when (or by whom) plaintiff's signal was intercepted.

I agree that plaintiffs' allegations against the Defaulted Defendants, accepted as true, *see Gesualdi*, 629 F. App'x at 113, are sufficient to state a cognizable claim against them under the third sentence of § 605(a). Plaintiffs adequately allege that the Programming was originally transmitted via satellite, FAC ¶¶ 1, 62-66; that the Defaulted Defendants did not have authorization to retransmit that Programming, *id*. ¶¶ 68, 79; and that they nonetheless did so, through the Website, in exchange for subscription fees. *Id*. ¶¶ 39, 42, 53, 79, 84-109; *id*. Ex. 17. While plaintiffs do not clearly allege that the Defaulted Defendants themselves "intercepted" plaintiffs' signal, *see id*. ¶ 2 ("each Defendant *either* directly intercepts Broadcasters' satellite communications *or* knowingly re-transmits intercepted satellite communications") (emphasis added); *id*. ¶ 5 ("Broadcasters do not know exactly how Defendants intercept satellite communications [or] whether and to what extent additional persons are involved"); *id*. ¶ 78 ("Upon information and belief, certain Defendants may rely on third parties to intercept satellite communications on their behalf."), the third sentence of § 605(a) "does not require pleading or proof that the defendant intercepted the plaintiff's signal."  2/15/17 R&R, at 17; *Dish Network*, 893 F. Supp. 2d at 473.

Since the well-pleaded allegations in the FAC state a claim under the third sentence of § 605(a), plaintiffs are entitled to recover damages pursuant to § 605(e)(3)(C)(i).

### D.       Statute of Limitations

Although the FCA provides a two-year statute of limitations for cases involving common carriers, 47 U.S.C. § 415(b), it contains no applicable statute of limitations for claims brought pursuant to § 605. *Nat'l Satellite Sports, Inc. v. Time Warner Entm't Co., L.P.*, 255 F. Supp. 2d 307, 310 (S.D.N.Y. 2003) (The FCA "is silent as to the period of limitations applicable to private suits brought for violations of the Act's anti-piracy provisions against companies that do not qualify as common carriers."). Where a federal statute provides no statute of limitations, the courts look first to analogous state law for an applicable statute of limitations, and then to analogous federal law if the application of state law would "frustrate or interfere with the implementation of national policies . . . or be at odds with the purpose and operation of federal substantive law." *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) (internal citations and quotation marks omitted).

Courts in this Circuit have generally applied a three-year statute of limitations to cases involving § 605 (and § 553) of the FCA, analogizing either to New York law governing conversion, *see CSC Holdings, Inc. v. Kraut*, 169 F. Supp. 2d 115, 118 (E.D.N.Y. 2001), or to the Copyright Act, 17 U.S.C. § 507(b). *See Nat'l Satellite Sports*, 255 F. Supp. 2d at 313 (borrowing the statute of limitations from the Copyright Act "provides a closer analogy" to the FCA than state law and "has the further substantial benefit of nationwide uniformity in implementing an act of inherently nationwide application"). *See also J & J Sports Prods., Inc. v. Taqueria Juarez Restaurant, Inc.*, 2018 WL 2056181, at *2 n.3 (E.D.N.Y. Mar. 16, 2018), *report and recommendation adopted sub nom. J & J Sports Prods., Inc. v. Taqueria Juarez Rest., Inc.*, 2018 WL 2048370 (E.D.N.Y. May 2, 2018) ("[a] three-year statute of limitations applies to plaintiff's claims" under the FCA).

Plaintiffs filed their initial Complaint on February 19, 2016, and therefore are entitled to damages that accrued after February 19, 2013. Prop. Findings at 24, ¶ 24.

### E.    Damages

Although "a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup*, 973 F.2d at 158. Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true. "The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999). *See also Byrnes v. Angevine*, 2015 WL 3795807, at *6 (N.D.N.Y. June 17, 2015) (quoting *House v. Kent Worldwide Mach. Works, Inc.*, 359 F. App'x 206, 207 (2d Cir. 2010)) (even "where a defendant has opted to default, rather than actively defend, a plaintiff nonetheless bears the burden of establishing a basis for an award of damages 'with reasonable certainty.'").

