**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------

JOINT STOCK COMPANY "Channel One Russia
Worldwide," et als.,

                            Plaintiffs,

              v.

INFOMIR LLC, et als.,

                            Defendants.

---------------------------------------------------------

Civil Action No. 1:16-cv-01318
(GBD)(BCM)

---

**DEFENDANT INFOMIR LLC'S BRIEF IN SUPPORT OF**
**MOTION TO EXCLUDE PLAINTIFFS' EXPERTS**

---

**BERKOWITZ LICHTSTEIN**
**KURITSKY GIASULLO & GROSS, LLC**
Attorneys for Defendant, Infomir, LLC
sleviss@blkgg.com
75 Livingston Avenue
Roseland, NJ  07068
Tel.: 973-325-7800
Fax.: 973-325-7930

On the brief:  Stewart M. Leviss, Esq.
                    Evan Silagi, Esq.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................1

STATEMENT OF RELEVANT FACTS................................................................................3

LEGAL ARGUMENT..............................................................................................................5

I.     THE COURT MUST ACT AS A GATEKEEPER TO EXCLUDE EXPERT
EVIDENCE WHICH IS UNRELIABLE AND UNHELPFUL. ..............................................5

II.     BARI'S FAILURE TO USE A RELIABLE METHODOLOGY, UNQUESTIONING
ACCEPTANCE OF PLAINTIFFS' ALLEGATIONS, AND PERSONAL OPINIONS
ABOUT MENTAL STATE AND LEGAL LIABILITY REQUIRE EXCLUSION.................6

A.   Plaintiffs' Deliberate Manipulation of The STBs Bari Relies on Requires Exclusion. ......6

B.   Bari May Not Testify as an Expert as to the Veracity of Plaintiffs' Legal Allegations......8

C.   Bari's Opinions that Infomir "Knew" or "Should Have Known" about Alleged "Piracy"
are not Admissible.....................................................................................................................9

D.   Bari's Opinions which Restate Plaintiffs' Allegations and Hearsay Are Inadmissible....10

E.   Bari's Technology Opinions Are Inadmissible As No STB Manufacturer Uses Bari's 4-
Part Holistic Anti-Piracy Toolkit Which Bari Admits Will Not Prevent IPTV Piracy...........12

III.     DIETRICH MUST BE EXCLUDED AS AN EXPERT WITNESS BECAUSE HE IS A
PARTISAN WHO HAS GIVEN FALSE EVIDENCE, EXCEEDS THE SCOPE OF
REBUTTAL OPINIONS AND LACKS A RELIABLE BASIS FOR HIS OPINIONS. .........16

A.   Plaintiffs' Proposed Rebuttal Expert, Dmitri Dietrich, Helped Incept and Prosecute this
Lawsuit, and has Participated in Fabrication of Excluded Evidence.......................................16

B.   Dietrich Should Be Barred from Offering Opinions Which Exceed The Scope Of A
Rebuttal Expert Report. ..........................................................................................................19

C.   Dietrich's Report Must Be Excluded as Lacking a Reliable Factual Basis......................22

CONCLUSION.......................................................................................................................26

# TABLE OF AUTHORITIES

## Cases

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256 (2d Cir. 2002)................... 5, 22, 24, 25

Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409 (S.D.N.Y. 2009) ....................... 10

Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346 (S.D.N.Y. 2003)........................................ 22

Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18 (2d Cir. 1996)....................................... 5, 6, 22

CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.,
    815 F. Supp. 2d 673 (S.D.N.Y. 2011)....................................................................................... 10

Crowley v. Chait, 322 F. Supp. 2d 530 (D.N.J. 2004)................................................................ 20

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ............................ 2, 5, 6, 17

Deutsch v. Novartis Pharm. Corp., 768 F. Supp. 2d 420 (E.D.N.Y. 2011) ................................. 9

Ebbert v. Nassau Cty., 2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008) ...................................... 20

El Ansari v. Graham, 2019 WL 3526714 (S.D.N.Y. Aug. 2, 2019)............................................ 16

General Elec. Co. v. Joiner, 522 U.S. 136 (1997)...................................................................... 22

Hart v. BHH, LLC, 2018 WL 3471813 (S.D.N.Y. July 19, 2018) ............................................... 9

Hewitt v. Metro-N. Commuter R.R., 244 F. Supp. 3d 379 (S.D.N.Y. 2017) ................................ 6

Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461 (S.D.N.Y. 2005)..................... 9

Hygh v. Jacobs, 961 F.2d 359 (2d Cir. 1992) ............................................................................ 6

In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig., 2000 WL
    876900 (E.D. Pa. June 20, 2000)............................................................................................. 9

In re M/V MSC Flaminia, 2017 WL 3208598 (S.D.N.Y. July 28, 2017) ...................................... 9

In re Mirena IUS Levonorgestrel-Related Products Liability, 982 F.3d 113 (2d Cir. 2020).......... 5

In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994) ..................................................... 5

In re Rezulin Products Liab. Litig., 309 F. Supp. 2d 531 (S.D.N.Y. 2004).................................. 9

In re Thilman, 557 B.R. 294 (Bankr. E.D.N.Y. 2016).................................................................. 6

Lara v. Delta International Machinery Corp., 174 F.Supp.3d 719 (E.D.N.Y. 2016)..................... 5

Lippe v. Bairnco Corp., 288 B.R. 678 (S.D.N.Y. 2003),
    aff'd, 99 Fed. Appx. 274 (2d Cir. 2004) ................................................................................. 16

Louis Vitton v. Dooney & Bourke, Inc., 525 F.Supp. 2d 558 (S.D.N.Y. 2007)............................. 5

McDermott v. Liberty Mar. Corp., 2011 WL 13300062 (E.D.N.Y. May 13, 2011) ..................... 20

Perfect 10, Inc. v. Giganews, Inc., 2014 WL 10894452 (C.D. Cal. Oct. 31, 2014) ..................... 17

Proteus Books Ltd. v. Cherry Lane Music Co., 873 F.2d 502 (2d Cir. 1989).............................. 16

Reach Music Pub., Inc. v. Warner Chappell Music, Inc., 988 F. Supp. 2d 395 (S.D.N.Y. 2013).. 6

S.E.C. v. U.S. Envtl., Inc., 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002)................................... 6

Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33 (S.D.N.Y. 2016)................................. 20, 22

Snyder v. Wells Fargo Bank, NA, 594 Fed. Appx. 710 (2d Cir. 2014)....................................... 6

Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., 2001 WL 1602976 (S.D.N.Y. Dec. 14, 2001) ... 10

United States v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991) ............................................................ 6

United States v. Duncan, 42 F.3d 97 (2dCir. 1994).................................................................... 6

United States v. Mejia, 545 F.3d 179 (2d Cir. 2008)............................................................. 5, 10

United States v. Williams, 506 F.3d 151 (2d Cir. 2007) .............................................................. 6

ii

Viterbo v. Dow Chem. Co., 646 F. Supp. 1420 (E.D. Tex. 1986),
    aff'd, 826 F.2d 420 (5th Cir. 1987) ........................................................................ 16, 19

**Other Authorities**

JACK B. WEINSTEIN (FNaa), Rule 702 of the Federal Rules of Evidence Is Sound; It Should
    Not Be Amended, 138 F.R.D. 631, 632 (1991) .................................................... 6, 17

**Rules**

Fed. R. Evid. 403 ............................................................................................................ 6, 19
Fed. R. Evid. 702 ............................................................................................................ 5, 6
Fed. R. Evid. 702(a) ........................................................................................................ 19
Rule 26(a)(2)(B)(I) ........................................................................................................... 20
Rule 26(a)(2)(D)(ii) .......................................................................................................... 20