"This means that, in an inquest on damages following a default, damages must be based on admissible evidence." *Braccia v. D'Blass Corp.*, 2011 WL 2848146, at *3 (S.D.N.Y. June 13, 2011), *report and recommendation adopted*, 2011 WL 2848202 (S.D.N.Y. July 18, 2011). *See also McLaughlin v. Barron*, 2018 WL 1872535, at *2 (S.D.N.Y. Jan. 24, 2018) (plaintiff must "substantiate a claim with evidence to prove the extent of damages"), *report and recommendation adopted,* 2018 WL 993627 (S.D.N.Y. Feb. 20, 2018); *House*, 359 F. App'x at 207 (collecting cases).

Here, plaintiffs seek damages pursuant to § 605(e)(3)(C)(i) of the FCA, which permits a party "aggrieved" by a violation of § 605(a) to recover, at its "election," either:

(I)    "the actual damages suffered by him as a result of the violation [of § 605(a)] and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages," or

(II)    "an award of statutory damages for each violation [of § 605(a)] involved in the action in a sum of not less than $1,000 or more than $10,000, as the court considers just."

47 U.S.C. § 605(e)(3)(C)(i)(I-II). Further, "[i]n any case in which the court finds that the violation was committed willfully . . . the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $100,000 for each violation" of § 605(a). 47 U.S.C. § 605(e)(3)(C)(ii).

### 1.    Statutory Damages

Plaintiffs present no evidence of lost profits or other compensable injuries that they incurred as a result of the Defaulted Defendants' violations of § 605(a) of the FCA. Instead, they seek between $3,974,390 and $5,657,000 pursuant to subclause (I) of § 605(e)(3)(C)(i), based on the Defaulted Defendants' estimated profits earned from selling subscriptions to My Panorama TV, "and" between $217,260,000 and $2,170,260,000 in statutory damages pursuant to subclause (II), based on the total estimated number of subscriptions sold. *See* Supp. Mem. at 2, 5. However, the statute requires an aggrieved plaintiff to elect "either" actual or statutory damages – not both. *See*, *e.g.*, *J & J Sports Prods., Inc. v. Gomez*, 2019 WL 4744229, at *8 n.3 (E.D.N.Y. Sept. 29, 2019) ("Plaintiffs may elect to request either statutory or actual damages under Section 605.").

Since plaintiffs failed to make the required election, the Court will make it on their behalf, with an eye towards maximizing their damages. *See Sykes I*, 997 F.2d at 1009 (where a plaintiff has established liability under both § 605 and § 553, court should grant damages under § 605(e) "instead of granting the lesser damages available under § 553"); *J & J Sports Prods., Inc. v. Alvarez*, 2009 WL 3096074, at *4 (S.D.N.Y. Sept. 25, 2009) ("I shall assess damages under § 605

because doing so will yield a higher award."). In this case, that means awarding statutory damages.[12]

"The amount of [statutory] damages assessed pursuant to section 605 rests within the sound discretion of the court." *Time Warner Cable of N. Y. C. v. Taco Rapido Rest.*, 988 F. Supp. 107, 111 (E.D.N.Y. 1997). The permissible range for "each violation" of § 605(a) is "not less than $1,000 or more than $10,000, as the court considers just." 47 U.S.C. § 605(e)(3)(C)(i)(II). "The statute does not clearly define 'violation'; instead it is up to the court to decide which acts constitute a single violation." *Entm't By J & J, Inc. v. Ramsarran*, 2002 WL 720480, at *2 (E.D.N.Y. Mar. 11, 2002).

In cases where the defendant has "published" a specific broadcast without authorization (for example, by exhibiting a pay-per-view sporting event in a tavern or social hall without the proper license), courts generally count that broadcast as a single violation. *See, e.g.*, *Joe Hand Promotions, Inc. v. Levin*, 2019 WL 3050852, at *4 n.3 (S.D.N.Y. July 12, 2019) (assessing statutory damages premised on a "single Section 605 violation" even though defendants "were

---

[12] In estimating the Defaulted Defendants' profits, plaintiffs properly assume that each subscription sold yielded $26.50 per month (or $208 per year) in profit. Supp. Mem. Ex. B. However, the Setplex invoices only provide subscriber counts for eight months, from March through October 2017. If all of those customers purchased monthly (rather than annual) subscriptions, the Setplex invoices would document a total of 24,480 monthly subscriptions sold, resulting in profits of $648,720 (24,480 multiplied by $26.50). Plaintiffs attempt to extrapolate from the Setplex invoices – and increase their potential award – by further assuming that the Defaulted Defendants sold 3,060 monthly subscriptions ("the average number of subscribers from the available Setplex invoices") each and every month from January 2012 through February 2017, resulting in a total profits of $5,657,390. Supp. Mem. Ex. B. However, plaintiffs are subject to a three-year statute of limitations, meaning that they are not entitled to recover profits earned by the Defaulted Defendants prior to February 2013. Moreover, in the absence of any actual subscriber counts at any time prior to March 2017, plaintiffs' technique is too speculative to sustain an award of actual damages, which – even after default – must be established with "reasonable certainty." *Credit Lyonnais Sec. (USA)*, 183 F.3d at 155. Were I to calculate damages based on the Defaulted Defendants' profits, therefore, I would recommend that the award be capped at $648,720.