## PRELIMINARY STATEMENT

In the "business and nonengineering opinion"[1] of plaintiffs' sole affirmative expert witness, Jonathan H. Bari, Infomir LLC "knows"[2] that two specific models of IPTV set-top-boxes ("STBs") are used by unidentified and theoretical individuals "primarily" to receive plaintiffs' IPTV programming from unlicensed third-party sources on the internet as part of an IPTV "piracy ecosystem."[3]   Under settled law, this constitutes inadmissible speculation by an expert and must be excluded.   Bari further opines that Infomir LLC therefore violates Section 605 (e)(4) of the Federal Communications and Copyright Act.[4]   These constitute inadmissible legal conclusions. The "method" by which Bari reaches his "opinions" – simply assuming the truth of the conclusion that he seeks to prove (i.e. devices sold by Infomir LLC are used 'primarily for piracy') and then regurgitating what he was told by plaintiffs' counsel – is insufficient as a matter of law.   Bari describes the manner in which he performed his role as an expert witness this way:

> I have not conducted an independent investigation of Infomir LLC ("Infomir") but relied on my review of materials provided by [plaintiffs' counsel] Dunnington, representations made by Dunnington and demonstrations conducted at Dunnington's office on certain devices.[5]

Bari's already dubious process is further undermined by the revelation that plaintiffs' counsel modified the STBs "demonstrated" for Bari, by manually overriding the STBs' operating software ("firmware") with other firmware which counsel had located on a third-party website, enabling access to IPTV sources that would have been inaccessible to the STBs but for counsel's interference.   Plaintiffs failed to disclose those modifications to Infomir LLC and Bari claims that

---

[1]  February 5, 2020 Report of Jonathan H. Bari ("Bari Rpt."), Exhibit A to Declaration of Stewart M. Leviss, Esq. ("Leviss Decl.") at ¶1; Transcript of October 30, 2020 Deposition of Jonathan H. Bari ("Bari T."), Exhibit B to Leviss Decl., at 134:7-9.
[2] See Bari Rpt. ¶28a – b.
[3] See Bari Rpt. Sec. XI.
[4] See Bari Rpt. ¶¶27-30.
[5] Bari Rpt. ¶21.

plaintiffs' counsel concealed their actions even from him.  The ability of the STBs to access that IPTV content during the "demonstration," is the cornerstone of Bari's opinions.  Plaintiffs' counsel's willful manipulation of the discovery process to mislead their own expert witness, alone, requires exclusion of Bari's testimony.

Independently, Bari's opinions fail to meet the standards of reliability and admissibility set by Rule 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  The facts Bari relies upon and admits, juxtaposed against his "opinions," reveals a fundamental disconnect and a lack of any rational relationship.  His mischaracterization, and recitation by cut-and-paste adoption, of hearsay documents selected by plaintiffs' attorneys lacks scientific rigor and does not constitute an acceptable expert methodology.  The flaws in Bari's process, reasoning and conclusion are so fundamental and pervasive that they go beyond those traditionally addressed at cross-examination and require complete exclusion of Bari as an expert witness.

Plaintiffs' rebuttal expert, Kartina Digital GmbH's[6] ("Kartina") Chief Technology Officer Dmitri Dietrich, fares no better.  Dietrich is a clear partisan in this case, who in no way resembles an "objective expert" that may permissibly testify to assist the trier of fact.  Dietrich was personally involved in commencing and steering this litigation, and personally participated in the fabrication of evidence and misrepresentations to the Court which resulted in sanctions against the plaintiffs and their attorneys.  Allowing Dietrich to present opinion testimony, under the pretext that he would help the trier of fact, would undermine the integrity of the litigation process.

Separately, Dietrich must be precluded from impermissibly using his "rebuttal" to introduce an entirely new, un-pleaded and false theory of liability, with voluminous new exhibits, and to thereby try to fill the hole created by Bari's lack of technical expertise or relevant

---

[6] Kartina's primary role in this civil action is well settled and discussed on the record at ECF 779 at 6; ECF 855 at 1.

knowledge.  As with Bari, Dietrich's conclusions are so inconsistent with and contradicted by the "evidence" he relies upon, and so deeply unreliable, that complete exclusion is the only remedy.

## STATEMENT OF RELEVANT FACTS[7]

On February 5, 2020 plaintiffs produced the report of Jonathan H. Bari ("Bari") as their sole affirmative expert.[8]  Bari was retained by Andreas Reich, Kartina's CEO and plaintiffs' counsel three weeks earlier.[9]  Bari's engagement letter states the "Bari Consulting Group will not be conducting an independent investigation in this matter, but rather a review of materials provided by legal counsel."[10] Bari specifically limits his opinions to two (2) models of Infomir-brand IPTV STBs: the MAG 254 and the MAG 256.[11]  Bari agrees it is perfectly legal to have an Infomir-brand STB and his opinions relating to "piracy" concern how the end user uses the boxes.[12]

On January 24, 2020 Bari was shown a series of "demonstrations," performed by plaintiffs' counsel, using Infomir-brand STBs, which as discussed below, were altered by plaintiffs' attorneys to mislead Bari about the ability of the devices to access certain websites.[13] Bari presents his opinions, in response to plaintiffs' questions which recite the elements of their claims, as follows:

> Infomir does sell select devices that can enable a user of that device to receive Broadcaster's programming from an unauthorized source.  And Infomir has "reason to know" that Infomir MAG 254 and MAG 256 STB's have been and are being used to assist U.S. consumers in receiving pirated communications.[14]
>
> Infomir has knowledge of direct infringements and [] select Infomir STBs and Stalker AKA Ministra middleware helped U.S. consumers to receive infringing content.  Infomir has the right and ability to control infringements occurring through Infomir's STBs.[15]

---

[7]The Court's familiarity with the history of this civil action, as set forth in ECF 779 and 815, is respectfully presumed.
[8] Exhibit A to Leviss Decl.
[9] Exhibit C to Leviss Decl.
[10] Id. at ¶3.
[11] Bari defines these "select devices" as the MAG 254 and MAG 256 STBs, neither of which Infomir LLC presently sells.  Bari T. 10:2-25 and 57:15. He offers no opinion critical of any other STB model.
[12] Bari T. 121:18-122:8.
[13] Bari Rpt. at ¶67-71; Leviss Decl. ¶10.
[14] Bari Rpt. at ¶29.
[15] Bari Rpt. at ¶30.

Among the several technological measures that Bari identifies as constituting a "holistic toolkit" a set top box manufacturer can implement to "aid or assist in mitigating infringing content being streamed" is to provide a "firmware update of the STB that blocks access to piracy portals."[16]  Bari is not aware of any STB manufacturer which engages in the URL or website "blacklisting" he proposes, did not examine any STB firmware, and failed even to document the date or model of the firmware that was running on the STBs forming the basis of his opinions.[17]

Although not disclosed to Bari, the STBs used by counsel in the demonstration for Bari had been "downgraded" to circumvent anti-piracy controls which the manufacturer of the STBs implemented starting in 2017.[18]  The firmware operating the STBs used in the demonstrations was found by plaintiffs' counsel's paralegal on a third-party website and then manually installed on the STB using a USB device to override the firmware that downloads automatically to Infomir-brand STBs.[19]  Bari claims he was not aware of this misconduct by plaintiffs' counsel in modifying the STBs.[20]  To the contrary, it was implicit to Bari that nothing had been done by plaintiffs' counsel to alter or configure the STBs used in the demonstrations he was shown which would circumvent any antipiracy measures, including firmware updates to the STBs.[21]  Critically, Bari admits that he has "no idea," and therefore is not competent to testify, as to the functionality of the STB if it had not been altered and had been running unmodified firmware.[22]

---

[16] Bari T. 42:4-7; 40:8-15; Bari Rpt. at ¶64.
[17] Bari T. 13:22-25; 66:23-67:5; 99:6-15.
[18]  Leviss Decl. at ¶10.
[19]  See September 11, 2017 Declaration of Christopher Vidulich, Exhibit I to Leviss Decl.  August 6, 2020 Report of Christopher Rucinski ("Rucinski Report"), Exhibit H to Leviss Decl. at 37 at Section VII ("…[T]he firmware version of the Bari MAG 254 discussed as the subject of tests … a fact that Bari omits but was revealed during the July STB Testing, and therefore the firmware on the Bari MAG 254 predates the Infomir firmware updates…").
[20] Bari T. 65:10-16 and 71:1-5.
[21] Bari T. at 69:11-18.
[22] Bari T. 70:21-25.