displaying the Broadcast on nine different television sets" to approximately 250 patrons). Statutory damages within the range of $1,000 to $10,000 may then be assessed based on the number of viewers or, alternatively, fixed at a flat rate, which may in turn be "based on the licensing fee defendants would have paid to show the [e]vent legally," as well as "the balance of the equities." *Joe Hand Promotions, Inc. v. Soviero*, 2012 WL 3779224, at *7 (E.D.N.Y. July 31, 2012), *report and recommendation adopted*, 2012 WL 3779221 (E.D.N.Y. Aug. 30, 2012).  *See also Levin*, 2019 WL 3050852, at *4 (quoting *Joe Hand Promotions, Inc. v. Martinez*, 2008 WL 4619855, at *4 (S.D.N.Y. Oct. 17, 2008) (the flat rate approach is "typically used when the number of patrons who observed the unauthorized programming is unknown"); *J & J Sports Prods., Inc. v. 291 Bar & Lounge, LLC*, 648 F. Supp. 2d 469, 474 (E.D.N.Y. 2009) ("Since there is no evidence to provide facts for a damages determination based on patronage, the court has no basis for an award above the statutory minimum of $1,000.00.").

In cases involving the unlawful use of cable decoders or other "descrambling devices" to intercept programming without paying for it, the Second Circuit has held that "a violation occurs each time a device is purchased and installed." *Cmty. Television Sys., Inc. v. Caruso*, 284 F.3d 430, 435 (2d Cir. 2002). Although an argument could be made that a new violation occurred each time the device was used (or each time a new viewer used it), the court did not wish to impose liability on unsuspecting viewers, such "guests, children, and babysitters," simply because they watched programming transmitted via the illegal device. *See id.* ("In the context of an alleged violation arising from a descrambling device, unless some limiting construction is given to the potentially far-reaching scope of this prohibition, a violation might be thought to occur every time a person 'receive[s]' TV images transmitted by radio waves and 'use[s]' such images 'for his own benefit' by enjoying a telecast."). "Thus," the court concluded, "there was one violation in each of the

27

homes for which a device was purchased and installed." *Id*. at 435-36; *see also DIRECTV, Inc. v. Pahnke*, 405 F. Supp. 2d 1182, 1190-91 (E.D. Cal. 2005) (holding that a single violation occurred, even though defendant Pahnke "utilized several devices to intercept the DIRECTV broadcast," because there was no evidence that he "successfully assisted others" in doing so).

In this case, the Defaulted Defendants did not distribute cable decoder boxes; rather, they provided Panorama's subscribers with access codes that allowed them to stream unauthorized content over the internet (either with or without a "smart set-top box"). *See* FAC ¶¶ 86-96, 98,103. The economic premise, however, is similar to the cable decoder cases in that the consumer makes a purchase that provides repeated unlawful access to the plaintiff's programming over time. The Court therefore agrees with plaintiffs that "using each subscriber as the unit of measurement in calculating statutory damages is appropriate and consistent with Second Circuit practice." Supp. Mem. at 4.

 In their Proposed Findings, plaintiffs noted that Panorama had 4,241 subscribers at its peak in May 2017 (according to Setplex invoice No. 1130, dated June 1, 2017), and on that basis counted 4,241 violations of § 605(a) and requested statutory damages of $4,241,000 to $42,410,000. Prop. Findings at 25, ¶ 31; *see also* 12/15/17 Dowd Decl. Ex. 11, at ECF page 8 (Setplex invoice No. 1130).

In their Supplemental Memorandum, however, plaintiffs grow more ambitious.  They now see a separate violation of § 605(a), and seek a new award of statutory damages, each month that a Panorama subscription was active. Supp. Mem. at 4 & Ex. B. Thus, over the eight months covered by the Setplex invoices, plaintiffs count 24,480 separate violations of the FCA, and seek statutory damages of $24,480,00 (at $1,000 per violation) to $244,800,000 (at $10,000 per violation). In addition, plaintiffs "estimate" that Panorama had 3,060 subscribers (the average of

the subscriber counts shown in the Setplex invoices) in each month *not* covered by those invoices, stretching back to January 2012, entitling them to another $3,060,000 to $30,600,000 in statutory damages for each such month. Supp. Mem. at 5 & Ex. B. In total, plaintiffs now count 217,260 violations of § 605(a), for which they seek statutory damages of $217,260,000 to $2,170,260,000. *Id*.