## LEGAL ARGUMENT

## I. THE COURT MUST ACT AS A GATEKEEPER TO EXCLUDE EXPERT EVIDENCE WHICH IS UNRELIABLE AND UNHELPFUL.

Under Rule of Evidence 702, trial courts perform a "gatekeeping" function and are charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."[23]  Plaintiffs must "demonstrate by a preponderance of evidence that their [expert]'s opinions are reliable."[24]   "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."[25] An expert's methodology must be reliable at every step of the way, and "[i]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a *rigorous examination* of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."[26] To be admissible, expert testimony "must be (1) based on sufficient facts or data, (2) the product of reliable principles and methods, (3) reliably applied to the facts of the case."[27]

Expert testimony that simply repeats hearsay evidence without proof the expert formed his or her own opinions, applying extensive experience and a reliable methodology, is inadmissible.[28] Expert testimony that expresses a legal conclusion or an opinion about a legal conclusion is

---

[23] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993).
[24] In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994).
[25] Lara v. Delta International Machinery Corp., 174 F.Supp.3d 719, 729 (E.D.N.Y. 2016) (quoting Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002).
[26] Amorgianos, 303 F.3d at 267; In re Mirena IUS Levonorgestrel-Related Products Liability, 982 F.3d 113, 123 (2d Cir. 2020).
[27] Louis Vitton v. Dooney & Bourke, Inc., 525 F.Supp. 2d 558, 579 (S.D.N.Y. 2007); See also Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996).
[28] United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008)

inadmissible.[29]  This includes opinion testimony that tracks language of statutes or the law the defendants are accused of violating.[30]  Expert testimony which is unreliable, such as opinions based on speculative assumptions or offered without evidentiary factual support, is inadmissible.[31]

Finally, expert testimony should be carefully evaluated under Rule of Evidence 403 to determine "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues [or] misleading the jury."  The Supreme Court cautions: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."[32]  The burden of proving the admissibility of expert evidence rests with the proponent—here, the plaintiffs.[33]

## II. BARI'S FAILURE TO USE A RELIABLE METHODOLOGY, UNQUESTIONING ACCEPTANCE OF PLAINTIFFS' ALLEGATIONS, AND PERSONAL OPINIONS ABOUT MENTAL STATE AND LEGAL LIABILITY REQUIRE EXCLUSION.

### A. Plaintiffs' Deliberate Manipulation of The STBs Bari Relies on Requires Exclusion.

Bari is not competent to testify about the functionality of the select devices (MAG 256 and MAG254), because the only devices he considered had been modified by plaintiffs' attorneys to circumvent existing anti-piracy measures and allow access to blocked "portals".  The only occasion

---

[29] Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992); Hewitt v. Metro-N. Commuter R.R., 244 F. Supp. 3d 379, 393 (S.D.N.Y. 2017) ("The Second Circuit … has held that expert testimony that expresses a legal conclusion must … be excluded."); Snyder v. Wells Fargo Bank, NA, 594 Fed. Appx. 710, 714 (2d Cir. 2014) ("expert may not give testimony stating ultimate legal conclusions based on those facts"); United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991)); In re Thilman, 557 B.R. 294, 302 (Bankr. E.D.N.Y. 2016) ("Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions.") (citations omitted).

[30] United States v. Duncan, 42 F.3d 97, 101 (2dCir. 1994); S.E.C. v. U.S. Envtl., Inc., 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002) ("Specifically, the expert cannot give testimony stating ultimate legal …, nor can that testimony track the language of the statute or the law that the defendants are accused of violating.").

[31] Daubert, 509 U.S. 579 (1993) (prohibiting expert testimony based on "subjective believe or supported speculation"); Boucher, 73 F.3d 18, 22 (2d Cir. 1996) (admission of expert testimony based on speculation is an abuse of discretion.)

[32] Daubert, 509 U.S. at 595 quoting JACK B. WEINSTEIN (FNaa), Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991).

[33] Reach Music Pub., Inc. v. Warner Chappell Music, Inc., 988 F. Supp. 2d 395, 401–02 (S.D.N.Y. 2013) (citing United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007); See also Fed. R. Evid. 702 advisory committee's note.

on which Bari encountered any of the select devices which are the subject of his Report is his "external observation and viewing" during a "demonstration" performed by plaintiffs' attorneys on January 24, 2020.[34]  That "demonstration" forms the basis for many of his opinions, including his conclusion that the firmware on the select devices is inadequate.[35]

As described in greater detail in the Leviss Declaration, Bari was misled by plaintiffs' attorneys.  Unbeknownst to Bari, prior to the "demonstration," paralegal Christopher Vidulich, obtained STB firmware from a third-party website which he manually installed on the select devices using a USB device for the purpose of circumventing anti-piracy controls on the default firmware.[36]  This makes Bari's opinions inadmissible and requires exclusion.

Bari was not made aware that plaintiffs' lawyers and their staff had circumvented the STB firmware. [37]  To the contrary, it was implicit to Bari that nothing had been done by plaintiffs' counsel to configure the STBs used in the demonstrations he was shown to circumvent any antipiracy measures, including firmware updates to the STBs.[38]

Critically, the "portals" visited by plaintiffs' attorneys during the "demonstration" which formed the basis for Bari's Report were all blocked by the default software operating on the STBs, but were accessible to Bari because of plaintiffs' attorneys' interference. [39]  The significance, to Bari's opinions, of the firmware downgrade is that Bari has no reliable basis to testify about the functionality of the STBs or how the observations he made from the demonstrations orchestrated by plaintiffs' counsel would be different if the STBs had been running unmodified firmware.[40]

---

[34] Bari Rpt. ¶23z, bb and 107.  See also Bari T. 34:24-25:9 (confirming that counsel controlled the STBs).
[35] See, e.g., Bari Rpt. ¶¶ 149-150.
[36] See ¶¶ 10 – 28 of Leviss Decl. and Exhibits F (Rucinski report) and H (Vidulich Affidavit) thereto.
[37] Bari T. 65:10-16; 71:1-5.
[38] Bari T. 69:5-14.
[39] Rucinski Report ¶4 ("By updating firmware on its STBs, Infomir implemented limited domain blacklisting, and the STBs used to support the opinions in Bari related to a lack of domain blacklisting had old firmware versions that predate this limited domain blacklisting.").
[40] Bari T. 70:21-25.

Fundamentally, plaintiffs, and their counsel, have *again* tampered with the discovery process to fabricate evidence to propagate their false claims against Infomir LLC.  The Court is aware of the full history of similar misconduct in this civil action.[41]  The central role of this tainted "demonstration" in Bari's process requires complete exclusion of Bari as an expert witness.

### B.  Bari May Not Testify as an Expert as to the Veracity of Plaintiffs' Legal Allegations.

Bari must be precluded from offering an "expert opinion" that Infomir LLC violated Sections 605(a) and 605(e)(4) of the FCA and engaged in secondary copyright infringement.[42]  The Second Circuit "is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."[43]  This is especially true where the "witness repeatedly tracked the exact language of the statutes and regulations which the defendant had allegedly violated and used judicially defined terms … in opining on the defendant's conduct."[44]

The Bari Report centers around two "questions" posed by Dunnington, which simply recite the statutory elements of plaintiff's legal claims against Infomir LLC.[45]  At his deposition, Bari confirmed that his entire report and all of his opinions, "must be viewed through the lens" of plaintiffs' request that he determine whether Infomir LLC violated the FCA and/or Copyright Act.[46]  The focal purpose of Bari's retention, to opine on the ultimate legal question, is improper function for an expert.  Bari and his opinions should be precluded entirely.