In my view, plaintiffs were right the first time. In an IPTV case, the Court may count each subscriber to the unlawful streaming service as one violation of § 605(a), but it may not presume the existence of 217,260 separate subscribers over a period of almost six years without any actual evidence to support those figures. The methodology that plaintiffs employ in their Supplemental Memorandum – adding up each monthly subscriber count, as if Panorama's entire customer base turned over every month – risks counting what should be a single violation (that is, a single subscriber) up to 12 times over the course of a year. Plaintiffs have further inflated the number of compensable violations by speculating as to Panorama's subscriber count for the years 2012-2016 (as to which the record contains no evidence whatsoever) and by seeking damages for periods outside of the statute of limitations. Although the Court has considerable discretion in the amount of statutory damages it awards per subscriber, it is not at liberty to presume tens of thousands of subscribers into existence.

I therefore recommend that statutory damages be based on the 4,241 subscribers that, according to the Setplex invoices, Panorama had at its peak in May 2017, and that each such subscriber be counted as a separate violation. I further recommend that $1,000 per violation be assessed, for a total of $4,241,000 in statutory damages. I recognize that $1,000 is the low end of the range set out in § 605(e)(3)(C)(i)(II). However, there is no evidence that Panorama's subscribers commercialized their unlawful access or otherwise used it for anything other than

personal viewing. Moreover, the recommended award falls squarely in the range of the actual damages that plaintiffs requested, *see* Suppl. Mem. Ex. B, and is well above the range of the actual damages that I would be prepared to recommend if statutory damages were not available. *See* n.12, *supra*. The figure is therefore just.

### 2.    Enhanced Damages

The Default Injunction found, among other things, that the Defaulted Defendants engaged in "willful" violations of the FCA, Default Inj. ¶¶ 13-14. Moreover, their goal was obviously not personal entertainment (as in, for example, *Cmty. Television Sys.*, 284 F.3d at 432); rather, the Defaulted Defendants were running a business, which sought to profit by selling unauthorized access to plaintiffs' content. *See* FAC ¶¶ 40, 42 (Yevdayev is "profiting" from Panorama's violations); *id*. ¶¶ 96, 100, 209. Plaintiffs are therefore entitled to additional damages pursuant to 47 U.S.C. § 605(e)(3)(c)(ii), which authorizes enhanced damages, in an amount "not more than $100,000 for each violation" of § 605(a), "[i]n any case in which the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain."

For single violations of § 605(a), some courts in our Circuit calculate enhanced damages as a multiplier of the statutory damages award. *See, e.g.*, *Joe Hand Promotions, Inc. v. Levin*, 2019 WL 3050852, at *4 (S.D.N.Y. July 12, 2019) (applying a multiplier of 2.5 to the $10,000 statutory damages award to arrive at an enhanced damages award of $25,000); *J & J Sports Prods., Inc. v. Ramirez*, 2018 WL 1961107, at *2 (S.D.N.Y. Apr. 9, 2018) (awarding $4,400 in statutory damages and another $4,400 in enhanced damages for a total damages award of $8,800); *J & J Sports Prods., Inc. v. Ribeiro*, 562 F. Supp. 2d 498, 502 (S.D.N.Y. 2008) (trebling statutory damages of $1,500 to award another $4,500 in enhanced damages). Other courts "have instead tended to award

a flat sum as enhanced damages." *J & J Sports Prods., Inc. v. Fantasy Bar & Rest. Corp.*, 2018 WL 5018065, at *7 (S.D.N.Y. Sept. 20, 2018) (awarding $10,000 in enhanced damages, in addition to $6,000 in statutory damages, for a single violation, and collecting cases), *report and recommendation adopted*, 2018 WL 5016606 (S.D.N.Y. Oct. 15, 2018). The amount of enhanced damages must be "sufficient to compensate the plaintiff and also deter the defendant[] and others from further violations." *J & J Sports Prods., Inc. v. Sugar Café Inc.*, 2018 WL 324266, at *2 (S.D.N.Y. Jan. 5, 2018) (quoting *Kingvision Pay-Per-View Ltd. v. Zalazar*, 653 F. Supp. 2d 335, 343 (S.D.N.Y. 2009)).