---

[41] See, generally, ECF 779 and ECF814.
[42] See Bari Rpt. ₱26 - 30.
[43] See note 29, <u>supra.</u>
[44] See note 30, <u>supra.</u>
[45] See Bari Rpt. ₱26.
[46] Bari T. 44:9 - 46:20 and 47:3-11. See also <u>Id.</u> at T. 9:7-10:25.

**C. Bari's Opinions that Infomir "Knew" or "Should Have Known" about Alleged "Piracy" are not Admissible.**

Bari must be precluded from testifying as to what he believes Infomir LLC "knew" or "should have known," which are his personal inferences and are outside the role of an expert witness.  "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."[47]  Accordingly, an expert is barred from testifying about a party's "knowledge" or "likely knowledge," which are personal inferences of the expert not based on a permissible methodology.[48]  An expert may not "present opinions in the form of legal conclusions regarding the reasonableness or prudence of a defendant's actions, or the scope of a [party]'s knowledge."[49]

Bari opines about what Infomir LLC "knew" or "should have known" in the context of Bari's opinions on Infomir LLC's alleged liability under the FCA and/or Copyright Act.[50]  Infomir LLC's "state of mind" and Bari's belief about what Infomir LLC "knew,"[51] "should have

---

[47] See In re Rezulin Products Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (citing In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig., 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) ("The question of intent is a classic jury question and not one for experts, and clearly not these experts.")).
[48] See Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (excluding expert testimony about state of mind, including that parties "knew," were "likely aware" or were "likely concerned" about facts, finding that "[n]one of this speculation is admissible…" as "[t]hese sorts of comments consist simply of inferences that [the expert] draws from other evidence in the case.") (collecting cases).
[49] Hart v. BHH, LLC, 2018 WL 3471813, at *5 (S.D.N.Y. July 19, 2018) (citing In re M/V MSC Flaminia, 2017 WL 3208598, at *18 (S.D.N.Y. July 28, 2017)).  See also Deutsch v. Novartis Pharm. Corp., 768 F. Supp. 2d 420, 448 (E.D.N.Y. 2011) ("To the extent that Dr. Marx seeks to offer the legal conclusion that Novartis acted in bad faith… that testimony is impermissible").
[50] See e.g. Bari Rpt. ¶139 ("I conclude that the correspondence is evidence that **Infomir knew** the difference between legitimate and pirate operators…"); ¶140 ("My review of the materials and information detailed in Section III … has led me to conclude that **Infomir knew** at least some type of security protocols necessary for legitimate IPTV operators…") ("**Infomir knew or had reason to know** that those piracy-enabled or plug-and-play STBs assist in receiving infringing programming."); ¶141 ("I conclude that **Infomir knew or should have known** that RTV was distributing unauthorized programming through the customized MAG 256 Alfabox."); ¶143 ("Infomir knows or should know that providing Ministra Middleware that is compatible with Infomir MAG STBs, increases the sales of devices such as Infomir STBs and Apps that enable piracy."); ¶144 ("I conclude that **Infomir should know** that this capability would enable pirate operators to replace blocked portals."); ¶148 ("**Infomir knowingly** markets that ecosystem with a view to encouraging piracy."); ¶149 ("I conclude that **Infomir has had reason to know** ….").
[51] Bari Rpt. Par 139, 140, 141, 143, 148.

known,[52]" had "reason to know"[53] or "had knowledge of[54]" are Bari's personal speculation and not the proper subject of expert testimony.

### D. Bari's Opinions which Restate Plaintiffs' Allegations and Hearsay Are Inadmissible.

Bari states: "My report, including my opinions herein, are based on representations from Dunnington."[55]  "An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact."[56]  For expert testimony to be admitted, "the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials."[57]  "Assumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable."[58]

Bari may not testify that Infomir-brand STBs are "primarily" used to view unlicensed programming, because he merely assumes the truth of plaintiffs' allegations without any supporting facts or reliable methodology.[59]  Bari has no usage data, statistics, or other objective basis that can support this opinion that the "primary" use of any STBs sold by Infomir LLC is 'piracy.'  Bari does not identify in his report, and could not do so at deposition, an unlicensed operator that sells or distributes Infomir-brand STBs,[60] let alone sufficient uses to reach a reliable (admissible) conclusion about their "primary" use.  Bari was made aware of evidence of "non-piracy use[s] of Infomir STBs," but disregarded it without investigation or analysis.[61]

---

[52] Bari Rpt. 89, 111, 117, 121, 140, 141, 143, 144.
[53] Bari Reprt Par. 28a, 29, 94, 105, 108, 149.
[54] Bari Rpt. Par. 28b, 30.
[55] Bari Rpt. ⁋⁋ 24- 25.
[56] Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009).
[57] United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008).
[58] CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc., 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011). (citing Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001)).
[59] See e.g. Bari Rpt. ⁋⁋ 28a, 28b, 86,108 149150.
[60] Bari T. 153:9-161:10 (Embarrassingly, Bari spent 30 minutes evading this question and requesting to review his report and attachments during his deposition, after which he read into the record the paragraph numbers of his report which discuss secondary references he had "not yet reviewed.").
[61] Bari Rpt. ⁋ 86; Bari T. 75:12-78:4.

Bari may not testify about the percentage of Infomir-brand MAG 254 or 256 STBs he believes are utilized by individuals to access plaintiffs' IPTV programming without authorization. Bari states: "Based on the 2019 Sandvine Report and the [Hardin] Rowley Declaration (ECF 663), it appears that approximately 95% (ninety five percent) of the MAG STBs imported by Infomir were ultimately sold directly to consumers to enable the viewing of pirated programming or to other businesses that then distributed unauthorized programming to end users."[62]  The "Sandvine Report" does not discuss anything relevant to what Bari seeks to extract, making his opinion incompetent speculation tethered loosely to inadmissible hearsay.[63]  To the extent that Bari expressly incorporates argument made by attorney Mr. Rowley in a declaration filed in support of Plaintiffs' failed motion for sanctions against Infomir LLC, it is not admissible.

Finally, Bari's personal belief that Infomir-brand STBs are "primarily" used for piracy because "licensed content providers aren't going to allow their programming to run in the midst of what [he] consider[s] to be a piracy ecosystem" is tautological and not admissible under any legal standard.[64]  The record is filled with examples of licensed operators that use Infomir-brand STBs,[65] which Bari chose to ignore and/or was not provided by plaintiffs' attorneys -- including Bari's employer in this case, Kartina, which supported Infomir-brand STBs at least until 2019 when it made a "business decision" not to do so.[66]

---

[62] Bari Rpt. ¶ 131.

[63] The cited portion of the "Sandvine Report" states that "MAG Box" along with (1) Amazon Fire TV Stick; (3) Android Device; (4) Windows PC; and (5) Apple Device are devices that can be used to view a "fraudulent IPTV service."  The Sandvine Report clarifies that each platform "can use completely legal, fee-paid services, as an alternative to a cable or satellite connection, but modified with piracy configured add-ons to access premium content."  The remainder expands upon those legitimate uses. There is neither data nor a conclusion in the Sandvine Report (or anywhere else) to support Bari's opinion that 95% of STBs sold by Infomir are used for piracy.

[64] Bari T. 75:1-11.

[65] ECF 300 ¶¶8-13.

[66] Dietrich T. 142:24-144:2; 41:11-14.