This case involves multiple violations of § 605(a) and therefore, I must determine the enhanced damages award for each of the 4,241 violations discussed above. *See* 47 U.S.C. § 605(e)(3)(c)(ii) (expressly requiring courts to calculate enhanced damages "for each violation of subsection (a)"). Given that there is no evidence of plaintiffs' losses – and sparse evidence of the Defaulted Defendants' profits – the amount of enhanced damages needed to compensate plaintiffs and deter the Defaulted Defendants is unclear. The recommended statutory damages award may be hefty enough, even without enhancement, to perform both of those functions. General deterrence, however, requires that the Court respond to the commercial-scale unlawful conduct at issue in this case with a sum significant enough to send a signal to others who are engaged – or contemplating engagement – in similar businesses. I therefore recommend an enhanced damages award of an additional $2,000 per subscriber, which will treble the total judgment in this action.

### 3.    Attorney's Fees and Costs

A prevailing party is ordinarily entitled to recover its reasonable attorneys' fees and costs incurred in bringing claims under the FCA. *See* 47 U.S.C. § 605(e)(3)(B)(iii) (the court "shall direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved

party who prevails"). Here, plaintiffs request a fee award, *see* Prop. Findings at 26-27, but do not specify the amount, and have never submitted any documentation of their actual fees and costs, despite my clear instruction to do so as part of their Proposed Findings. *See, e.g.*, 7/18/17 Order at 2 ("[a]ny request for attorney's fees must be supported by contemporaneous time records"). Instead, plaintiffs seek leave to "submit a proposed judgment and an application for attorney's fees and costs within fifteen days of this memorandum." Prop. Findings at 27, ¶ 37.

Plaintiffs' Supplemental Memorandum does not mention attorneys' fees at all.

Given plaintiffs' failure to follow the Court's direction with respect to their application for fees and costs, I cannot now recommend any such award. However, as noted above, this Court previously awarded plaintiffs monetary sanctions in the amount of $61,475.97, running against Panorama and its former counsel, for their discovery misconduct in connection with Panorama's jurisdictional motion (Dkt. No. 747), and additional monetary sanctions in the amount of $30,607.50, running against both Defaulted Defendants, for their post-default discovery misconduct. (Dkt. No. 758.)[13] To the extent that these sanctions remain unpaid, I recommend that they be added to the judgment against the Defaulted Defendants.[14]

---

[13] Neither of these awards was challenged by the Defaulted Defendants. The $61,475.97 award was challenged by attorney Fraade, whose objections remain pending before the District Judge. *See supra* n.7.

[14] Entering a judgment based on (or incorporating) accumulated but unpaid sanctions and fines is appropriate even where additional sanctions may become final thereafter. *See, e.g.*, *CE Int'l Res. Holdings LLC v. S.A. Minerals Ltd. P'ship*, 2013 WL 324061, at *3 (S.D.N.Y. Jan. 24, 2013) (noting the court's power to "enter judgment . . . from time to time for the accrued amounts of [the] fines"); *Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 2004 WL 1810597, at *5 (S.D.N.Y. Aug. 12, 2004) (entering judgment and permitting defendant "every three months . . . [to] serve and file a letter requesting an interim judgment confirming . . . a specific dollar amount"); *Burgie v. Euro Brokers, Inc.*, 2008 WL 4185701, at *7-8 (E.D.N.Y. Sept. 8, 2008) (entering judgment on unpaid fee award).

## III.   CONCLUSION

For the reasons set forth above, I respectfully recommend that judgment be entered in favor of plaintiffs and against the Defaulted Defendants, jointly and severally, in the amount of (1) $4,241,000 in statutory damages; (2) $8,482,000 in enhanced damages; and (3) $30,607.50 in previously-imposed discovery sanctions, for a total of $12,753,607.50. In addition, I recommend that judgment be entered in favor of plaintiffs and against Panorama in the additional amount of (4) $61,475.97 in previously-imposed discovery sanctions.

The Clerk of Court is respectfully requested to mail a copy of this order to Panorama Alliance, L.P. at 1 Lyric Square, London, United Kingdom, W6 0NB, and to Asaf Yevdayev at 115 Langham Street, Brooklyn, NY 11235.

Dated: New York, New York
       October 25, 2019

**BARBARA MOSES**
**United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. George B. Daniels at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned Magistrate Judge. Any request for an extension of time to file objections must be directed to Judge Daniels. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review**. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).