**E. Bari's Technology Opinions Are Inadmissible As No STB Manufacturer Uses Bari's 4-Part Holistic Anti-Piracy Toolkit Which Bari Admits Will Not Prevent IPTV Piracy.**

Although Bari concedes that a STB "does not distinguish by itself" between a licensed or unlicensed IPTV stream, and that "there is no perfect system that can prevent piracy,"[67] he opines about four (4) specific technological measures he contends are part of the "holistic toolkit … with regard to the antipiracy measures that a set top box manufacturer could utilize" which "can aid or assist in mitigating infringing content being streamed."[68]   The four technologies which self-described non-engineer Bari opines as part of that "toolkit" are:

(1) Blocking infringing content sources by updating firmware;

(2) Using "HTTPS" (Hypertext Transfer Protocol Secure) security which respects the secure transfer of data and can enable industry blacklisting capabilities;

(3) Blocking MAC (media access control) addresses of STBs used by pirates;

(4) Selling STBs and devices loaded with Digital Rights Management (DRM) software such as Verimatrix which permits legitimate content owners to audit usage and facilitate licensing payment.[69]

This entire line of testimony is inadmissible because it is not derived from any industry standard and Bari is unaware of any STB manufacturer which implements his "holistic toolkit" and concedes that these four tools, either individually or in concert, would not prevent an STB from receiving unlicensed IPTV content available from third-party websites on the internet.[70]

*First,* Bari opines that Infomir LLC should prevent piracy by issuing "firmware update[s] of the STB that blocks access to piracy portals."[71]   As discussed *supra,* Infomir-brand STBs, in their default state, do receive firmware updates which provide limited blocking to certain portals.[72]

---

[67] Bari T. 92:10-13; 40:8-11.
[68] Bari T. 42:4-7; 40:8-15.
[69] Bari Rpt. ¶28(c).
[70] See Bari T. 36:24; 40:22-41:2; 41:23-42:10; 100:6-22.
[71] Bari Rpt. at ¶64.
[72] ECF300¶30.

Indeed, they are the only STBs identified in this litigation to do so.  This type of "portal blacklisting" is not effective as an IPTV anti-piracy measure, as explained by computer scientist Christopher Rucinski.[73]  But more fundamentally, the STBs demonstrated to Bari had been "downgraded" by counsel to remove this limited protection[74] – enabling Bari's fictitious analysis. Bari did not examine any STB firmware and he did not document the date of the firmware that was running on any of the STBs used in the demonstrations.[75]  So Bari bases his testimony about the anti-piracy protection he believes (incorrectly) exists on the STBs solely on "[his] external observation and viewing of the demonstration…"[76] and what Dunnington told him, per his report.

Bari may not testify that Infomir-brand STBs should include stronger URL or website "blacklisting" protections to satisfy an industry standard, because Bari is not aware of any STB manufacturer which engages in "blacklisting."[77]  Bari may not testify that "blacklisting" is an effective or industry standard or required or expected feature in the absence of any objective basis.

*Second*, Bari opines "[i]t is standard practice to secure content with hypertext transfer protocol secure ("https") internet communication protocol that secures data between the user's device and the source of the data."[78]  Https is a form of encryption that protects content from being intercepted while travelling *en route* from the content server to the recipient device,[79] which is not the allegation in this case; all of the allegedly unlicensed IPTV broadcasts Bari was shown were

---

[73] Rucinski Report § VII ("I also disagree with Bari's opinions suggesting that blacklisting by any individual STB device manufacturer is an effective or practical means to restrict or prevent broadcast of unlicensed IPTV content.") and § IX ("Attempting to counteract alleged infringement by updating firmware that blacklists domains is not an effective or practical solution for Infomir to restrict or prevent broadcast of unlicensed IPTV content in general.").
[74] Leviss Decl.¶10.
[75] Bari T. at 13:22-25; 66:23-67:5.
[76] See Bari Rpt. ⁋ 107.
[77] Bari T 99:6-16 ("Do I know specific set-top box manufacturers [that implement blacklisting]?  The answer is no.").
[78] Bari Rpt. ⁋ 63.
[79] See generally Bari Rpt. at ⁋ 63, citing article, which states: "HTTPS (Hypertext Transfer Protocol Secure) is an internet communication protocol that protects the integrity and confidentiality of data between the user's computer and the site."

streamed unencrypted[80] and there is no claim that broadcasts to Infomir-brand STBs are being intercepted by "pirates."  Bari admits he is not aware of any standard requiring https capability for IPTV STBs[81] or with respect to the related technology of extended validation certificates.[82]  In attempting to support this opinion, Bari refers to several publications and internet articles (that were provided to him by plaintiffs' attorneys), none of which addresses "https" security nor extended "validation certificates" in context of STB manufacturers or discussed an industry standard.[83]  Bari has no statistical or other evidence suggesting that https communications are more likely to include licensed content than http broadcasts making Bari's opinion mere speculation.

Bari also concedes that installing https capability on an Infomir-brand STB would not prevent receipt of unlicensed content.[84]  All experts agree on this point.[85]  The alleged third-party "pirates" identified by plaintiffs to date use both http and https.[86]

*Third*, Bari opines that Infomir-brand STBs should block "MAC" addresses of individual STBs used by pirates.  Bari explains that a Media Access Control (MAC) address is "a unique number" assigned to a "device such as an STB."[87]  He opines that as part of the "holistic toolkit", a STB distributor may "block the MAC address of an infringer."[88]  As with the other technologies Bari cannot explain how MAC address blocking could prevent a STB from displaying unencrypted

---

[80] Bari T. 38:25-39:2.
[81] Bari T 100:12-19 ("I'm not aware of a particular industry standard that says [https] required of a particular set-top box, but in general it's my opinion that it's one of the measures of a toolkit for antipiracy.").
[82] Bari T. 102:15-21.
[83]  See ECF 752-18 Jones & Foo, Analyzing the Modern OTT Piracy Video Ecosystem (containing no reference to "https"). See also Bari Rpt. at ¶63 (citing websites which do not discuss IPTV STBs).
[84] Bari T. 100:6-19.
[85] See e.g. Rosenblatt Report I ¶67 ("Unlicensed content services may or may not use HTTPS, just as licensed content services (or other websites) may or may not use HTTPS.").
[86] See Rosenblatt Rpt. Par 12 citing Exhibits to Bari Rpt.
[87] Bari Rpt. ¶ 62.
[88] Bari Rpt. ¶64.

content that the box receives, such as the broadcasts which were demonstrated to him.[89] There is no evidence anywhere that any STB manufacturer engages in MAC address blocking.

*Fourth*, Bari identifies Digital Rights Management capability ("DRM") -- a broad term for different signal encryption systems developed by various companies -- as a "tool" which an STB "may have …to protect the television programming content."[90]  Again, Bari speculates, without evidence, that DRM use is more consistent with licensed than unlicensed broadcasts.[91]  Bari admits that DRM would not prevent a STB from receiving and displaying unlicensed or unencrypted IPTV content,[92] including all of the "pirated" IPTV content that Bari was shown by plaintiffs' attorneys during the demonstrations, which was unencrypted.[93]

Although Bari opines that DRM should be included on all STBs not intended for piracy, Bari did not know (as documents relied on by plaintiffs' rebuttal expert show) that the Infomir-brand STBs discussed in Bari's report come preloaded with "Secure Media" DRM.[94]  Bari did not conduct any tests of those devices and limited his inspection to an "external observation," which would not show DRM software.[95]  As explained by plaintiffs' counsel, such testing is outside Bari's technical capability.[96]  Bari also does not know if plaintiffs require their own licensed distributors, including Kartina, to use DRM in the distribution and broadcast of plaintiffs' IPTV programming, despite his opinion about DRM being a universally required anti-piracy function.[97]

---

[89] Bari T. at 41:23-42:10 (Q. How would MAC address blocking prevent a set-top box from displaying unencrypted content that the box receives? … A. I don't know -- I don't know the exact answer to that.).
[90] Bari Rpt. ¶ 60.
[91] Bari Rpt. ¶91 ("**In theory**, Pirate Portals would have no reason to include DRM protections or other conditional access protections…").
[92] Bari T. 40:22-41:2.
[93] Bari T. 38:13-39:2.
[94] See August 4, 2020 Report of Dmitri Dietrich, Exhibit D to Leviss Decl., at Exhibits 6-7 (DDRR71 and 74).
[95] Bari Rpt. ¶107.
[96] 3/5/20 T 10:6-21.
[97] Bari T. 98:14-17.

In fact, plaintiffs do *not* use DRM when broadcasting their content over IPTV, a fact which alone objectively proves the unreliability of Bari's opinions.[98]

Bari's "holistic toolkit" is not used by any other STB manufacture, is not supported by or consistent with any industry standard, and he concedes it would be ineffective to combat the receipt of unlicensed IPTV content.  Accordingly, Bari's opinion is inadmissible and must be excluded.

**III.   DIETRICH MUST BE EXCLUDED AS AN EXPERT WITNESS BECAUSE HE IS A PARTISAN WHO HAS GIVEN FALSE EVIDENCE, EXCEEDS THE SCOPE OF REBUTTAL OPINIONS AND LACKS A RELIABLE BASIS FOR HIS OPINIONS.**

**A. Plaintiffs' Proposed Rebuttal Expert, Dmitri Dietrich, Helped Incept and Prosecute this Lawsuit, and has Participated in Fabrication of Excluded Evidence.**

The Court should not tolerate Kartina senior executive Dmitri Dietrich as plaintiffs' rebuttal expert witness given his involvement as Plaintiffs' counsel's client in this case, proven participation in the fabrication of now-stricken evidence, propagation of false testimony and participation in serial bad-faith litigation. Casting Dietrich as anything other than a partisan is intellectually dishonest.  Dietrich is diametrically contraposed to the concept of an 'objective expert' -- a disconnect which cannot be remedied by cross-examination and requires complete exclusion.

"An expert may be excluded if the expert has a clear conflict of interest or bias of an extraordinary degree."[99]  While some bias may be intrinsic to the role of a trial expert, "[w]here an expert becomes an advocate for a cause, he therefore departs from the ranks of an objective expert witness, and any resulting testimony would be unfairly prejudicial and misleading."[100]

---

[98] Dmitri Dietrich Deposition ("Dietrich T")., Exhibit E to Leviss Decl. at 22:2-23:4; 39:25-40:2.

[99] El Ansari v. Graham, 2019 WL 3526714, at *8 (S.D.N.Y. Aug. 2, 2019) (collecting cases).

[100] Viterbo v. Dow Chem. Co., 646 F. Supp. 1420, 1425 (E.D. Tex. 1986), aff'd, 826 F.2d 420 (5th Cir. 1987) (cited with approval by the Second Circuit in Proteus Books Ltd. v. Cherry Lane Music Co., 873 F.2d 502 (2d Cir. 1989)). Lippe v. Bairnco Corp., 288 B.R. 678, 688 (S.D.N.Y. 2003) (excluding expert witness, who had formerly served as party's attorney, on the basis of unacceptable bias), aff'd, 99 Fed. Appx. 274 (2d Cir. 2004).

Exclusion is warranted where a party has gone "too far" in selecting an interested party as an expert.[101] An improperly biased expert should be excluded under F.R.E. 403 because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."[102]

Dietrich is Kartina's Chief Technical Officer.[103] The Court has recognized Kartina as a *de facto* party as it, not plaintiffs, retained Dunnington and "pays plaintiffs' legal fees and coordinates their legal strategy."[104] Dunnington represents Kartina in this action.[105] In his executive status at Kartina, Dietrich personally coordinates with Dunnington to initiate legal actions against entities that his department determines to be "pirates."[106] Dietrich has participated meaningfully as the client in the prosecution of this litigation, engaging in over 500 attorney/client privileged communications with Dunnington on behalf of plaintiffs[107] and has "repeatedly invoked the attorney-client privilege and/or work product doctrine to shield [Kartina's] activity."[108]

Dietrich provided both fact and expert evidence in this case, including testimony at a sanctions hearing in 2019.[109] That proceeding and the parties' related submissions revealed it was Dietrich who taught plaintiffs' counsel how to conduct the Wireshark investigation and analyze its results and coordinated instructional sessions to educate counsel,[110] and he submitted sworn statements in which he advocated and opined in support of evidence that was later stricken by the

---

[101] Lippe, 288 B.R. at 688. See also Perfect 10, Inc. v. Giganews, Inc., 2014 WL 10894452, at *5 (C.D. Cal. Oct. 31, 2014) (excluding interested expert witness to "promote public confidence in the legal system.")
[102] See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 595 (199) quoting JACK B. WEINSTEIN (FNaa), Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991).
[103] ECF 855 at 1.
[104] Id.
[105] ECF 619, 620 and 621.
[106] See Dietrich T. 53:20-54:2; 88:19-89:25; 92:15-20 (we only give boxes to Dunnington for further monitoring if my colleagues identify that these boxes have to deal with piracy or they were accompanied by instructions of how to pirate content.").  See also October 28, 2020 Deposition Transcript of Dmitri Dietrich, Exhibit F to Leviss Decl., T 158:2-7 (referring to Dunnington as "the company which we help with technical consultation.").
[107] See ECF 694 at ¶13.
[108] ECF 779 at 7.
[109] ECF 855 at 1-2
[110] ECF 779 at 30

Court, including defending misconduct which the Court described as "aggressively willful."[111] The Court specifically faulted Dietrich's omission in allowing plaintiffs to perpetuate numerous false presentations of the evidence he assisted to create, without correction.[112]

Dietrich's direct involvement in that conduct demonstrates his willingness to use his technical knowledge to any and all means, including deceiving the Court, to advance plaintiffs' claims. During that February 6, 2019 sanctions hearing, Dietrich testified – falsely – in open court that Kartina was then presently a licensed broadcaster of plaintiff Channel One Russia.[113] This representation was not true when it was made, as Channel One had publicized, on December 28, 2018 that its license agreements with Kartina were terminated and that Kartina's continued distribution of Channel One programming was illegal.[114] Channel One has since publicly identified Kartina as a "pirate"[115] The status of the relationship between Channel One and Kartina outside of this case has not been addressed by plaintiffs, Kartina nor Dunnington but Kartina remains, along with plaintiffs, a client of Dunnington.[116] Dietrich's active role in facilitating "piracy" of plaintiffs' content during this case renders him unfit to appear as an expert witness to impugn Infomir LLC's anti-piracy efforts and makes his testimony objectively unreliable.

The pattern of bad faith and deceptive conduct by Kartina and Dietrich has been demonstrated in several parallel judicial proceedings. Kartina is presently being sued in a separate action, by a former defendant in this action, Actava TV, Inc., for its "remarkable and relentless

---

[111] ECF 779 at 3 and 66.

[112] Id. at 62 ("The question is further complicated by the involvement of a non-party client, Kartina, which helped Dunnington set up the Wireshark Investigation but failed to provide even the minimal follow-up that would have alerted counsel to the central inaccuracy in the Vidulich Affidavit.").

[113] 2/6/19 T. at 110:5-10 ("Q. And Kartina today, February 6, 2019, is broadcasting Channel One programming; correct? A. That's right, yes. Q. And Kartina today, February 6, 2019, is licensed by Channel One to broadcast this programming; correct? A. That's right, yes."). (ECF733)

[114] Exhibit H to Leviss Decl.

[115] Exhibit I to Leviss Decl.

[116] ECF275 at 1 in Joint Stock Co. v. Russian TV Company (18-cv-2318)(LGS)(BCM)(USDC-SDNY)

effort … to marshal the judicial process to target – and virtually destroy – Actava…"[117]  In another proceeding, defendant Russian TV Company, Inc., has demonstrated that Kartina "concealed from the Court" that it sold the IPTV access codes it now alleges are infringing.[118]

In addition, Dunnington used Dietrich's designation as an "expert witness" to circumvent the Court's Confidentiality Order[119] providing him documents designated "CONFIDENTIAL – ATTORNEYS' AND EXPERTS' EYES ONLY."[120]  This allowed a Kartina senior executive access to documents which Dunnington was prohibited from disclosing to any of its clients.[121]

Against this background, Dietrich cannot credibly be presented as anything other than a partisan -- and certainly not as an expert with even a modicum of objectivity.  Dietrich has far "depart[ed] from the ranks of an objective expert witness, and [his] resulting testimony would be unfairly prejudicial and misleading…"[122] and would not "help the trier of fact to understand the evidence or determine a fact in issue…" Fed. R. Evid. 702(a) and 403.  Exclusion of Dietrich's opinion testimony is the only equitable remedy to counterbalance the abuse of the expert process.  Any prejudice to plaintiffs is self-inflicted because they made a deliberate, if confounding, decision to select Dietrich as their rebuttal expert.

**B. Dietrich Should Be Barred from Offering Opinions Which Exceed The Scope Of A Rebuttal Expert Report.**

---

[117] ECF 38 in Actava TV, Inc., et al. v. Kartina Digital GmbH, et al. 1:18-cv-6626 (USDC-SDNY)
[118] ECF 270 in Joint Stock Co. v Russian TV Company, Inc. et al. 18-cv-2318.
[119] ECF 504.
[120] Exhibits 63-69 to Dietrich Rpt. have been excluded from this submission to preserve confidentiality.  They consist of invoices, royalty reports and similar confidential business information relating to integration of Verimatrix DRM into certain Infomir-brand STBs.  The documents will be provided to the Court, along with an application to seal, if requested.  See discussion at Leviss Decl. ¶¶ 6-7.
[121] ECF 504 at ¶9.
[122] Viterbo v. Dow Chem. Co., 646 F. Supp. 1420, 1426 (E.D. Tex. 1986), aff'd, 826 F.2d 420 (5th Cir. 1987) (noting "great possibility of misleading the jury through the creation of a false aura of scientific infallibility through the use of such testimony.").

Although couched as a "rebuttal," Dietrich's Report is plaintiffs' latest attempt to start over, seeking to introduce seventy-six (76) exhibits, constituting 793 pages of documentation, some in the Russian language, the overwhelming majority of which are previously undisclosed materials sourced from third-party internet sites.[123]   Dietrich also presents a new 'theory' of liability against Infomir LLC, regarding a never-before-mentioned "embedded portal" feature of an STB. Plaintiffs' affirmative expert, Bari, does not discuss or offer any opinion involving an "embedded portal."[124]   Neither does defense affirmative expert William Rosenblatt.

Rule 26(a)(2)(B)(I) requires that an initial expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Rule 26(a)(2)(D)(ii) allows the admission of rebuttal testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party ...." "A rebuttal expert report is not the proper place for presenting new legal arguments, unless presenting those arguments is substantially justified and causes no prejudice."[125]

The term "embedded portal" appears fifty-five (55) times in Dietrich's Report.  A large portion of the Dietrich Report is dedicated to (conclusory and independently excludable) attacks on the "embedded portal," which is never clearly defined or identified.[126]  Without conducting any scientific tests or experiments, and relying solely upon cherry-picked portions of internet documentation, Dietrich makes sweeping and technical claims about the DRM capability of the

---

[123] See Exhibit D to Leviss Decl.
[124] Bari T 34:12-17.
[125] Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (citing Ebbert v. Nassau Cty., 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008) (granting "motion to strike the newly added portions of the Rebuttal Report that should have been disclosed in the Initial Report…" due to prejudice arising from closed discovery and lack of "inadvertence.")).  See also McDermott v. Liberty Mar. Corp., 2011 WL 13300062, at *11 (E.D.N.Y. May 13, 2011) (striking improper rebuttal report) (citing Crowley v. Chait, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (a rebuttal report is not "an opportunity for the correction of any oversights in the plaintiff's case in chief.").
[126] Dietrich Rpt. ¶72-102; 139-152.

software supposedly underlying the "embedded portal," which he opines is insufficient[127]   Dietrich

"conclude[s] that the embedded portal is designed primarily for piracy…" and that "Infomir's use

of a preinstalled web-based embedded portal … creates an ideal platform for piracy."[128]   Dietrich

repeatedly criticizes Rosenblatt for "failing to consider" the "embedded portal."[129]

      The websites relied upon by Dietrich explain that the "embedded portal" is nothing more

than a window-based menu that "provides the "user interface for convenient configuration and

control of STBs operation on accessing media resources"– analogous to a computer desktop to

navigate the STB.[130]   But the lack of substance to this entirely new legal theory does not alter the

evident purpose of Dietrich's Report, which is to circumvent plaintiffs' decision to a utilize

"business and non-engineering" expert Bari who offers no opinions about any "embedded portal".

      Plaintiffs' effort to inject an entirely new theory of liability at the rebuttal expert phase is

intentionally prejudicial, depriving Infomir LLC of the opportunity to have taken relevant

discovery, to test or perform experiments to understand and discredit the assertions, and to

otherwise pose the issue to its experts.   This cannot be accomplished now because Dietrich

conducted no actual experiments, fails to effectively define the "embedded portal," and uses it

interchangeably with other applications, so that his opinions are unclear, impeding fair rebuttal.[131]

      Dietrich's report should be excluded for impermissibly exceeding the scope of rebuttal

testimony, including the voluminous exhibits improperly attached thereto.

---

[127] See generally Dietrich Rpt. ¶140-151.

[128] Id. at ¶102.

[129]  Dietrich Rpt. ¶21 "Rosenblatt failed to examine the DRM-less **embedded portal** feature on Infomir STBs, a built-in method of obtaining pirated content, which contradicts Rosenblatt's conclusions;" "As detailed above, Rosenblatt fails to opine about the **embedded portal** found on Linux-based STBs like the MAG 254." ¶140; "Rosenblatt ignored the **embedded portal** feature on the STB." ¶84; "On March 16, 2020, I simulated the customer configuration that Rosenblatt failed to do in the Rosenblatt Report, i.e. configuring **the embedded portal** on an STB." ¶90; "Rosenblatt … failed to configure **the embedded portal**, which is necessary for the IPTV Channels feature he examined to work." ¶98.

[130] Dietrich Rpt. ¶ 140 and https://wiki.infomir.eu/eng/set-top-box/stb-linux-webkit/embedded-portal/main-menu.

[131] Dietrich Rpt. ¶72-102; 139-152.

### C. Dietrich's Report Must Be Excluded as Lacking a Reliable Factual Basis.

Even as a rebuttal expert, Dietrich's opinions remain subject to the *Daubert* standard.[132] "The district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."[133] "[E]xpert testimony should be excluded altogether if it is 'speculative' or 'conjectural' or if it is based on assumptions 'so unrealistic and contradictory as to suggest bad faith.'"[134] "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."[135]

Such a significant critical mass of Dietrich's report lacks a factual basis, or consists of mere conjecture or allegation, that the entirety of his testimony is unreliable and must be excluded.

*First*, Dietrich cannot be permitted testify that the "primary" use of STBs sold by Infomir LLC is piracy.[136]  Dietrich's opinions and his report are devoid of any methodology to determine the "primary" use of Infomir-brand STBs and he offers no cogent explanation for how his opinion was reached.  He provides no usage data, statistical evidence, or other objective basis to support that sweeping and conclusory allegation.[137]  While claiming there is "no evidentiary support" that

---

[132]  Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 44 (S.D.N.Y. 2016) ("At a minimum, however, rebuttal experts must  meet Daubert's threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony.").

[133]  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002).

[134]  Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003) (citing Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)).

[135]  General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

[136]  See, e.g., Dietrich Rpt. ¶17 ("Infomir sells a platform of hardware, software, and services that's primary purpose is to enable piracy."); ¶39 ("…the primary and overwhelming use of Infomir's STBs is to promote access to infringing content."); ¶43 ("…Infomir's knows piracy is the primary use of its MAG STBs").

[137]  Dietrich, in fact, admits that he lacks such evidence while attempting to impeach Rosenblatt's report, stating "without evidence of [Infomir LLC's] market information, Rosenblatt cannot conclude that these STBs have substantial non-infringing uses or indeed if they are sold at all."  Dietrich Rpt. ¶37.  Dietrich's criticism is entirely incorrect as – unlike Dietrich -- Rosenblatt identifies a significant number of services which use Infomir-brand products, which Dietrich chooses to ignore.

Infomir STBs are used by "legitimate customers," Dietrich simultaneously concedes that Infomir-brand STBs are compatible with Kartina[138] and Megogo,[139] such that this opinion is proven false. Dietrich does not address or dispute the numerous other legitimate services identified by Infomir LLC and discussed by its affirmative expert, other than to characterize them as a "seemingly small user base of licensed providers" – again without any underlying data.[140] Dietrich must be precluded from offering opinions about the "primary" usage of Infomir-brand STBs.

*Second*, Dietrich's opinion that "pirate operators" broadcast without DRM, while legitimate operators require DRM,[141] is inadmissible because there is simply no data, evidence or study to support it. Dietrich admits that Kartina (the company for which he is CTO) broadcasts IPTV content globally (including plaintiffs' content), <u>without encryption or DRM</u>:[142]

> Q. So what content protection scheme does Kartina use when it's broadcasting non-German channels outside of Germany?
> A: We don't use any.
>
> ***
>
> Q. So is it accurate then that a large majority of the content providers that Kartina broadcasts are being broadcast without content protection at this time?
> A. Yes, right.
>
> ***
>
> Q. So outside of Germany that content is broadcast without DRM, correct?
> A. Correct, yes.[143]

Dietrich confirmed that Kartina does not use a DRM system because "[o]ur partners do not have content that needs to be protected by DRM systems."[144] Dietrich was referring to the "50

---

[138] Dietrich T. 33:18 - 41:14.
[139] Dietrich T. 116:5 - 118:20.
[140] Dietrich Rpt. ¶39.
[141] See, e.g., Dietrich Rpt. ¶68 ("Based on my industry experience, I know that legal operators would prefer a platform STB that they can comply with its licensor DRM requirements"); ¶69 ("By contrast, pirate operators have little interests in DRMs because they have no licensors or need for DRM protections"); ¶127 ("In other words, an authorized distributor would require DRMs, while a pirate operator would not.").
[142] Note that this testimony includes both Channel One (which Kartina has not been licensed to broadcast, and other plaintiffs, which Kartina has been licensed to broadcast).
[143] Dietrich T. 39:25-40:2.
[144] Dietrich T. 80:7-23.

companies" -- including several plaintiffs in this case -- that provide the media content which is "broadcast by Kartina without DRM protection."[145] Dietrich either does not believe his own opinion or he believes it applies only to Infomir LLC, but either way it is not admissible. Dietrich admits that his opinions about DRM usage are based on his "industry experience"[146] as "these technologies didn't really exist" when he completed his education.[147] Dietrich may not offer opinions that are contradicted by his actual experience and have no basis in fact.[148]

*Third*, Dietrich cannot testify the Infomir-brand STBs lack DRM capability because that opinion is contradicted by the very documents he relies upon.[149] All of the Infomir-brand STBs at issue *do* come pre-loaded with DRM software -- called "Secure Media." This is plainly stated in the technical documentation which Dietrich relies upon and has attached to his report (DDRR71 and DDRR74), which state that the MAG254 and MAG256 come preloaded with "Secure Media" DRM software. Dietrich's claim that those STBs lack DRM is based solely upon a (deliberate?) misreading of those unambiguous documents.[150] Dietrich does not dispute that Secure Media is DRM.[151] He just pretends that it does not exist. This not an acceptable method of technical inquiry and cannot be admitted.

*Fourth*, Dietrich may not testify that "Infomir's website advertises instructions explaining how to configure an Infomir STB for piracy."[152] At his deposition, Dietrich was asked to identify

---

[145] Dietrich T. 40:3-9; 21:16-23:4.
[146] See Dietrich Rpt. ¶68 (<u>Based on my industry experience</u>, I know that legal operators would prefer a platform STB that they can comply with its licensor DRM requirements") (emphasis added).
[147] Dietrich T. 18:4-19:7.
[148] Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").
[149] See Dietrich Rpt. ¶36 ("As detailed below, the MAG 254 and alfabox7 do not have built in DRMs and DRMs cannot be installed on the portals of these STBs.").
[150] Dietrich T. 77:10-78:8.
[151] Dietrich T. 79:10-80:14.
[152] Dietrich Rpt. ¶21.

evidence to support this claim and was unable to do so.[153]   No such evidence exists.  Absent a

factual evidentiary basis, an expert's opinion is speculative and inadmissible.[154]

*Fifth*, Dietrich may not testify that "MAGic Solution is a service Infomir uses to enable

and encourage piracy."[155]   Dietrich was unable to identify any MAGic Solutions customer that

"broadcasts IPTV content that [Dietrich] believe[s] is unlicensed."[156]  There are no such customers.

*Sixth*, Dietrich may not testify that Stalker/Ministra middleware "create a platform for

industrial scale piracy," that they "create[] an ideal platform for piracy" or is otherwise a basis for

liability.[157]   Dietrich acknowledges that middleware is "necessary," and not "illegal;" that the

"operator [not the middleware provider] decides whether the content is licensed or unlicensed;"

that the same middleware system will function identically with either licensed or unlicensed

content; and that middleware does not "detect which a source server is providing licensed or

unlicensed content."[158]   Dietrich confirmed that Ministra/Stalker performs each of the functions

that a middleware software would be expected to perform, and does not perform any additional

illegal functions.[159]

Exclusion of Dietrich as an expert witness is the only appropriate remedy, given the

pervasiveness of speculation and junk science underlying his opinions, coupled with his incurable

bias and the prejudice caused to Infomir LLC by plaintiffs' abuse of the rebuttal expert procedure.

---

[153] Dietrich T. 99:4-115:25. (Mr. Dowd: "You've made your point that he's unable to located this…").

[154] Amorgianos, supra, 303 F.3d. at 267.

[155] Dietrich Rpt. ¶193; See also Id. at ¶17 ("Infomir sells a platform of hardware, software, and services that's primary purpose is is to enable piracy. The hardware is the MAG STB. The software is Stalker middleware. The service is the MAGic solution.").

[156] Dietrich T. 197:2-197:7 ("Q. and do you have any examples of any customer that purchased Magic Solutions that broadcast IPTV content that you believe is unlicensed? A. It's a good question, but I can't recall right now").

[157] Dieterich Rpt. ¶¶ 17, 20, 173.

[158] Dietrich T. 151:12-152:19 ("And does middleware detect whether the source server is providing licensed or unlicensed content? A. No. It's the role of the people that tune up the middleware system. Q. The operator decides whether the content is licensed or unlicensed, correct? A. Correct.").

[159] Dietrich T. 165:11-171:3.  Dietrich briefly identified "MAC Address identification" as a feature that he believes is related to piracy, but did not provide any explanation.  That testimony is irrelevant because Dietrich then explained that he was referring to an older STB model which is not at issue, and that the feature "disappeared" after that model.

## CONCLUSION

For the foregoing reasons it is respectfully requested that the Court enter an order excluding

Jonathan H. Bari and Dmitri Dietrich as expert witnesses in this civil action.

Respectfully submitted,

*/s/ STEWART M. LEVISS*

Dated: February 16, 2021                        STEWART M. LEVISS, ESQ.